FILED

2009 JAN 27  PM 1: 04

CLERK U.S. DISTRICT COURT
CENTRAL DIST. O. CALIF.
LOS ANGELES

BY _____

1  DAVID J. STEELE, CA Bar No. 209797
   Email:  djslit@cph.com
2  CHRISTIE, PARKER & HALE, LLP
   3501 Jamboree Road, Suite 6000-North Tower
3  Newport Beach, CA  92660
   Telephone: (949) 476-0757
4  Facsimile: (949) 476-8640

5  HOWARD A. KROLL, CA Bar No. 100981
   Email:  howard.kroll@cph.com
6  CHRISTIE, PARKER & HALE, LLP
   350 W. Colorado Boulevard, Suite 500
7  Pasadena, CA  91105
   Telephone: (626) 795-9900
8  Facsimile: (626) 577-8800

9  SARAH B. DEUTSCH (*pro hac vice* pending)
   Email:  sarah.b.deutsch@verizon.com
10 VERIZON CORPORATE SERVICES GROUP LLC
   1320 North Court House Road, Suite 900
11 Arlington, VA  22201
   Telephone: (703) 351-3044
12 Facsimile:  (703) 351-3670

13 Attorneys for Plaintiffs
   VERIZON CALIFORNIA INC.
14 VERIZON TRADEMARK SERVICES LLC
   VERIZON LICENSING COMPANY

15

16              UNITED STATES DISTRICT COURT

17              CENTRAL DISTRICT OF CALIFORNIA

18                     WESTERN DIVISION

19

20  VERIZON CALIFORNIA INC.;          Case No.  CV09-0613 CAS (JCx)
    VERIZON TRADEMARK SERVICES
21  LLC; and VERIZON LICENSING         NOTICE OF MOTION AND
    COMPANY,                           MOTION FOR TEMPORARY
22                                     RESTRAINING ORDER AND
                  Plaintiffs,          FOR A PRELIMINARY
23                                     INJUNCTION; MEMORANDUM
          vs.                          OF POINTS AND
24                                     AUTHORITIES IN SUPPORT OF
    LEAD NETWORKS DOMAINS PVT.         MOTION
25  LTD; NARESH MALIK a/k/a NICK M.;   *[An application requesting this
    MAHESH MALIK; KEVIN DASTE; and     document be filed under seal is being
26  DOES 1-100;                        concurrently filed herewith.]*

                  Defendants.
27

28

CHRISTIE, PARKER & HALE, LLP

1
2
**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................1

II.   STATEMENT OF FACTS ....................................................................3

      A.   Plaintiffs' Business and Their Trademarks ................................3

      B.   Defendants' Unlawful Cybersquatting Operations ....................5

III.  PLAINTIFFS ARE ENTITLED TO A TRO ENJOINING
      DEFENDANTS' UNLAWFUL ACTIVITIES TO PREVENT
      FURTHER IRREPARABLE HARM....................................................7

      A.   Standard For Granting Injunctive Relief....................................7

      B.   Plaintiffs Are Likely To Succeed On The Merits Of Their
           Claim Against Defendants For Cybersquatting .........................8

           1.   Defendants' Registration And Use Of Domain Names.............8

           2.   The Domain Names Are Confusingly Similar to
                Plaintiffs' Distinctive and Famous Marks ...................................8

                a)   The VERIZON Marks Are Distinctive And Famous.............8

                b)   Defendants have Registered At Least 238 Domain
                     Names That Are Confusingly Similar To Plaintiff's
                     Marks ................................................................................10

           3.   Defendants' Bad Faith Intent To Profit From The Marks........12

                a)   The trademark or other intellectual property rights of
                     the person, if any, in the domain name (15 U.S.C.
                     § 1125(d)(1)(B)(i)(I)) ......................................................13

                b)   The extent to which the domain name consists of the
                     legal name of the person or a name that is otherwise
                     commonly used to identify that person (15 U.S.C.
                     § 1125(d)(1)(B)(i)(II)) .....................................................13

                c)   The person's prior use, if any, of the domain name in
                     connection with the bona fide offering of any goods or
                     services (15 U.S.C. § 1125(d)(1)(B)(i)(III)) ....................13

                d)   The person's bona fide noncommercial or fair use of
                     the mark in a site accessible under the domain name
                     (15 U.S.C. § 1125(d)(1)(B)(i)(IV)) ..................................14

e)   The person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site (15 U.S.C. § 125(d)(1)(B)(i)(V)).................................................14

f)   The person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct (15 U.S.C. § 1125(d)(1)(B)(i)(VI)) ...............................17

g)   The person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct (15 U.S.C. § 1125(d)(1)(B)(i)(VII)).................................17

h)   The person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties (15 U.S.C. § 1125(d)(1)(B)(i)(VIII)) ....................................18

i)   The extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of section 43 (15 U.S.C. § 1125(d)(1)(B)(i)(IX)) ...............................................19

j)   Additional factors to be considered by the Court ....................19

C.   Irreparable Harm .........................................................................20

D.   The Balance Of Hardships Tips Decidedly In Favor Of Granting Preliminary Injunctive Relief................................................21

IV.   DEFENDANTS MUST BE RESTRAINED FROM DESTROYING AND MOVING EVIDENCE ........................................................23

V.   A BOND, IF REQUIRED AT ALL, SHOULD BE MINIMAL ..................24

VI.   CONCLUSION...........................................................................24

# TABLE OF AUTHORITIES

*American Home Products Corp. v. Johnson Chemical Co.,*
589 F.2d 103 (2d Cir. 1978) ..............................................................21

*Brookfield Commc'ns., Inc. v. West Coast Ent. Corp.,*
174 F.3d 1036 (9th Cir. 1999) ......................................................14, 20

*Burger King Corp. v. Majeed,*
805 F. Supp. 994 (S.D. Fla. 1992).....................................................22

*Fitzgerald Public Co., Inc. v. Baylor Public Co., Inc.,*
807 F.2d 1110 (2nd Cir. 1986) ..........................................................19

*Harrods Ltd. v. Sixty Internet Domain Names,*
157 F. Supp. 2d 658 (E.D. Va. 2001), *aff'd in part, rev'd in part,* 302
F.3d 214 (4th Cir. 2002) ..................................................................12

*Los Angeles Memorial Coliseum Com. v. National Football League,*
634 F.2d 1197 (9th Cir. 1980) ..........................................................21

*Louis Vuitton Malletier & Oakley, Inc. v. Veit,*
211 F. Supp. 2d 567 (E.D. Pa. 2002)...............................................19

*Metropolitan-Goldwyn-Mayer, Inc. v. American Honda Motor Co., Inc.,*
900 F. Supp. 1287 (C.D. Cal. 1995) ....................................................8

*N. Light Tech., Inc. v. N. Lights Club,*
236 F.3d 57 (1st Cir. 2001)...............................................................11

*Opticians Association of America v. Independent Opticians of America,*
920 F.2d 187 (3d Cir. 1990) .............................................................22

*Panavision International, L.P. v. Toeppen, et al.,*
141 F.3d 1316 (9th Cir. 1998) ..........................................................16

*Patsy's Brand v. I.O.B. Realty,*
58 U.S.P.Q. 2d 1048 (S.D.N.Y. 2001) ................................................9

*Processed Plastic Co. v. Commc'ns, Inc.,*
675 F.2d 852 (7th Cir. 1982) ............................................................22

*Senate of State of California v. Mosbacher,*
968 F.2d 974 (9th Cir. 1992).............................................................7

*Shields v. Zuccarini,*
254 F.3d 476 (3d Cir. 2001) .......................................... 11, 15, 18, 21

*Sporty's Farm L.L.C. v. Sportsman's Market, Inc.,*
202 F.3d 489 (2nd Cir. 2000) ...........................................................20

*Verizon California Inc et al v. Maltuzi LLC et al.,*
Case No. CV-07-01732-SVW (JC), (C.D. Cal. 2007) ......................11

CHRISTIE, PARKER & HALE, LLP

*Verizon California Inc., et al., v. Navigation Catalyst Systems, Inc.,*
    568 F. Supp. 2d 1088 (C.D. Cal. 2008) ..................................................11, 15

**STATUTES**

15 U.S.C. §1114(2) ..........................................................................................20

15 U.S.C. § 1116 ...............................................................................................1

15 U.S.C. § 1125(d) ........................................................ 7, 8, 9, 13, 14, 15, 17

15 U.S.C. § 1125(d)(1)(III) ........................................................................13, 17

15 U.S.C. § 1125(d)(1)(VIII) ...........................................................................18

15 U.S.C. § 1125(d)(1)(IX) ...............................................................................19

Fed.R.Civ.P. 64 ..................................................................................................1

Fed.R.Civ.P. 65(c) ............................................................................................22

S. Rep No. 106-140, 6-7 (1999) ......................................................................16

Rule 7-3        ........................................................................................................2

CHRISTIE, PARKER & HALE, LLP

PLEASE TAKE NOTICE that Plaintiffs Verizon California Inc., Verizon Trademark Services LLC, and Verizon Licensing Company ("Plaintiffs"), pursuant to Federal Rules of Civil Procedure 64 and 65 and 15 U.S.C. § 1116 hereby move this honorable Court to issue a temporary restraining order ("TRO"), and a preliminarily injunction upon expiration of the TRO, that would preliminarily enjoin Defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the TRO, from:

1.      Destroying, altering or transferring any records of their business activities, whether on paper, in electronic format, or on any other medium, and including, without limitation all accounting records and all logs or other documents relating to selecting, registering, trafficking in, monetizing, releasing, assigning, renewing, deleting, transferring, using and maintaining the 238 domain names that are confusingly similar to Plaintiffs' Marks;

2.      Transferring, releasing, deleting or assigning the 238 domain names confusingly similar to Plaintiffs' Marks;

3.      Registering or using any domain name that is identical or confusingly similar to Plaintiffs' Marks; and

4.      Assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to in paragraphs 1 through 3 above.

In support of their Motion, Plaintiffs submit this Memorandum, and the supporting Declarations of Janis M. Manning and Anne F. Bradley and rely on their Complaint, the contents of the Court's file to date, and such further evidence and argument as may be presented at the hearing on their Motion.

1         This Motion is subject to an application for an accelerated, *ex parte* hearing

2    and a motion to seal, since any advance notice to Defendants would likely cause

3    them to flee the jurisdiction and destroy evidence; accordingly, no Local Rule 7-3

4    pre-filing conference of counsel has been attempted.

5                                     CHRISTIE, PARKER & HALE, LLP

6

7

8    DATED:  January 27, 2009     By

9                                       David J. Steele
                                        Howard A. Kroll

10                                      Attorneys for Plaintiffs

11                                      VERIZON CALIFORNIA INC.
                                        VERIZON TRADEMARK SERVICES LLC

12                                      VERIZON LICENSING COMPANY

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

Plaintiffs Verizon California Inc., Verizon Trademark Services LLC, and Verizon Licensing Company (collectively "Plaintiffs") are owners or licensees of the famous trade names and trademarks VERIZON, VERIZON WIRELESS and the logo versions that include a "V Design" above or to the left of the word marks (the "VERIZON Marks"), FIOS and VERIZON FIOS (the "VERIZON FIOS Marks"), and the distinctive trade names and trademarks VZ, VZACCESS, VZEMAIL, VZGLOBAL, VZVOICE, VZW (the "VZ Marks"), (collectively "Plaintiffs' Marks").

Defendants Lead Networks Domains PVT. LTD, Naresh Malik a/k/a Nick M, and Mahesh Malik (collectively, the "Registrar Defendants") operate one of the largest and most nefarious cybersquatting schemes ever seen, having registered tens of thousands of domain names that are confusingly similar to famous trademarks and service marks.  The Registrar Defendants' portfolio of domain names reads like a who's who of corporate America, including obvious misspellings of many famous marks, including Plaintiffs' Marks.  In fact, the Registrar Defendants and defendant Kevin Daste ("Daste")[1] have registered at least 238 domain names that are identical or confusingly similar to Plaintiffs' Marks.  Declaration of Anne F. Bradley ("Bradley Decl.") ¶ 19 and Exhibit 14 to Bradley Decl.  Defendants are serial cybersquatters who, even after notice of their unlawful acts, refuse to cease their infringing activity.  Bradley Decl., ¶ 33-38, and Exhibits 23-28 to Bradley Decl.

The Registrar Defendants also provide a "service" to other cybersquatters (including to Daste) to avoid detection and to frustrate the transfer of unlawfully

---

[1]  The Registrar Defendants, Daste, and Does 1-100 are collectively referred to as "Defendants."

held domain names to trademark owners.  First, the Registrar Defendants hide the identity of the registrant of the unlawful domain names by using shell entities and fictitious businesses and providing false contact information in various public records and databases.  Bradley Decl., ¶ 15.

Second, when an infringing domain name is the subject of an administrative action under the Uniform Domain Name Dispute Resolution Policy (the "UDRP"), the Registrar Defendants change the listed owner to one of shell entities or fictitious businesses to hide the true registrant. After the UDRP decision orders the infringing domain name transferred, the Registrar Defendants then file procedurally-defective legal proceedings in India to further delay any transfer of the domain name[2] to the trademark owner. Bradley Decl., ¶ 33-38, and Exhibits 23-28 to Bradley Decl. Once the procedurally-defective legal proceedings has been filed and the transfer stopped, the Registrar Defendants then offer to sell the unlawful domain name to the trademark owner.  Bradley Decl., ¶ 50-51.

Plaintiffs seek an *ex parte* temporary restraining order ("TRO"), and a preliminarily injunction upon expiration of the TRO, enjoining Defendants from registering, using, and trafficking in infringing domain names and from destroying and moving evidence.  Plaintiffs have also filed a motion concurrently herewith for an order (1) granting accelerated discovery, and (2) temporarily sealing the file for this litigation until Defendants are served with these orders.

As discussed below, the requested relief is necessary to prevent further irreparable harm to Plaintiffs and Plaintiffs' Marks by restraining Defendants' cybersquatting activities. The requested relief also is necessary to prevent the loss or destruction of crucial evidence concerning those activities, the co-conspirators of Defendants in these illegal activities, and the extent of the damages to

---

[2] Under the UDRP, the Registrar Defendants must transfer the domain name to the trademark owner within 10 business days after the decision ordering the transfer is issued.

Plaintiffs. Defendants are highly likely to destroy evidence or move evidence out of the country if they receive notice of the filing of this action, and Plaintiffs will thus be deprived of an effective remedy unless the Court grants the requested relief.

## II.  STATEMENT OF FACTS

### A.  Plaintiffs' Business and Their Trademarks

In 2000, Bell Atlantic Corporation and GTE Corporation merged to form Verizon Communications Inc. ("Verizon Communications").  Today, Verizon Communications, its subsidiaries and affiliates, including Plaintiffs Verizon California Inc. ("Verizon California"), Verizon Trademark Services LLC ("Verizon Trademark Services") and Verizon Licensing Company ("Verizon Licensing"), form one of the largest, well-known telecommunications companies in the world.  Verizon Communications generates annual consolidated operating revenues of over 93 billion dollars.  Declaration of Janis M. Manning ("Manning Decl."), ¶ 3.

Verizon Trademark Services owns Plaintiffs' Marks.  Manning Decl., ¶ 4-6.[3]  Verizon Licensing is the exclusive licensor of Plaintiffs' Marks and has granted, directly or indirectly, licenses to use these marks to its parent company, Verizon Communications, and to the various Verizon Communications' subsidiaries (collectively referred to as the "Verizon Companies").  Manning Decl., ¶7.

The Verizon Companies, under Plaintiffs' Marks, provide a full array of communications and entertainment product and service offerings, including local, long distance, and wireless telephone services; Internet access; television services; phones; and related equipment.[4]  Manning Decl., ¶ 8.  Products and

---

[3] Copies of the registration certificates for each United States trademark registration are attached to the Manning Decl. as Exhibits A, B, and C.

[4] For example, the Verizon Companies use the VZ Marks to provide wireless

services provided under the VERIZON Marks reach one-third of the United States households, and more than one-third of Fortune 500 company headquarters, as well as the United States federal government. *Id*. The Verizon Companies have extensive operations in the United States and some of the Verizon Companies operate throughout the world. *Id*.

The Verizon Companies' main Internet websites using the VERIZON Marks feature information on many of the products and services of the Verizon Companies and can be accessed at the domain names verizon.com and verizon.net, which have used the VERIZON Marks since at least as early as June 2000, and verizonwireless.com which has used the VERIZON Marks since at least as early as April 2000. Manning Decl., ¶ 12, and Exhibit D to the Manning Decl. The Verizon Companies' main Internet websites using the VERIZON FIOS Marks featuring information on many of the products and services of the Verizon Companies can be accessed via the domain names verizon.com and verizonfios.com, which have used the VERIZON FIOS Marks since at least as early as August 2004. Manning Decl., ¶ 13, and Exhibit E to the Manning Decl. The Verizon Companies' main Internet websites using the VZ Marks and featuring information on many of the products and services of the Verizon Companies can be accessed via the domain names verizon.com, vzw.com, and vzw.msn.com. Manning Decl., ¶ 14, and Exhibit F to the Manning Decl.

Plaintiffs' Marks are widely known and recognized among consumers and members of the telecommunications industry in the United States, and are unique and distinctive. The Verizon Companies spend and have spent many millions of dollars each year to extensively advertise and promote VERIZON, VERIZON WIRELESS, VERIZON FIOS, VZ, and VZW branded products and services in

---

voice and data services to over 70.8 million customers nationwide. Manning Decl., ¶ 11. The Verizon Companies' wireline business uses the VERIZON Marks to provide telephone and broadband products and services to consumer and business customers in 25 states. Manning Decl., ¶ 16.

the United States through a variety of media, including television, radio, print advertisements, direct mail, trade shows, conferences, and the Internet.  Manning Decl., ¶ 15.  The Verizon Companies expend substantial effort and expense to protect Plaintiffs' Marks and the marks' distinctiveness in the marketplace.  *Id*.

### B.   Defendants' Unlawful Cybersquatting Operations

The Registrar Defendants operate a massive cybersquatting operation and have registered and used over 100,000 domain names; and, Daste has registered and used thousands of domain names (collectively "Defendants' Domain Names").  Bradley Decl., ¶ 10. The Registrar Defendants have registered many of these domain names for their own use, *i.e.* the Registrar Defendants, or one of their aliases, are both the registrar and registrant of Defendants' Domain Names. Bradley Decl., ¶ 9.  The Registrar Defendants have also actively participated and assisted in the cybersquatting of Daste and the Doe defendants in violation of Plaintiffs' trademark rights.

Many of Defendants' Domain Names are confusingly similar to trademarks owned by others ("Confusingly Similar Domain Names"), including trademarks that also serve as the names of some of the world's most well-known companies. Bradley Decl., ¶ 11.  The famous trademarks that Defendants have cybersquatted include:   AMERICAN  EXPRESS,  BANK  OF  AMERICA,  CINGULAR WIRELESS,  DIRECT  TV,  EHARMONY,  FORD  MOTORS,  GOOGLE, HARLEY DAVIDSON, ITT, J.C. PENNEY, KELLY BLUE BOOK, LEXIS NEXUS, MAPQUEST, NASCAR, OFFICE DEPOT, RADIO SHACK, SEARS, TOYOTA, UNITED AIRLINES, VICTORIA SECRET, WALMART, XM SATELLITE, YAMAHA, and ZALES.  Bradley Decl., ¶ 11, Exhibits 9 to the Bradley Decl.  In fact, Defendants' portfolio of domain names is so infested with domain names that infringe famous trademarks that the *representative* list filed in Exhibit 9 to the Bradley Declaration is fourteen pages long and contains over fourteen hundred domain names which are confusingly similar to just twenty six

CHRISTIE, PARKER & HALE, LLP

1   representative famous marks. *Id.*[5]

2       Defendants have registered at least 238 domain names that are identical or

3   confusingly similar to Plaintiffs' Marks alone. Bradley Decl., ¶ 19 and Exhibit 14

4   to the Bradley Decl. The extraordinary number of domain names that are

5   confusingly similar to famous marks shows that Defendants are intentionally

6   targeting famous marks as part of their cybersquatting business.

7       Defendants register and use these confusingly similar domain names to lure

8   Internet users who are searching for genuine websites associated with famous or

9   distinctive trademarks. The websites hosted at most of these confusingly similar

10   domain names display links featuring goods or services directly competitive with

11   those sold or provided in connection with the famous or distinctive trademarks.

12   For instance, websites hosted at the Confusingly Similar Domain Names display

13   HTML links featuring advertisements for goods and services that are directly

14   competitive with those sold or provided in connection with the Plaintiffs' Marks.

15   Bradley Decl., ¶¶ 12-13, 19-22 and Exhibits 10 and 14-16 to the Bradley Decl.

16   Advertisers, search engines, and affiliate programs make payment each time an

17   advertisement is displayed or a link is clicked on that domain name.

18       Defendants identify available domain names they believe will be profitable

19   because of anticipated Internet traffic resulting from "typosquatting"—domain

20   names containing typographical variations of others' marks—and the consumer

21   confusion it causes. Defendants also register and use domain names that combine

22   others' marks (or variations thereof) with generic or descriptive terms.

23       Defendants employ various means to conceal their true identity and

24   involvement in the registration, trafficking in, and use of Defendants' Domain

25   Names. Defendants conduct business using numerous shell-entities, fictitious

26

27   [5] This representative list includes the infringing domain names for only one
    famous mark for each letter of the alphabet. Bradley Decl., ¶ 11 and Exhibit 9 to

28   the Bradley Decl.

business, and personal names.  Bradley Decl., ¶¶ 14-18 and Exhibits 11-13 to the Bradley Decl.  For example, Defendants conduct business using at least the following aliases: Privacy Protection, Private Whois Escrow Domains Private Limited, PrivacyProtect.org, Watch My Domain, Comdot Internet Services Private Limited, Cyber Veillance Private Limited and Laksh Internet Solutions Private Limited. *Id.* Defendants have conducted business, or are conducting business, are holding themselves out as, or have held themselves out as, one or more of these aliases. *Id.*

III.  **PLAINTIFFS ARE ENTITLED TO A TRO ENJOINING DEFENDANTS' UNLAWFUL ACTIVITIES TO PREVENT FURTHER IRREPARABLE HARM**

A.  **Standard For Granting Injunctive Relief**

Plaintiffs seek entry of a TRO, and a preliminary injunction upon expiration of the TRO, prohibiting Defendants from registering, using, and trafficking in any domain name that is confusingly similar to Plaintiffs' Marks, and from destroying or moving evidence.

Plaintiffs are entitled to injunctive relief because Plaintiffs are likely to succeed on the merits of their claim that Defendants have violated the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) (the "ACPA"). In addition, Plaintiffs are entitled to injunctive relief because Plaintiffs face irreparable harm if Defendants are permitted to continue registering or using domain names confusingly similar to the Plaintiffs' Marks. *See Senate of State of California v. Mosbacher*, 968 F.2d 974, 977 (9th Cir. 1992) (citations omitted) (a plaintiff seeking preliminary injunctive relief must prove either: "(1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) the existence of serious questions going to the merits, the balance of hardships tipping sharply in [plaintiff's] favor, and at least a fair chance of success on the merits"). The alternative standards represent a sliding scale under

which "a lesser showing of probability of success requires a greater showing of harm, and vice versa." *Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co., Inc.*, 900 F. Supp. 1287, 1292 (C.D. Cal. 1995) (citation omitted).

**B.    Plaintiffs Are Likely To Succeed On The Merits Of Their Claim Against Defendants For Cybersquatting**

Pursuant to the ACPA, cybersquatting involves the (1) registration, use, or trafficking in, a domain name (2) that is identical or confusingly similar to a distinctive or famous trademark, (3) with a bad faith intent to profit from the mark. 15 U.S.C. § 1125(d). As will be shown below, Defendants have violated the ACPA and must be enjoined from continuing its cybersquatting.

**1.    Defendants' Registration And Use Of Domain Names**

Defendants have registered, used, or trafficked in at least 238 domain names that are confusingly similar to Plaintiffs' Marks. Bradley Decl., ¶ 19 and Exhibit 14 to the Bradley Decl. Defendants use these confusingly similar domain names to host websites that display links, featuring goods or services that are directly competitive with Plaintiffs' goods and services. Bradley Decl., ¶ 20 and Exhibits 15 to the Bradley Decl.

**2.    The Domain Names Are Confusingly Similar to Plaintiffs' Distinctive and Famous Marks**

**a)    The VERIZON Marks Are Distinctive And Famous**

Verizon Trademark Services own numerous United States trademark registrations for Plaintiffs' Marks. Manning Decl., ¶¶ 4, 5, 6 and Exhibits A, B, C to the Manning Decl. The VERIZON Marks have been used in interstate commerce by the Verizon Companies since 2000 to designate the products and services offered by the Verizon Companies. Manning Decl., ¶¶ 8, 16. The VERIZON FIOS Marks have been used in interstate commerce by the Verizon Companies since 2004, and several of the VZ Marks have been used in interstate commerce by the Verizon Companies since 2000. Manning Decl., ¶¶ 9, 10.

CHRISTIE, PARKER & HALE, LLP

1    The Verizon Companies expend substantial effort and expense to protect
2  these marks and their distinctiveness in the marketplace.  As such, the VERIZON
3  Marks, the VERIZON FIOS Marks, and the VZ Marks are unique and distinctive
4  and designate a single source of origin.  Manning Decl., ¶ 15.  *See, e.g., Patsy's*
5  *Brand v. I.O.B. Realty,* 58 U.S.P.Q.2d 1048, 1049 (S.D.N.Y.  2001) ("corporate
6  giants have come to learn the value of choosing a distinctive name such as Xerox
7  or Verizon ...").

8    The VERIZON Marks are also famous marks.  The newly enacted dilution
9  statute provides, "a mark is famous if it is widely recognized by the general
10  consuming public of the United States as a designation of source of the goods or
11  services of the mark's owner."   15 U.S.C.  §  1125(c)(2)(A).   In determining
12  whether a mark possesses the requisite degree of recognition, courts may consider
13  all relevant factors, including: (1) the duration, extent, and geographic reach of
14  advertising and publicity of the mark; (2) the amount, volume, and geographic
15  extent of sales of goods or services offered under the mark; (3) the extent of
16  actual recognition of the mark; and (4) whether the mark was registered.  *Id.*

17    The VERIZON Marks are well-known throughout the country.  Currently,
18  the Verizon Companies' wireline business uses the VERIZON Marks in
19  connection with the provision of telephone and broadband products and services
20  to consumer and business customers in 25 states (including California where such
21  products  and  services  are  provided  by  Plaintiff  Verizon  California)  and  the
22  District of Columbia serving a territory consisting of more than 37 million access
23  lines  and  8.4  million  broadband  connections.    Manning  Decl.,  ¶  16.  These
24  products and services reach one-third of the United States households, and more
25  than one-third of Fortune 500 company headquarters, as well as the U.S. federal
26  government. Manning Decl., ¶ 8.

27    Verizon  Communications  generates  annual  consolidated  operating
28  revenues of over 93 billion dollars.  In addition, the Verizon Companies spend

1  and have spent many millions of dollars each year since 2000 to extensively

2  advertise and promote VERIZON and VERIZON WIRELESS branded products

3  and services in the United States through a variety of media, including television,

4  radio, print advertisements, direct mail, trade shows, conferences, and the

5  Internet.  Manning Decl., ¶¶ 3, 15.

6       The VERIZON Marks are widely known and recognized among consumers

7  and others throughout the world.  Having been widely promoted to the general

8  public, and having exclusively identified the Verizon Companies and their

9  products and services, the VERIZON Marks symbolize the tremendous goodwill

10  associated with the Verizon Companies and are a property right of incalculable

11  value.  The VERIZON Marks have long enjoyed unquestionable fame as a result

12  of favorable general public acceptance and recognition.  Manning Decl., ¶17.

13       **b)**   **Defendants have Registered At Least 238 Domain Names**

14          **That Are Confusingly Similar To Plaintiff's Marks**

15       Defendants have registered, used, or trafficked in at least 238 domain

16  names that are confusingly similar to Plaintiffs' Marks. A representative list of

17  these confusingly similar domain names includes names like:  veri8zon.com,

18  verizon1.com, verizonnwireless.com, verizonvireless.com, verizonwirelesss.com

19  and verizonphonebook.com.   The full list of these confusingly similar domain

20  names appears in Exhibit 9 to the Bradley Declaration.

21       Some of the infringing domain names are confusingly similar to Plaintiffs'

22  Marks because they are misspellings of Plaintiffs' Marks. For example, the

23  domain name verizonwirelesss.com merely adds an extra letter "s" into Plaintiffs'

24  exact trademark.  And veri8zon.com merely inserts the number "8" (the number

25  "8" and the letter "i" are close to each other on the keyboard and will often be

26  pushed by accident when typing). "A reasonable interpretation of conduct

27  covered by the phrase 'confusingly similar' is the intentional registration of

28  domain names that are misspellings of distinctive or famous names, causing an

Internet user who makes a slight spelling or typing error to reach an unintended site." *Shields v. Zuccarini*, 254 F.3d 476, 484 (3d Cir. 2001); *see also N. Light Tech., Inc. v. N. Lights Club*, 236 F.3d 57, 66 n.14 (1st Cir. 2001) (the identical or confusingly similar requirement of the ACPA looks to the facial similarity of the domain name with the mark).

In an earlier case on almost identical facts,[6] *Verizon California Inc., et al., v. Navigation Catalyst Systems, Inc.*, 568 F. Supp. 2d 1088, *13 (C.D. Cal. 2008), when granting Plaintiffs' motion for a preliminary injunction, Judge Collins stated:

> [Defendants] never make the argument that the names they registered are not sufficiently close to Plaintiffs' marks to satisfy ACPA's requirement. Nor could they, especially in light of the fact that similarity here is judged not just by appearances, but by the likelihood that a particular domain name might be typed in accidentally by someone trying to type in one of Plaintiffs' marks or domain names [internal citations omitted]. For instance, at issue are ve3rizon.com and veri8zon.net, both of which consist of Plaintiffs' actual domain names, including Plaintiffs' trademarks, plus one extra character -- in both cases a character located on the computer keyboard next to a letter found in the correct domain name, making any

---

[6] On highly similar facts, additional courts have found that Plaintiffs are likely to succeed on the merits of their ACPA claims and have issued preliminary injunction orders. *See Verizon California Inc et al v. Ultra RPM Inc.*, Case No. CV 07-02587-ABC (CWx), (C.D. Cal. 2008) and *Verizon California Inc et al v. Maltuzi LLC et al.*, Case No. CV-07-01732-SVW (JC), (C.D. Cal. 2007).

websites using those domain names one easily-made typo away from Plaintiffs' primary domains.

Some of Defendants' other infringing domain names merely append a generic word associated with the Plaintiffs' Marks to the mark or a portion of the mark. For example, the domain name verizonphonebook.com merely appends the generic word "phonebook" to the VERIZON mark. Domain names which merely append a generic word to a distinctive or famous mark are also confusingly similar to the mark upon which they prey. *See, e.g., Harrods Ltd. v. Sixty Internet Domain Names*, 157 F. Supp. 2d 658, 67-78 (E.D. Va. 2001), *aff'd in part, rev'd in part*, 302 F.3d 214 (4th Cir. 2002) (domain names adding descriptive or generic terms like "bank," "financial," and "shopping" to the mark HARRODS held confusingly similar).

Defendants host websites on many of these 238 confusingly similar domain names which display links to goods and services that are directly competitive to Plaintiffs' goods and services. Bradley Decl., ¶¶ 19-20 and Exhibit 14-15 to the Bradley Decl. Defendants' effort to capitalize on Internet users' misspellings or mistypings when such users are looking for Plaintiffs' websites, including verizon.com, verizon.net and verizonwireless.com, are further evidence that each of the domain names is confusingly similar to the Plaintiffs' Marks.

### 3. Defendants' Bad Faith Intent To Profit From The Marks

The facts leave no question regarding Defendants' bad faith intent to profit. In determining whether Defendants possessed the required bad faith intent to profit from the Plaintiffs' Marks, the ACPA identifies nine separate factors for the courts to examine. 15 U.S.C. § 1125(d)(1)(B)(i). In this case, not surprisingly, most of the nine factors support or strongly support a finding that Defendants' registration and use of the 238 confusingly similar domain names were with a bad faith intent to profit from these marks.

### a)   The trademark or other intellectual property rights of the

CHRISTIE, PARKER & HALE, LLP

person, if any, in the domain name (15 U.S.C.
§ 1125(d)(1)(B)(i)(I))

Defendants have no intellectual property rights in any of the 238 confusingly similar domain names that they registered or used, nor have any of the Plaintiffs authorized Defendants to register or use the Plaintiffs' Marks. Manning Decl., ¶ 18. As such, the first bad faith intent factor under the ACPA supports a finding that Defendants registered the confusingly similar domain names with a bad faith intent to profit.

b) **The extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person (15 U.S.C. § 1125(d)(1)(B)(i)(II))**

Similarly, none of the 238 confusingly similar domain names consists of the legal names of Defendants nor are Defendants commonly known by any of these 238 confusingly similar domain names. Therefore, the second bad faith intent factor under the ACPA supports a finding that Defendants registered the confusingly similar domain names with a bad faith intent to profit.

c) **The person's prior use, if any, of the domain name in connection with the *bona fide* offering of any goods or services (15 U.S.C. § 1125(d)(1)(B)(i)(III))**

The third bad faith factor under the ACPA asks the Court to analyze whether Defendants' prior use of the 238 confusingly similar domain names was in connection with a *bona fide* offering of any goods or services. In this case, Defendants use the confusingly similar domain names to lure Internet users trying to reach Plaintiffs' actual websites, including verizon.com, verizon.net and verizonwireless.com, to websites featuring advertisements and links to goods or services directly competitive with Plaintiffs' goods and services. It is well settled that misdirecting Internet traffic with the intent to trade on another party's mark is

1   unlawful. *Brookfield Commc'ns., Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036,
2   1059 (9th Cir. 1999). Since this unlawful use cannot be a *bona fide* offering of
3   goods or services, the third bad faith intent factor supports a finding of
4   Defendants' bad faith intent to profit.

5           **d)**    **The person's *bona fide* noncommercial or fair use of the**
6                   **mark in a site accessible under the domain name (15**
7                   **U.S.C. § 1125(d)(1)(B)(i)(IV))**

8       Defendants' use of the 238 confusingly similar domain names was and is
9   purely commercial. They selected and registered domain names that would
10  generate revenue from advertisers, search engines, and affiliate programs, and
11  engineered its systems to maximize Defendants' returns.  Because none of the
12  websites contained any commentary about, or comparisons of, Plaintiffs' goods
13  or services, Defendants' use was not a *bona fide* noncommercial or fair use.
14  Further, since Defendants' use of each of the domain names is purely commercial
15  it cannot be a noncommercial use.  Therefore, the fourth bad faith factor supports
16  a finding that Defendants registered the confusingly similar domain names with a
17  bad faith intent to profit.

18          **e)**    **The person's intent to divert consumers from the mark**
19                  **owner's online location to a site accessible under the**
20                  **domain name that could harm the goodwill represented by**
21                  **the mark, either for commercial gain or with the intent to**
22                  **tarnish or disparage the mark, by creating a likelihood of**
23                  **confusion as to the source, sponsorship, affiliation, or**
24                  **endorsement of the site (15 U.S.C. § 1125(d)(1)(B)(i)(V))**

25      In view of the similarity between the 238 confusingly similar domain
26  names and Plaintiffs' Marks, it is obvious that Defendants' intent was to divert
27  consumers searching for Plaintiffs' websites. "Cybersquatters often register well-
28  known marks to prey on consumer confusion by misusing the domain name to

CHRISTIE, PARKER & HALE, LLP

divert customers from the mark owner's site to the cybersquatter's own site, many of which are pornography sites that derive advertising revenue based on the number of visits, or 'hits,' the site receives." *Shields v. Zuccarini,* 254 F.3d at 484. Although Defendants' sites do not involve pornography, Defendants' intent is the same as the defendant in *Zuccarini*: "to register a domain name in anticipation that consumers would make a mistake, thereby increasing the number of hits his site would receive, and consequently, the number of advertising dollars he would gain." *Id*

The only reason that consumers would access the websites at any of the 238 confusingly similar domain names is because these domain names are misspellings or mistypings of Plaintiffs' Marks or the domains names are generic words appended to the Plaintiffs' Marks. As stated by Judge Collins in *Verizon California Inc., et al. v. Navigation Catalyst Systems, Inc., et al.*, 568 F. Supp. at *18:

> It is clear that [Defendants'] intent was to profit from the poor typing abilities of consumers trying to reach Plaintiffs' sites: what other value could there be in a name like ve3rizon.com? Further, the sites associated with these names often contained links to products directly competitive with Plaintiffs' cellphone and internet businesses, potentially diverting consumers who would otherwise have purchased goods or services from Plaintiffs away from Plaintiffs.

Defendants thus intended to create a likelihood of confusion in order to capitalize, for their own commercial gain, on the mistakes of consumers looking for Plaintiffs' websites. Defendants' desire to profit from the misspellings or mistypings by consumers is further evidenced by the fact that websites at each of these confusingly similar domain names featured links to goods and services

CHRISTIE, PARKER & HALE, LLP

directly competitive to Plaintiffs' goods and services.  Bradley Decl., ¶¶ 19-22 and Exhibits 14-16 to the Bradley Decl.

In addition, Plaintiffs are harmed by the likelihood that consumers will mistakenly access Defendant's confusingly similar domain names.  "Prospective users of plaintiff's services who mistakenly access defendant's web site may fail to continue to search for plaintiff's own home page ...." *Panavision International, L.P. v. Toeppen, et al.,* 141 F.3d 1316, 1327 (9th Cir. 1998) (citations omitted).

Finally, it defies logic to believe that Defendants did not know what they were doing.  Defendants appear to have used an automated process[7] to identify domain names and to have only kept those domain names which had sufficient traffic to ensure that Defendants would make a profit on those domain names.  In employing this automated process, Defendants must have known that many of the 238 confusingly similar domain names they registered were receiving traffic **solely** because they were misspellings or mistypings of the VERIZON Marks.  Why else would verizonwirelesss.com, for example, receive traffic unless customers were trying to reach verizonwireless.com?  Despite this knowledge, Defendants continue to register and use confusingly similar domain names.  Bradley Decl., ¶¶ 11-13 and Exhibit 9-10 to Bradley Decl.

Accordingly, this fifth bad faith factor strongly supports that Defendants willfully registered the confusingly similar domain names with a bad faith intent to profit from the Plaintiffs' Marks

> **f)  The person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any**

---

[7] Congress described the use of automated computer programs to register thousands of domain names at a time as one of the "abuses of the domain name registration systems" the new law was targeting. S. Rep No. 106-140, 6-7 (1999).

CHRISTIE, PARKER & HALE, LLP

goods or services, or the person's prior conduct indicating a pattern of such conduct (15 U.S.C. § 1125(d)(1)(B)(i)(VI))

In the past, the Registrar Defendants have offered for sale confusingly similar domain names to trademark owners attempting to recover infringing domain names.  In once case, in a dispute involving Lead Domain Names that were confusingly similar to trademark, the attorneys received an offer from the Registrar Defendants purportedly from the actual registrant of two domain names. Bradley Decl., ¶ 50. Additionally, numerous other trademark owners have, after prevailing in a UDRP proceeding, received offers to sell the domain names instead of receiving the domain names. Bradley Decl., ¶ 51.

Therefore, the sixth bad faith factor supports a finding that Defendants registered the confusingly similar domain names with a bad faith intent to profit.

g)    The person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct (15 U.S.C. § 1125(d)(1)(B)(i)(VII))

Defendants conduct business using numerous shell-entities, fictitious business, and personal names in order to avoid detection by Plaintiffs and other trademark owners.  Bradley Decl., ¶¶ 14-15. Plaintiffs were able to identify seven different identities Defendants use when registering domain names. *Id*.

This seventh bad faith factor of using numerous false identities and aliases when registering domain names also strongly supports finding that Defendants registered at least 238 confusingly similar domain names with a bad faith intent to profit.

h)    The person's registration or acquisition of multiple domain names which the person knows are identical or

- 17 -

> **confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties (15 U.S.C. § 1125(d)(1)(B)(i)(VIII))**

The eighth bad faith factor, in short, focuses on the number of infringing domain names a defendant has registered.  Courts consider excessive numbers of infringing domain names as strong proof of bad faith as well as an important factor in determining the amount of statutory damages to be awarded under the ACPA.  *See Shields v. Zuccarini,* 254 F.3d at 485 n. 5 (Zuccarini's registration of thousands of Internet domain names that are identical or confusingly similar to the distinctive marks of others reflects a "pattern of behavior ... consistent with a bad faith intent to profit").

Here, Defendants have engaged in one of the largest cybersquatting operations ever witnessed, having registered at least tens of thousands of infringing domain names. Defendants have registered so many domain names that infringe famous trademarks that the representative list attached as Exhibit 9 to the Bradley Declaration is fourteen pages long and contains over 1,400 domain names that were confusingly similar to only 26 famous marks.  Bradley Decl., ¶ 11, Exhibit 9 to the Bradley Decl.  This representative list included infringing domain names for only one famous mark for each letter of the alphabet. *Id.*

Furthermore, Defendants intended to divert consumers from trademark owners' websites to their own websites because they continued to register and use confusingly similar domain names **even after Defendants had notice**.  *See Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.,* 807 F.2d 1110, 1115 (2nd Cir. 1986) (actual or constructive knowledge on infringing acts proves willfulness); *Louis Vuitton Malletier & Oakley, Inc. v. Veit,* 211 F. Supp. 2d 567, 583 (E.D. Pa.

CHRISTIE, PARKER & HALE, LLP

2002) ("Willfulness can be inferred by the fact that a defendant continued infringing behavior after being given notice"). Here, Defendants knew that they had improperly registered hundreds of domain names confusingly similar to the trademarks of others because they have subjected to numerous administrative proceedings under the UDRP. Yet, Defendant continued cybersquatting on the marks of others. Bradley Decl., ¶¶ 10-11, 28-39 and Exhibits 9, 21-29 to the Bradley Decl.

This eighth bad faith factor strongly supports a finding that Defendants registered 238 domain names with a bad faith intent to profit from Plaintiffs' Marks

> **i)    The extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of section 43 (15 U.S.C. § 1125(d)(1)(B)(i)(IX))**

The final factor also strongly supports Defendants' bad faith intent to profit. As discussed above, Plaintiffs have created in their marks some of the most famous and distinctive marks in the world.

> **j)    Additional factors to be considered by the Court**

The nine factors listed by the ACPA, however, are not exclusive, and courts often consider other factors in addition to those recited. *See Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 498 (2nd Cir. 2000) ("But we are not limited to considering just the listed factors when making our determination of whether the statutory criterion has been met.")

The Registrar Defendants are a domain name Registrar accredited by ICANN. As an accredited Registrar, the Registrar Defendants are in a position of trust by ICANN as well as the Internet community. Unfortunately, the Registrar Defendants are abusing this trust by registering and using domain names for their own benefit and pecuniary interest. The Registrar Defendants are also abusing

this trust by hiding the identities of other registrants of confusingly similar domain names; and engineering a scheme to frustrate the transfer of such domain names to the trademark owner.

The Registrar Defendants' abuse of their position of trust as an ICANN accredited registrar, should be an additional factor considered by the Court as it strongly supports a finding that Defendants had a bad faith intent to profit from the Plaintiffs' Marks.[8]

## C.   <u>Irreparable Harm</u>

Irreparable harm is presumed where the injury befalls a trademark. *Brookfield Communs., Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1066 (9th Cir.1999) (irreparable harm is generally presumed in a trademark infringement action where likelihood of confusion has been shown).   Therefore, as a matter of law, Plaintiffs have suffered the "irreparable harm."

Furthermore, Plaintiffs are in fact being harmed.   The websites hosted at most of Defendants' confusingly similar domain names display links featuring goods or services directly competitive with those sold or provided by Plaintiffs. Bradley Decl., ¶¶ 11-12, 19-20 and Exhibits 9-10, 14-15 to the Bradley Decl. *See Shields v. Zuccarini,* 89 F. Supp. 2d 634, 641 (E.D. Pa. 2000) *aff'd* 254 F. 3d 476 (3rd Cir. 2001) ("this sort of injury is not easily compensable after the fact, as it will be nearly impossible to discover how many Internet users did *not* visit [Plaintiffs'] site because of [Defendant's] domain names") (emphasis in original). The injury to Plaintiffs, which operates extensive online businesses, is thus real, immediate, and irreparable.

Defendants' persistent registration and use of these domain names to divert

---

[8] Because the Registrar Defendants are *both* the registrant and registrar, the Registrar Defendants do not qualify for the "safe harbor" provision of the ACPA that exempts domain name registrars from liability. 15 U.S.C. §1114(2)(D)(iii). Moreover, even if the Registrar Defendants were just the registrar, they would not qualify for this exemption because they have acted clearly in "bad faith."

Internet traffic from Plaintiffs to their competitors results in "irreparable harm" to Plaintiffs

**D.**  **The Balance Of Hardships Tips Decidedly In Favor Of Granting Preliminary Injunctive Relief**

The Court must also weigh the harm which a preliminary injunction might cause the Defendants and weigh it against the threatened injury to Plaintiffs. *Los Angeles Memorial Coliseum Com. v. National Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). As against the substantial injury to Plaintiffs discussed above, the harm to Defendants' "legitimate" business interests are negligible because Defendants *have no* legitimate business interests in their cybersquatting scheme. Defendants are not a good-faith competitor or participant in Plaintiffs' market. Defendants have no basis to complain about the effects of an injunction.

> As aptly noted in *American Home Products Corp. v. Johnson Chemical Co.*, 589 F.2d 103, 107 (2d Cir. 1978), "one who adopts the mark of another for similar goods acts at his own peril," since he has no claim to the profits or advantages thereby derived. Any harm suffered by defendants was brought about by their own actions. . . Defendants' self-inflicted harm is far outweighed by the immeasurable damage done [to the plaintiff] by the infringement of its Marks. Defendants simply have no equitable standing to complain of injury should their infringements be preliminarily enjoined.

*Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1006 (S.D. Fla. 1992). Indeed, Defendants' intentional and reckless cybersquatting of Plaintiffs' Marks carried with it a clear risk of an injunction and damages. *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 197 (3d Cir. 1990); *Processed*

CHRISTIE, PARKER & HALE, LLP

*Plastic Co. v. Commc'ns, Inc.*, 675 F.2d 852, 859 (7th Cir. 1982) (finding defendant had copied plaintiff's toy car and thus "cannot now complain that having to mend its ways may be too expensive").

As a practical matter, Plaintiffs seek an injunction against a very small portion of Defendants' operation—only the portion that infringes Plaintiffs' Marks. Unless an injunction issues, Defendants will continue to register confusingly similar domain names and counterfeit domain names, causing further harm to Plaintiffs and the public. On the other hand, granting an injunction will prevent Defendants only from profiting from their illegal behavior, which is not a cognizable "hardship" that this Court should consider. Moreover, nothing in the injunction would prevent Defendants from registering non-infringing domain names. Finally, if the Court issues an injunction, Plaintiffs may be required to post a bond that will compensate Defendants for any possible monetary harm they might suffer if the injunction later is deemed improper. *See* Fed.R.Civ.P. 65(c). In short, the balance of hardships tips strongly in Plaintiffs' favor.[9]

## IV. DEFENDANTS MUST BE RESTRAINED FROM DESTROYING AND MOVING EVIDENCE

While under normal circumstances commencing litigation would itself be sufficient to put a defendant on notice that all materials potentially usable as evidence should be preserved, these are not normal circumstances. Defendants are engaged in a nefarious scheme and they have taken and continue to take many

---

[9] In this case, filing UDRP complaints against Defendants would not provide effective relief for several reasons. First, despite having numerous UDRP complaints filed against them, Defendants have not stopped or even curtailed their cybersquatting. Second, Defendants would seek to frustrate the transfer of the subject domain names by filing an action in India. Finally, the only relief available in a UDRP proceeding is transfer or cancellation of the domain names; there is no injunctive or monetary relief. Adverse UDRP decisions thus do not prevent cybersquatters like Defendants from registering more infringing domain names as Defendants have done here. Accordingly, the only effective way to deal with Defendants and to stop this vicious cycle of cybersquatting is to obtain an injunction preventing Defendants from registering infringing and diluting domain names in the future. Bradley Decl., ¶¶ 28-39.

CHRISTIE, PARKER & HALE, LLP

affirmative steps to conceal it. The risk that Defendants will destroy or move relevant data or documents is great. Defendants have employed numerous and extensive devices to avoid detection by trademark owners. Further, Defendants have extensively employed offshore locations to further obscure detection in an effort to limit U.S. jurisdiction.

In another Federal Court action against Defendant Lead Networks for cybersquatting, it has failed to answer or even appear, despite being properly served. *See Citigroup Inc. vs. Naresh Malik* (EDV, Case No. 1:07cv1168). The court in that action has recently entered default against Defendant Lead Networks.

Further increasing the risk that Defendants may destroy or move evidence is the ease with which the records Plaintiffs seek to seize can be destroyed and transferred. Much of the evidence Plaintiffs hope to use in the prosecution of this action is in electronic form and subject to quick, easy, untraceable destruction by Defendants. For example, most if not all of the domain name registration, renewal, and transfer process is done online, *i.e.*, electronically. Moreover, domain name registrants generally receive notifications relating to every aspect of the domain name registration, renewal, and transfer process by email. E-mail is clearly the customary and preferred method of communication for domain name matters. In addition, the process for Defendants receiving payments for advertising clicks and click-throughs on their websites corresponding to the infringing domain names is handled primarily if not exclusively by electronic means.

Accordingly, Defendants must be enjoined from destroying and moving any of their business records, and ordered to retain all relevant records. Additionally, Defendants must be enjoined from registering any additional domain names that are confusingly similar to Plaintiffs' Marks, and from using any of the Infringing Domain Names. Lastly, Plaintiffs must be enjoined from

transferring in any manner the Infringing Domain Names to any other registrar or registrant.

## V.   A BOND, IF REQUIRED AT ALL, SHOULD BE MINIMAL

If this Court believes that Plaintiffs must post a bond to comply with the statute, a minimal bond will suffice. As discussed above, Defendants have no legitimate business interests in using confusingly similar domain names to divert traffic from Plaintiffs' websites.  Further, for the brief period from now until the preliminary injunction hearing, Defendants' losses from being unable to infringe Plaintiffs' Marks will be *de minimus*. Accordingly, if the Court believes a bond is necessary, Plaintiffs propose an amount of $10,000.

## VI. CONCLUSION

For the above reasons, Plaintiffs request that the Court enter a TRO, and a preliminarily injunction upon expiration of the TRO that would preliminarily enjoin Defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the TRO, from:

1.     Destroying, altering or transferring any records of their business activities, whether on paper, in electronic format, or on any other medium, and including, without limitation all accounting records and all logs or other documents relating to selecting, registering, trafficking in, monetizing, releasing, assigning, renewing, deleting, transferring, using and maintaining the 238 domain names that are confusingly similar to Plaintiffs' Marks;

2.     Transferring, releasing, deleting or assigning the 238 domain names confusingly similar to Plaintiffs' Marks;

3.     Registering or using any domain name that is identical or confusingly similar to Plaintiffs' Marks; and

CHRISTIE, PARKER & HALE, LLP

1        4.    Assisting, aiding or abetting any other person or business entity in

2  engaging in or performing any of the activities referred to in paragraphs 1 through

3  3 above.

4

5                          CHRISTIE, PARKER & HALE, LLP

6

7

8  DATED:  January 27, 2009    By

9                         David J. Steele
                        Howard A. Kroll

10                        Attorneys for Plaintiffs

11                        VERIZON CALIFORNIA INC.
                        VERIZON TRADEMARK SERVICES LLC

12                        VERIZON LICENSING COMPANY

13   DJS PAS833826.1-*-01/27/09 5:52 AM

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28