1    **DAVID J. STEELE, CA Bar No. 209797**
     **Email:  djslit@cph.com**
2    **CHRISTIE, PARKER & HALE, LLP**
     **3501 Jamboree Road, Suite 6000-North Tower**
3    **Newport Beach, CA  92660**
     **Telephone:  (949) 476-0757**
4    **Facsimile:  (949) 476-8640**

5    **HOWARD A. KROLL, CA Bar No. 100981**
     **Email:  howard.kroll@cph.com**
6    **CHRISTIE, PARKER & HALE, LLP**
     **350 West Colorado Boulevard, Suite 500**
7    **Pasadena, California 91105**
     **Telephone:  (626) 795-9900**
8    **Facsimile:  (626) 577-8800**

9    **SARAH B. DEUTSCH (Admitted *pro hac vice*)**
     **Email:  sarah.b.deutsch@verizon.com**
10   **VERIZON CORPORATE RESOURCES GROUP LLC**
     **1320 North Court House Road, 9th Floor**
11   **Arlington, VA  22201**
     **Telephone: (703) 351-3044**
12   **Facsimile: (703) 351-3670**

13   Attorneys for Plaintiffs
     VERIZON CALIFORNIA INC.
14   VERIZON TRADEMARK SERVICES LLC
     VERIZON LICENSING COMPANY

15

16              UNITED STATES DISTRICT COURT

17              CENTRAL DISTRICT OF CALIFORNIA

18                    WESTERN DIVISION

19   VERIZON CALIFORNIA INC.;          Case No.  CV-09-0613 ABC (CWx)
     VERIZON TRADEMARK SERVICES
20   LLC; and VERIZON LICENSING        **MEMORANDUM OF POINTS**
     COMPANY,                          **AND AUTHORITIES IN**
21                                     **SUPPORT OF APPLICATION**
                  Plaintiffs,          **FOR FINAL DEFAULT**
22                                     **JUDGMENT AGAINST**
            vs.                        **MAHESH MALIK**
23
     LEAD NETWORKS DOMAINS             **DATE:    January 10, 2011**
24   PRIVATE LIMITED; NARESH           **TIME:    10:00 AM**
     MALIK a/k/a NICK M.; MAHESH       **CTRM:    680**
25   MALIK; KEVIN DASTE; and
     DOES 1-100,
26                                     **Hon. Audrey B. Collins**
                  Defendants.
27

28

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ............................................................... 1

II.     STATEMENT OF FACTS ................................................. 2

        A.      Plaintiffs' Business and Their Trademarks ........................... 2

        B.      Defendant's Unlawful Cybersquatting Operations ............... 4

III.    DEFENDANT VIOLATED THE ACPA ....................................... 6

        A.      Legal Stand For Cybersquatting ...................................... 6

                1.      Defendant's Registration And Use Of Domain Names ............ 7

                2.      The Domain Names Are Confusingly Similar to Plaintiffs' Distinctive and Famous Marks ........................ 7

                        a)      The VERIZON Marks Are Distinctive And Famous .............................................. 7

                        b)      Defendant has Registered At Least 238 Domain Names That Are Confusingly Similar To Plaintiff's Marks ......................................... 9

                3.      Defendant's Bad Faith Intent To Profit From The Marks ........ 11

                        a)      The trademark or other intellectual property rights of the person, if any, in the domain name (15 U.S.C. § 1125(d)(1)(B)(i)(I)) .................................. 11

                        b)      The extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person (15 U.S.C. § 1125(d)(1)(B)(i)(II)) .............................. 11

                        c)      The person's prior use, if any, of the domain name in connection with the *bona fide* offering of any goods or services (15 U.S.C. § 1125(d)(1)(B)(i)(III)) ..................................... 12

                        d)      The person's *bona fide* noncommercial or fair use of the mark in a site accessible under the domain name (15 U.S.C. § 1125(d)(1)(B)(i)(IV)) ..................... 12

                        e)      The person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship,

affiliation, or endorsement of the site (15 U.S.C. § 1125(d)(1)(B)(i)(V))..........................................................13

f)   The person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct (15 U.S.C. § 1125(d)(1)(B)(i)(VI)).........15

g)   The person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct (15 U.S.C. § 1125(d)(1)(B)(i)(VII))..............................15

h)   The person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties (15 U.S.C. § 1125(d)(1)(B)(i)(VIII)).................16

i)   The extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of section 43 (15 U.S.C. § 1125(d)(1)(B)(i)(IX)) ......................................17

IV.   PLAINTIFFS ARE ENTITLED TO FINAL DEFAULT JUDGMENT ..........................................................18

V.   PLAINTIFFS ARE ENTITLED TO STATUTORY DAMAGES FOR DEFENDANT'S VIOLATIONS OF THE ACPA ...........................19

   A.   Defendant's Violations Are Willful and Egregious ...........................20

   B.   Defendant's Use of False Contact Information is Extreme................21

   C.   Defendant Engaged in a Pattern of Unlawful Cybersquatting Against Famous Marks ........................................................22

VI.   PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION ..........................................................23

VII.   THERE IS NO JUST REASON FOR DELAY AND DIRECT ENTRY OF A DEFAULT FINAL IS PROPER UNDER RULE 56(b) ..........................................................24

1

VIII.  CONCLUSION ............................................................................................. 25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CHRISTIE, PARKER & HALE, LLP

<u>**TABLE OF AUTHORITIES**</u>

<u>**Page(s)**</u>

**CASES**

*Aztar Corp. v. MGM Casino*,
2001 U.S. Dist. LEXIS 13118 (E.D. Va. 2001)............................................. 21

*Bellagio v. Denhammer*,
2001 U.S. Dist. LEXIS 24764 (D. Nev. July 10, 2001)................................. 24

*Biocryst Pharms, Inc. v. Namecheap.com*,
Case No. CV-05-7615 JFW (C.D. Cal. Nov. 21, 2006) ........................ 21, 22

*Brookfield Commc'ns., Inc. v. West Coast Ent. Corp.*,
174 F.3d 1036 (9th Cir. 1999)......................................................................... 12

*Century 21 Real Estate Corp. v. Sandlin*,
846 F.2d 1175 (9th Cir. 1988)......................................................................... 24

*Citigroup Inc. and Diners Club International Ltd. v. Naresh Malik a/k/a Nick M., et. al.*,
Case No. CV-07-1168 (E.D. Va. July 15, 2009) ............................21, 23, 24

*Citigroup, Inc. v. Chen Bao Shui*,
611 F. Supp. 2d 507 (E.D. Va. 2009)............................................................. 21

*Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*,
259 F.3d 1186 (9th Cir. 2001)......................................................................... 20

*DirecTV, Inc. v. Huynh*,
503 F.3d 847 (9th Cir. 2007)........................................................................... 19

*Electronics Boutique Holdings Corp. v. Zuccarini*,
2000 U.S. Dist. LEXIS 15719 (E.D. Pa. 2000)............................... 13, 21, 23

*Fitzgerald Public Co., Inc. v. Baylor Public Co., Inc.*,
807 F.2d 1110 (2nd Cir. 1986)........................................................................ 17

*Graduate Management Admission Council v. Raju*,
267 F. Supp. 2d 505 (E.D. Va. 2003)............................................................. 21

*Harrods Ltd. v. Sixty Internet Domain Names*,
157 F. Supp. 2d 658 (E.D. Va. 2001),
*aff'd in part*, *rev'd in part*, 302 F.3d 214 (4th Cir. 2002) ........................... 10

*Johnson v. Connolly*,
2007 U.S. Dist. LEXIS 31721 (N.D. Cal. 2007)........................................... 20

*Kiva Kitchen & Bath, Inc. v. Capital Distributing Inc.*,
Case No. 08-20303, 2009 U.S. App. LEXIS 7344
(5th Cir. Tex. 2009).......................................................................................... 20

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

*Lahoti v. Vericheck, Inc.*,
2007 U.S. Dist. LEXIS 91997 (W.D. Wash. 2007) ...................................... 23

*Louis Vuitton Malletier & Oakley, Inc. v. Veit*,
211 F. Supp. 2d 567 (E.D. Pa. 2002) ............................................................. 17

*Microsoft Corp. v. Evans*,
2007 U.S. Dist. LEXIS 77088 (E.D. Cal. 2007) ........................................... 19

*Mirage Resorts, Inc. v. Cybercom Products*,
228 F. Supp. 2d 1141 (D. Nev. 2002) ............................................................ 22

*N. Light Tech., Inc. v. N. Lights Club*,
236 F.3d 57 (1st Cir. 2001) ............................................................................... 9

*Neiman Marcus Group, Inc. et al v. Rivard et al.*,
Case No. CV-09-60594-WPD (S.D. Fla. July 28, 2009) .............................. 21

*Panavision International, L.P. v. Toeppen, et al.*,
141 F.3d 1316 (9th Cir. 1998) ........................................................................ 14

*Patsy's Brand v. I.O.B. Realty*,
58 U.S.P.Q. 2d 1048 (S.D.N.Y. 2001) 7

*Shields v. Zuccarini*,
254 F.3d 476 (3d Cir. 2001) ................................................................ 9, 13, 17

*Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*,
202 F.3d 489 (2nd Cir. 2000) ......................................................................... 18

*Verizon California Inc., et al., v. Navigation Catalyst Systems, Inc.*,
568 F. Supp. 2d 1088 (C.D. Cal. 2008) ....................................................... 9, 14

**STATUTES**

15 U.S.C. §1114(2) ................................................................................................. 18

15 U.S.C. §1116(a) ................................................................................................. 24

15 U.S.C. § 1117(d) ............................................................................................... 20

15 U.S.C. § 1125(c)(2) ............................................................................................. 8

15 U.S.C. § 1125(d) ............................................................................................. 2, 7

15 U.S.C. § 1125(d)(1) ........................................................................................... 11

15 U.S.C. § 1125(d)(1)(I) ....................................................................................... 11

15 U.S.C. § 1125(d)(1)(II) ...................................................................................... 12

CHRISTIE, PARKER & HALE, LLP

1

## TABLE OF AUTHORITIES (cont.)

2

**Page(s)**

3   15 U.S.C. § 1125(d)(1)(III) ....................................................................... 12

4   15 U.S.C. § 1125(d)(1)(IV) ....................................................................... 12

5   15 U.S.C. § 1125(d)(1)(V)......................................................................... 13

6   15 U.S.C. § 1125(d)(1)(VI) ....................................................................... 15

7   15 U.S.C. § 1125(d)(1)(VII)...................................................................... 16

8   15 U.S.C. § 1125(d)(1)(VIII) .................................................................... 16

9   15 U.S.C. § 1125(d)(1)(IX)) ...................................................................... 18

10  Fed. R. Civ P. Rule 12(a)      ..................................................................... 19

11  Fed. R. Civ. P. Rule 55 ............................................................................. 19

12  Fed. R. Civ. P. Rule 55(b)(2)..................................................................... 19

13  H.R. Conf. Rep. No. 106-464, at 38 (1999) .............................................. 20

14  S. Rep. No. 106-140, at 8 (1999)............................................................... 20

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CHRISTIE, PARKER & HALE, LLP

## I.     __INTRODUCTION__

Plaintiffs Verizon California Inc., Verizon Trademark Services LLC, and Verizon Licensing Company (collectively "Plaintiffs") are owners or licensees of the famous trade names and trademarks VERIZON, VERIZON WIRELESS and the logo versions that include a "V Design" above or to the left of the word marks (the "VERIZON Marks"), the trademarks FIOS and VERIZON FIOS (the "VERIZON FIOS Marks"), and the trademarks VZ, VZACCESS, VZEMAIL, VZGLOBAL, VZVOICE, VZW (the "VZ Marks"), (collectively "Plaintiffs' Marks").

Defendant Mahesh Malik ("Defendant") is a cybersquatter, registering thousands of domain names that are confusingly similar to famous trademarks and service marks.[1]  Defendant's portfolio of domain names reads like a who's who of corporate America, including obvious misspellings of many famous marks, including Plaintiffs' Marks.  In fact, Defendant has registered at least 238 domain names that are identical or confusingly similar to Plaintiffs' Marks. Declaration of Anne F. Bradley ("Bradley Decl."), ¶ 18 and Exhibit 13 to Bradley Decl.  Defendant is a serial cybersquatter who, even after notice of his unlawful acts, refuses to cease his infringing activity.   Bradley Decl., ¶¶ 30-35, and Exhibits 20-25 to Bradley Decl.

Defendant also provides a "service" to other cybersquatters to avoid detection and to frustrate the transfer of unlawfully held domain names to trademark owners.  First, Defendant hides the identity of the registrant of the unlawful domain names by using shell entities and fictitious businesses and providing false contact information in various public records and databases. Bradley Decl., ¶ 15.

---

[1]  Mahesh Malik and his brother, Defendant Nick M, work together to run and operate Defendant Lead Networks Domains Private Limited.  Declaration of Anne F. Bradley, ¶¶ 2-9.

Second, when an infringing domain name is the subject of an administrative action under the Uniform Domain Name Dispute Resolution Policy (the "UDRP"), Defendant changed the listed owner to one of shell entities or fictitious businesses to hide the true registrant.  After the UDRP decision ordered the infringing domain name transferred, Defendant then filed procedurally-defective legal proceedings in India to further delay any transfer of the domain name[2] to the trademark owner.  Bradley Decl., ¶¶ 30-35, and Exhibits 20-25 to Bradley Decl.  Once the procedurally-defective legal proceedings have been filed and the transfer stopped, Defendant then offers to sell the unlawful domain name to the trademark owner.  Bradley Decl., ¶¶ 47-48.

On August 23, 2010, default was entered against Defendant.  Plaintiffs now seek final default judgment in the amount of $23,800,000 in statutory damages for Defendant's violations of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) (the "ACPA").  Plaintiffs also request that this Court order Defendant to transfer to Plaintiffs all domain names which are confusingly similar to Plaintiffs' Marks and enter a permanent injunction enjoining Defendant from registering, trafficking in or using any domain name that is identical or confusingly similar to Plaintiffs' Marks and assisting, aiding or abetting any other person or business entity in engaging in or performing any of these activities.

## II.   STATEMENT OF FACTS

### A.   Plaintiffs' Business and Their Trademarks

In 2000, Bell Atlantic Corporation and GTE Corporation merged to form Verizon Communications Inc. ("Verizon Communications").  Today, Verizon Communications and its subsidiaries, including Plaintiffs Verizon California Inc. ("Verizon California"), Verizon Trademark Services LLC ("Verizon Trademark Services") and Verizon Licensing Company ("Verizon Licensing") form one of

---

[2] Under the UDRP, a Registrar must transfer the domain name to the trademark owner within 10 business days after the decision ordering the transfer is issued.

1  the largest, well-known leading providers of communications and entertainment
2  products and services in the world.  In 2008, Verizon Communications generated
3  consolidated operating revenues of over 97 billion dollars.  Declaration of
4  Janis M. Manning ("Manning Decl."), ¶ 3.

5  Verizon Trademark Services owns Plaintiffs' Marks.  Manning Decl., ¶¶
6  4-6.[3]  Verizon Licensing is the exclusive licensor of Plaintiffs' Marks and has
7  granted, directly or indirectly, licenses to use these marks to its parent company,
8  Verizon Communications, and to the various Verizon Communications'
9  subsidiaries (collectively referred to as the "Verizon Companies").  Manning
10  Decl., ¶7.

11  The Verizon Companies, under Plaintiffs' Marks, provide a full array of
12  communications and entertainment product and service offerings, including local,
13  long distance, and wireless telephone services; Internet access; television
14  services; phones; and related equipment.[4]  Manning Decl., ¶ 8.  Products and
15  services provided under the VERIZON Marks reach one-third of the United
16  States households, and more than one-third of Fortune 500 company
17  headquarters, as well as the United States federal government.  *Id.*  The Verizon
18  Companies have extensive operations in the United States and some of the
19  Verizon Companies operate throughout the world. *Id.*

20  The Verizon Companies' main Internet websites using the VERIZON
21  Marks feature information on many of the products and services of the Verizon
22  Companies and can be accessed at the domain names verizon.com and
23  verizon.net, which have used the VERIZON Marks since at least as early as June

24  [3]  Copies of the registration certificates for each United States trademark
25  registration are attached to the Manning Decl. as Exhibits A, B, and C.
26  [4]  For example, the Verizon Companies use the VZ Marks to provide wireless
   voice and data products and services to 86.6 million customers nationwide.
27  Manning Decl., ¶ 11. The Verizon Companies' wireline business uses the
   VERIZON Marks to provide telephone and broadband products and services to
28  consumer and business customers in 25 states.  Manning Decl., ¶ 16.

2000, and verizonwireless.com which has used the VERIZON Marks since at least as early as April 2000.  Manning Decl., ¶ 12, and Exhibit D to the Manning Decl.  The Verizon Companies' main Internet websites using the VERIZON FIOS Marks featuring information on many of the products and services of the Verizon Companies can be accessed via the domain names verizon.com and verizonfios.com, which have used the VERIZON FIOS Marks since at least as early as August 2004.  Manning Decl., ¶ 13, and Exhibit E to the Manning Decl. The Verizon Companies' main Internet websites using the VZ Marks and featuring information on many of the products and services of the Verizon Companies can be accessed via the domain names verizon.com and vzw.com. Manning Decl., ¶ 14, and Exhibit F to the Manning Decl.

Plaintiffs' Marks are widely known and recognized among consumers and members of the telecommunications industry in the United States, and are unique and distinctive.  The Verizon Companies spend and have spent many millions of dollars each year to extensively advertise and promote VERIZON, VERIZON WIRELESS, FIOS, VERIZON FIOS, VZ, and VZW branded products and services in the United States through a variety of media, including television, radio, print advertisements, direct mail, trade shows, conferences, and the Internet. Manning Decl., ¶ 15.  The Verizon Companies expend substantial effort and expense to protect Plaintiffs' Marks and the marks' distinctiveness in the marketplace. *Id.*

### B. Defendant's Unlawful Cybersquatting Operations

Defendant operates a massive cybersquatting operation and has registered and used over 100,000 domain names (collectively "Defendant's Domain Names").  Bradley Decl., ¶ 10.  Defendant has registered many of these domain names for his own use, *i.e.* Defendant, or one of his alter egos or aliases, is both the registrar and registrant of Defendant's Domain Names.  Bradley Decl., ¶ 9. Defendant has also actively participated and assisted in the cybersquatting of

other entities in violation of Plaintiffs' trademark rights.

Many of Defendant's Domain Names are confusingly similar to trademarks owned by others ("Confusingly Similar Domain Names"), including trademarks that also serve as the names of some of the world's most well-known companies. Bradley Decl., ¶ 11.  The famous trademarks that Defendant has cybersquatted include:   AMERICAN  EXPRESS,  BANK  OF  AMERICA,  CINGULAR WIRELESS, DIRECTV, EHARMONY, FORD MOTORS, GOOGLE, HARLEY DAVIDSON, ITT, J.C. PENNEY, KELLY BLUE BOOK, LEXIS NEXUS, MAPQUEST, NASCAR, OFFICE DEPOT, POKEMON, QUICKBOOKS, RADIO  SHACK,  SEARS,  TOYOTA,  UNITED  AIRLINES,  VICTORIA'S SECRET, WALMART, XM RADIO, YAMAHA, and ZALES.  Bradley Decl., ¶ 11, Exhibit 9 to the Bradley Decl.  In fact, Defendant's portfolio of domain names is so infested with domain names that infringe famous trademarks that the *representative* list filed in Exhibit 9 to the Bradley Declaration is fourteen pages long and contains over fourteen hundred domain names which are confusingly similar to just twenty six representative famous marks.  *Id.*[5]

Defendant has registered at least 238 domain names that are identical or confusingly similar to Plaintiffs' Marks alone.  Bradley Decl., ¶ 18 and Exhibit 13 to the Bradley Decl.   The extraordinary number of domain names that are confusingly  similar  to  famous  marks  shows  that  Defendant  is  intentionally targeting famous marks as part of his cybersquatting business.

Defendant registers and uses these confusingly similar domain names to lure Internet users who are searching for genuine websites associated with famous or distinctive trademarks.   The websites hosted at most of these confusingly similar  domain  names  display  links  featuring  goods  or  services  directly

---

[5] This representative list includes the infringing domain names for only one famous mark for each letter of the alphabet.  Bradley Decl., ¶ 11 and Exhibit 9 to the Bradley Decl.

CHRISTIE, PARKER & HALE, LLP

competitive with those sold or provided in connection with the famous or distinctive trademarks. For instance, websites hosted at the Confusingly Similar Domain Names display HTML links featuring advertisements for goods and services that are directly competitive with those sold or provided in connection with Plaintiffs' Marks. Bradley Decl., ¶¶ 12-13, 18-21 and Exhibits 10 and 13-15 to the Bradley Decl. Advertisers, search engines, and affiliate programs make payment each time an advertisement is displayed or a link is clicked on that domain name.

Defendant identifies available domain names he believes will be profitable because of anticipated Internet traffic resulting from "typosquatting" - domain names containing typographical variations of others' marks—and the consumer confusion it causes. Defendant also registers and uses domain names that combine others' marks (or variations thereof) with generic or descriptive terms.

Defendant employs various means to conceal his true identity and involvement in the registration, trafficking in, and use of Defendant's Domain Names. Defendant conducts business using numerous shell-entities, fictitious business, and personal names. Bradley Decl., ¶¶ 14-17 and Exhibits 11-12 to the Bradley Decl. For example, Defendant conducts business using at least the following aliases: Privacy Protection, Private Whois Escrow Domains Private Limited, PrivacyProtect.org, Watch My Domain, Comdot Internet Services Private Limited, Cyber Veillance Private Limited and Laksh Internet Solutions Private Limited. *Id*. Defendant has conducted business, or is conducting business, holding himself out as, or has held himself out as, one or more of these aliases. *Id*.

## III.   DEFENDANT VIOLATED THE ACPA

### A.   Legal Stand For Cybersquatting

Pursuant to the ACPA, cybersquatting involves the (1) registration, use, or trafficking in, a domain name (2) that is identical or confusingly similar to a

distinctive or famous trademark, (3) with a bad faith intent to profit from the mark.  15 U.S.C. § 1125(d).  As will be shown below, Defendant has violated the ACPA and must be enjoined from continuing its cybersquatting.

### 1.  Defendant's Registration And Use Of Domain Names

Defendant has registered, used, or trafficked in at least 238 domain names that are confusingly similar to Plaintiffs' Marks.  Bradley Decl., ¶ 18 and Exhibit 13 to the Bradley Decl.  Defendant uses these confusingly similar domain names to host websites that display links, featuring goods or services that are directly competitive with Plaintiffs' goods and services.  Bradley Decl., ¶ 19 and Exhibit 14 to the Bradley Decl.

### 2.  The Domain Names Are Confusingly Similar to Plaintiffs' Distinctive and Famous Marks

#### a)    The VERIZON Marks Are Distinctive And Famous

Verizon Trademark Services owns numerous United States trademark registrations for Plaintiffs' Marks.  Manning Decl., ¶¶ 4, 5, 6 and Exhibits A, B, C to the Manning Decl.  The VERIZON Marks have been used in interstate commerce by the Verizon Companies since 2000 to designate the products and services offered by the Verizon Companies.  Manning Decl., ¶¶ 8, 16.  The VERIZON FIOS Marks have been used in interstate commerce by the Verizon Companies since 2004, and several of the VZ Marks have been used in interstate commerce by the Verizon Companies since 2000.  Manning Decl., ¶¶ 9, 10.

The Verizon Companies expend substantial effort and expense to protect these marks and their distinctiveness in the marketplace.  As such, the VERIZON Marks, the VERIZON FIOS Marks, and the VZ Marks are unique and distinctive and designate a single source of origin.  Manning Decl., ¶ 15.  *See, e.g., Patsy's Brand v. I.O.B. Realty,* 58 U.S.P.Q.2d 1048, 1049 (S.D.N.Y.  2001) ("corporate giants have come to learn the value of choosing a distinctive name such as Xerox or Verizon ...").

The VERIZON Marks are also famous marks. The newly enacted dilution statute provides, "a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). In determining whether a mark possesses the requisite degree of recognition, courts may consider all relevant factors, including: (1) the duration, extent, and geographic reach of advertising and publicity of the mark; (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark was registered. *Id.*

The VERIZON Marks are well-known throughout the country. Currently, the Verizon Companies' wireline business uses the VERIZON Marks in connection with the provision of telephone and broadband products and services to consumer and business customers in 25 states (including California where such products and services are provided by Plaintiff Verizon California) and the District of Columbia serving a territory consisting of more than 35.1 million access lines and 8.9 million broadband connections. Manning Decl., ¶ 16. These products and services reach one-third of the United States households, and more than one-third of Fortune 500 company headquarters, as well as the U.S. federal government. Manning Decl., ¶ 8.

In 2008, Verizon Communications generated consolidated operating revenues of over 97 billion dollars. In addition, the Verizon Companies spend and have spent many millions of dollars each year since 2000 to extensively advertise and promote VERIZON and VERIZON WIRELESS branded products and services in the United States through a variety of media, including television, radio, print advertisements, direct mail, trade shows, conferences, and the Internet. Manning Decl., ¶¶ 3, 15.

The VERIZON Marks are widely known and recognized among consumers and others throughout the world. Having been widely promoted to the general

public, and having exclusively identified the Verizon Companies and their products and services, the VERIZON Marks symbolize the tremendous goodwill associated with the Verizon Companies and are a property right of incalculable value.  The VERIZON Marks have long enjoyed unquestionable fame as a result of favorable general public acceptance and recognition.  Manning Decl., ¶17.

> **b)**   **Defendant has Registered At Least 238 Domain Names That Are Confusingly Similar To Plaintiff's Marks**

Defendant has registered, used, or trafficked in at least 238 domain names that are confusingly similar to Plaintiffs' Marks. A representative list of these confusingly similar domain names includes names like:   veri8zon.com, verizon1.com, verizonnwireless.com, verizonvireless.com, verizonwirelesss.com and verizonphonebook.com.   The full list of these confusingly similar domain names appears in Exhibit 13 to the Bradley Declaration.

Some of these infringing domain names are confusingly similar to Plaintiffs' Marks because they are misspellings of Plaintiffs' Marks.   For example, the domain name verizonwirelesss.com merely adds an extra letter "s" into Plaintiffs' exact trademark.   And veri8zon.com merely inserts the number "8" (the number "8" and the letter "i" are close to each other on the keyboard and will often be pushed by accident when typing). "A reasonable interpretation of conduct covered by the phrase 'confusingly similar' is the intentional registration of domain names that are misspellings of distinctive or famous names, causing an Internet user who makes a slight spelling or typing error to reach an unintended site." *Shields v. Zuccarini,* 254 F.3d 476, 484 (3d Cir. 2001); *see also N. Light Tech., Inc. v. N. Lights Club*, 236 F.3d 57, 66 n.14 (1st Cir. 2001) (the identical or confusingly similar requirement of the ACPA looks to the facial similarity of the domain name with the mark).

In an earlier case on almost identical facts, *Verizon California Inc., et al., v. Navigation Catalyst Systems, Inc.*, 568 F. Supp. 2d 1088, *13  (C.D. Cal. 2008),

when granting Plaintiffs' motion for a preliminary injunction, this Court stated:

> [Defendants] never make the argument that the names
> they registered are not sufficiently close to Plaintiffs'
> marks to satisfy ACPA's requirement. Nor could they,
> especially in light of the fact that similarity here is judged
> not just by appearances, but by the likelihood that a
> particular domain name might be typed in accidentally by
> someone trying to type in one of Plaintiffs' marks or
> domain names [internal citations omitted]. For instance,
> at issue are ve3rizon.com and veri8zon.net, both of which
> consist of Plaintiffs' actual domain names, including
> Plaintiffs' trademarks, plus one extra character -- in both
> cases a character located on the computer keyboard next
> to a letter found in the correct domain name, making any
> websites using those domain names one easily-made typo
> away from Plaintiffs' primary domains.

Some of Defendant's other infringing domain names merely append a generic word associated with the Plaintiffs' Marks to the mark or a portion of the mark. For example, the domain name verizonphonebook.com merely appends the generic word "phonebook" to the VERIZON mark. Domain names which merely append a generic word to a distinctive or famous mark are also confusingly similar to the mark upon which they prey. *See, e.g.*, *Harrods Ltd. v. Sixty Internet Domain Names*, 157 F. Supp. 2d 658, 67-78 (E.D. Va. 2001), *aff'd in part*, *rev'd in part*, 302 F.3d 214 (4th Cir. 2002) (domain names adding descriptive or generic terms like "bank," "financial," and "shopping" to the mark HARRODS

held confusingly similar).

Defendant hosts websites on many of these 238 confusingly similar domain names which display links to goods and services that are directly competitive to Plaintiffs' goods and services. Bradley Decl., ¶¶ 18-19 and Exhibits 13-14 to the Bradley Decl. Defendant's effort to capitalize on Internet users' misspellings or mistypings when such users are looking for Plaintiffs' websites, including verizon.com, verizon.net and verizonwireless.com, are further evidence that each of these domain names is confusingly similar to the Plaintiffs' Marks.

### 3. Defendant's Bad Faith Intent To Profit From The Marks

The facts leave no question regarding Defendant's bad faith intent to profit. In determining whether Defendant possessed the required bad faith intent to profit from the Plaintiffs' Marks, the ACPA identifies nine separate factors for the courts to examine. 15 U.S.C. § 1125(d)(1)(B)(i). In this case, not surprisingly, most of the nine factors support or strongly support a finding that Defendant's registration and use of the 238 confusingly similar domain names were with a bad faith intent to profit from these marks.

**a)** **The trademark or other intellectual property rights of the person, if any, in the domain name (15 U.S.C. § 1125(d)(1)(B)(i)(I))**

Defendant has no intellectual property rights in any of the 238 confusingly similar domain names that they registered or used, nor have any of the Plaintiffs authorized Defendant to register or use the Plaintiffs' Marks. Manning Decl., ¶ 18. As such, the first bad faith intent factor under the ACPA supports a finding that Defendant registered the confusingly similar domain names with a bad faith intent to profit.

**b)** **The extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person (15 U.S.C.**

**§ 1125(d)(1)(B)(i)(II))**

Similarly, none of the 238 confusingly similar domain names consists of the legal names of Defendant nor is Defendant commonly known by any of these 238 confusingly similar domain names.  Therefore, the second bad faith intent factor under the ACPA supports a finding that Defendant registered the confusingly similar domain names with a bad faith intent to profit.

> **c)   The person's prior use, if any, of the domain name in connection with the *bona fide* offering of any goods or services (15 U.S.C. § 1125(d)(1)(B)(i)(III))**

The third bad faith factor under the ACPA asks the Court to analyze whether Defendant's prior use of the 238 confusingly similar domain names was in connection with a *bona fide* offering of any goods or services.  In this case, Defendant uses the confusingly similar domain names to lure Internet users trying to reach Plaintiffs' actual websites, including verizon.com, verizon.net and verizonwireless.com, to websites featuring advertisements and links to goods or services directly competitive with Plaintiffs' goods and services.  It is well settled that misdirecting Internet traffic with the intent to trade on another party's mark is unlawful. *Brookfield Commc'ns., Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036, 1059 (9th Cir. 1999).  Since this unlawful use cannot be a *bona fide* offering of goods or services, the third bad faith intent factor supports a finding of Defendant's bad faith intent to profit.

> **d)   The person's *bona fide* noncommercial or fair use of the mark in a site accessible under the domain name (15 U.S.C. § 1125(d)(1)(B)(i)(IV))**

Defendant's use of the 238 confusingly similar domain names was and is purely commercial.  He selected and registered domain names that would generate revenue from advertisers, search engines, and affiliate programs, and engineered its systems to maximize Defendant's returns.  Because none of the

websites contained any commentary about, or comparisons of, Plaintiffs' goods or services, Defendant's use was not a *bona fide* noncommercial or fair use. Further, since Defendant's use of each of these domain names is purely commercial it cannot be a noncommercial use.  Therefore, the fourth bad faith factor supports a finding that Defendant registered the confusingly similar domain names with a bad faith intent to profit.

> e) **The person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site (15 U.S.C. § 1125(d)(1)(B)(i)(V))**

In view of the similarity between the 238 confusingly similar domain names and Plaintiffs' Marks, it is obvious that Defendant's intent was to divert consumers searching for Plaintiffs' websites.  "Cybersquatters often register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site, many of which are pornography sites that derive advertising revenue based on the number of visits, or 'hits,' the site receives."  *Shields v. Zuccarini,* 254 F.3d at 484.  Although Defendant's sites do not involve pornography, Defendant's intent is the same as the defendant in *Zuccarini*: "to register a domain name in anticipation that consumers would make a mistake, thereby increasing the number of hits his site would receive, and consequently, the number of advertising dollars he would gain." *Id*

The only reason that consumers would access the websites at any of the 238 confusingly similar domain names is because these domain names are misspellings or mistypings of Plaintiffs' Marks or the domains names are generic

1   words appended to the Plaintiffs' Marks.  As stated by this Court in *Verizon*

2   *California Inc., et al. v. Navigation Catalyst Systems, Inc., et al.*, 568 F. Supp. at

3   *18:

4           It is clear that [Defendants'] intent was to profit from the

5           poor typing abilities of consumers trying to reach

6           Plaintiffs' sites: what other value could there be in a

7           name like ve3rizon.com? Further, the sites associated

8           with these names often contained links to products

9           directly competitive with Plaintiffs' cellphone and

10          internet businesses, potentially diverting consumers who

11          would otherwise have purchased goods or services from

12          Plaintiffs away from Plaintiffs.

13          Defendant thus intended to create a likelihood of confusion in order to

14  capitalize, for his own commercial gain, on the mistakes of consumers looking for

15  Plaintiffs' websites.  Defendant's desire to profit from the misspellings or

16  mistypings by consumers is further evidenced by the fact that websites at each of

17  these confusingly similar domain names featured links to goods and services

18  directly competitive to Plaintiffs' goods and services.  Bradley Decl., ¶¶ 18-21

19  and Exhibits 13-15 to the Bradley Decl.

20          In addition, Plaintiffs are harmed by the likelihood that consumers will

21  mistakenly access Defendant's confusingly similar domain names.  "Prospective

22  users of plaintiff's services who mistakenly access defendant's web site may fail

23  to continue to search for plaintiff's own home page ...."  *Panavision*

24  *International, L.P. v. Toeppen, et al.,* 141 F.3d 1316, 1327 (9th Cir. 1998)

25  (citations omitted).

26          Finally, it defies logic to believe that Defendant did not know what he was

27  doing.  Given the large number of Defendant's domain names that are

28  confusingly similar to the VERIZON Marks, Defendant must have known that

these domain names were receiving traffic **solely** because they were misspellings or mistypings of the VERIZON Marks. Why else would verizonwirelesss.com, for example, receive traffic unless customers were trying to reach verizonwireless.com? Despite this knowledge, Defendant continued to register and use confusingly similar domain names. Bradley Decl., ¶¶ 11-13 and Exhibits 9-10 to Bradley Decl.

Accordingly, this fifth bad faith factor strongly supports that Defendant willfully registered the confusingly similar domain names with a bad faith intent to profit from the Plaintiffs' Marks

> **f)   The person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct (15 U.S.C. § 1125(d)(1)(B)(i)(VI))**

In the past, Defendant has offered for sale confusingly similar domain names to trademark owners attempting to recover infringing domain names. In one case, in a dispute involving Defendant's Domain Names that were confusingly similar to a trademark, the attorneys for the trademark owner received an offer from Defendant purportedly from the actual registrant of two domain names. Bradley Decl., ¶ 47. Additionally, numerous other trademark owners have, after prevailing in a UDRP proceeding, received offers to sell the domain names instead of receiving the domain names. Bradley Decl., ¶ 48.

Therefore, the sixth bad faith factor supports a finding that Defendant registered the confusingly similar domain names with a bad faith intent to profit.

> **g)   The person's provision of material and misleading false contact information when applying for the registration of**

CHRISTIE, PARKER & HALE, LLP

-15-

**the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct (15 U.S.C. § 1125(d)(1)(B)(i)(VII))**

Defendant conducts business using numerous shell-entities, fictitious business, and personal names in order to avoid detection by Plaintiffs and other trademark owners.   Bradley Decl., ¶¶ 14-15.   Plaintiffs were able to identify seven different identities Defendant uses when registering domain names. *Id.*

This seventh bad faith factor of using numerous false identities and aliases when registering domain names also strongly supports finding that Defendant registered at least 238 confusingly similar domain names with a bad faith intent to profit.

> **h)   The person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties (15 U.S.C. § 1125(d)(1)(B)(i)(VIII))**

The eighth bad faith factor, in short, focuses on the number of infringing domain names a defendant has registered.   Courts consider excessive numbers of infringing domain names as strong proof of bad faith as well as an important factor in determining the amount of statutory damages to be awarded under the ACPA.  *See Shields v. Zuccarini,* 254 F.3d at 485 n. 5 (Zuccarini's registration of thousands of Internet domain names that are identical or confusingly similar to the distinctive marks of others reflects a "pattern of behavior ... consistent with a bad faith intent to profit").

1  Here, Defendant has engaged in one of the largest cybersquatting

2  operations ever witnessed, having registered at least thousands of infringing

3  domain names.  Defendant has registered so many domain names that infringe

4  famous trademarks that the representative list attached as Exhibit 9 to the Bradley

5  Declaration is fourteen pages long and contains over 1,400 domain names that

6  were confusingly similar to only 26 famous marks.  Bradley Decl., ¶ 11, Exhibit 9

7  to the Bradley Decl.  This representative list included infringing domain names

8  for only one famous mark for each letter of the alphabet. *Id.*

9  Furthermore, Defendant intended to divert consumers from trademark

10  owners' websites to his own websites because he continued to register and use

11  confusingly similar domain names **even after Defendant had notice**.  *See*

12  *Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.,* 807 F.2d 1110, 1115 (2nd Cir.

13  1986) (actual or constructive knowledge on infringing acts proves willfulness);

14  *Louis Vuitton Malletier & Oakley, Inc. v. Veit,* 211 F. Supp. 2d 567, 583 (E.D. Pa.

15  2002) ("Willfulness can be inferred by the fact that a defendant continued

16  infringing behavior after being given notice").  Here, Defendant knew that he had

17  improperly registered hundreds of domain names confusingly similar to the

18  trademarks of others because he has subjected to numerous administrative

19  proceedings under the UDRP.  Yet, Defendant continued cybersquatting on the

20  marks of others.  Bradley Decl., ¶¶ 10-11, 25-36 and Exhibits 9, 18-26 to the

21  Bradley Decl.

22  This eighth bad faith factor strongly supports a finding that Defendant

23  registered 238 domain names with a bad faith intent to profit from Plaintiffs'

24  Marks.

25        i)    **The extent to which the mark incorporated in the person's**

26                **domain name registration is or is not distinctive and**

27                **famous within the meaning of subsection (c) of section 43**

28                **(15 U.S.C. § 1125(d)(1)(B)(i)(IX))**

1

2

3

The final factor also strongly supports Defendant's bad faith intent to profit.  As discussed above, Plaintiffs have created in their marks some of the most famous and distinctive marks in the world.

4

## IV.  PLAINTIFFS ARE ENTITLED TO FINAL DEFAULT JUDGMENT

5

6

7

8

9

Courts have inherent equitable powers to enter default judgments for failure to defend a lawsuit.  When entering a default judgment, the general rule is that upon default the factual allegations of the complaint are considered to be true.  *DirecTV, Inc. v. Huynh,* 503 F. 3d 847, 851 (9th Cir.  2007).  *See also*, Fed. R. Civ. P., Rule 55.

10

11

12

13

14

15

16

17

18

19

20

21

Defendant was served with the Summons and Complaint on April 17, 2010 pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters ("Hague Convention").  *See* Proof of Service of Defendant Mahesh Malik and Exhibits to Proof of Service of Defendant Mahesh Malik (Dkt. ## 108 & 108-1). Defendant has failed to appear,[6] respond to the Complaint or file any other pleading or motion permitted by law within the time prescribed by Rule 12(a)(1)(A) of the Federal Rules of Civil Procedure. *See* August 17, 2010 Declaration of David J. Steele In Support Of Plaintiffs' Request For Entry Of Default Of Defendant Mahesh Malik at ¶ 3 (Dkt. # 114-1).  The Court ordered the Clerk of the Court to enter Defendant's Default on August 23, 2010. (Dkt. # 116). On August 23, 2010, default was entered against Defendant. (Dkt. # 117).

22

23

24

Where a defendant refused to defend a suit, by not responding to the or to the clerk's entry of default, the defendant leaves no other remedy to the plaintiff than default judgment. *Johnson v. Connolly*, 2007 U.S. Dist. LEXIS 31721, at *4

25

26

27

28

---

[6] Although Defendant has not formally appeared in this action, Plaintiffs provided Defendant written notice of this application on December 3, 2010. *See Microsoft Corp. v. Evans*, 2007 U.S. Dist. LEXIS 77088 (E.D. Cal. 2007) (a defaulting party is entitled to written notice of the application for default judgment unless the party has not appeared in the action citing Fed. R. Civ. P. 55(b)(2).)

1   (N.D. Cal. 2007). Since Defendant has failed to respond or appear in this case,

2   Plaintiffs are entitled to default judgment.[7]

3   **V.   PLAINTIFFS ARE ENTITLED TO STATUTORY DAMAGES FOR**

4   **DEFENDANT'S VIOLATIONS OF THE ACPA**

5   Under the ACPA, a prevailing "plaintiff may elect, at any time before final

6   judgment is rendered by the trial court, to recover, instead of actual damages and

7   profits, an award of statutory damages in the amount of not less than $1,000 and

8   not more than $100,000 per domain name, as the court considers just." 15 U.S.C.

9   § 1117(d). In drafting the ACPA, Congress expressly provided for these statutory

10   damages "both to deter wrongful conduct and to provide adequate remedies for

11   trademark owners who seek to enforce their rights in court." See S. Rep. No.

12   106-140, at 8 (1999). *See also* H.R. Conf. Rep. No. 106-464, at 38 (1999).

13   The Court is granted wide discretion in determining the amount of statutory

14   damages within the specified range. *See Kiva Kitchen & Bath, Inc. v. Capital*

15   *Distrib. Inc.,* No. 08-20303, 2009 U.S. App LEXIS 7344 at *9 (5th Cir. Tex.

16   2009) (upholding a statutory damages award of $100,000 for three domain

17   names) (quoting *Columbia Pictures Television, Inc. v. Krypton Broad. of*

18   *Birmingham, Inc.,* 259 F.3d 1186, 1194 (9th Cir. 2001) for its discussion of

19   analogous statutory damages provision for copyright infringement). An analysis

20   of prior cases in which courts have awarded statutory damages under the ACPA

21   shows that the following considerations are among the most important in

22   determining the amount of statutory damages: the egregiousness or willfulness of

23   the defendant's conduct, defendant's use of false contact information, whether the

24   defendant has engaged in a pattern of registering and using large numbers of

25   domain names that infringe the rights of many different parties.

26

27   _____

    [7] Mahesh Malik is not a minor or an incompetent person or in military service or

28   otherwise exempted under the Servicemembers Civil Relief Act, 50 App. U.S.C.
    § 521. Declaration of David J. Steele, ¶ 2.

Numerous courts have awarded statutory damages at the high-end of the specified range in ACPA cases.  *See Electronics Boutique Holdings Corp. v. Zuccarini*, 2000 U.S. Dist. LEXIS 15719 at *24 (E.D. Pa. 2000) (awarding $100,000 per infringing domain name*); Graduate Mgmt. Admission Council v. Raju*, 267 F. Supp. 2d 505, 512-513 (E.D. Va. 2003) (awarding $100,000 per domain name); *Neiman Marcus Group, Inc. et al v. Rivard et al.*, Case No. CV-09-60594-WPD (S.D. Fla. July 28, 2009) (awarding $100,000 per domain name); *Citigroup Inc. and Diners Club Intl. Ltd. v. Naresh Malik a/k/a Nick M., et. al.*, Case No. CV-07-1168 (E.D. Va. July 15, 2009) (awarding $100,000 per infringing domain name); *Biocryst Pharms, Inc. v. Namecheap.com*, Case No. CV-05-7615 JFW (C.D. Cal. Nov. 21, 2006) (awarding $100,000 per domain name).  Accordingly, an award of the statutory maximum is appropriate within existing ACPA statutory damages jurisprudence

### A.      Defendant's Violations Are Willful and Egregious

In determining the appropriate amount of statutory damages under the ACPA, courts consider conduct by a defendant that shows "willfulness" supportive of an award on the high-end of the damages scale.  *See, e.g., Aztec Corp. v. MGM Casino*, 2001 U.S. Dist. LEXIS 13118 at *6 (E.D. Va. 2001) (awarding $ 100,000 per domain name when defendant's willful and bad faith infringement was especially deceptive and continued even after plaintiff put defendant on notice of the infringing conduct); *Citigroup, Inc. v. Chen Bao Shui*, 611 F. Supp. 2d 507, 512-513 (E.D. Va. 2009) (awarding $100,000 per domain name where the defendant had registered other Internet domain names which infringed plaintiff's marks, had used the domain names to provide advertisements for the plaintiff's competitors, and "sold the [contested] domain name for financial gain to a third-party in an apparent effort to avoid liability"); *Mirage Resorts, Inc. v. Cybercom Prods.,* 228 F. Supp. 2d 1141, 1142-43 (D. Nev. 2002) (awarding maximum statutory damages on default of $100,000 per domain

name).

Defendant has registered and used at least 238 domain names that are identical or confusingly similar to Plaintiffs' Marks.  Bradley Decl., ¶ 18 and Exhibit 13 to the Bradley Decl.  Defendant hosts websites on many of these domain names which display links to goods and services that are directly competitive to Plaintiffs' goods and services.  Bradley Decl., ¶ 19 and Exhibit 14 to the Bradley Decl.  These domain names are also used to provide pay-per-click advertisements and links that provide revenue to the domain name owner each time they are clicked.  Bradley Decl., ¶ 20.

Plaintiffs are entitled to the maximum of $100,000 per domain name because of the egregiousness of Defendant's practice of registering and using domain names which are confusingly similar to Plaintiffs' Marks.

**B.**     <u>Defendant's Use of False Contact Information is Extreme</u>

Another factor that supports an award of maximum statutory damages under the ACPA is Defendant's use of false contact information in registering the contested domain names.  *See Biocryst Pharms, Inc. v. Namecheap.com*, No. CV-05-7615 JFW at *4 (C.D. Cal. Nov. 21, 2006) (awarding $100,000 per domain name in part based on defendant's "having knowingly provided false contact information concealing his registration and use of [the domain name]").

In registering the 238 domain names that are identical or confusingly similar to Plaintiff's Marks, Defendant uses several false identities to hide his ownership and to avoid detection by trademark owners.  Bradley Decl., ¶¶ 14, 15, 22 and 37 and Exhibits 11, 16, and 20-26 to the Bradley Decl.  In fact, Defendant went to extreme measures to hide his identity as the registrant of these domain names.  For example, Defendant created shell corporate entities for use in filing defective appeals designed to delay the timely transfer of domain names ordered transferred under the UDRP.  Bradley Decl., ¶¶ 37 and Exhibits 20-26 to the Bradley Decl.

1   Since Defendant knowingly provided materially false contact information

2   in the registration of the infringing domain names (as well as other domain

3   names), the Court should award statutory damages of $100,000 per domain name.

4   **C.    <u>Defendant Engaged in a Pattern of Unlawful Cybersquatting</u>**

5   **<u>Against Famous Marks</u>**

6   In determining the appropriate amount of statutory damages under the

7   ACPA, courts also consider whether the defendant has engaged in a pattern of

8   registering and using large numbers of domain names that infringe the rights of

9   many different parties.  When excessive numbers of infringing domain names

10   have been registered and used, courts have awarded high statutory damages.  *See,*

11   *e.g. Electronics Boutique Holdings Corp. v. Zuccarini*, 2000 U.S. Dist. LEXIS

12   15719 at *24 (E.D. Pa. 2000) (awarding $100,000 per infringing domain name,

13   noting Mr. Zuccarini's pattern of registering names that "are misspellings of

14   famous names and infringe on the marks of others," recognizing the significant

15   number of cases brought by other trademark owners for the same type of

16   infringement, and commenting on Mr. Zuccarini's new registrations of infringing

17   domain names after notice); *Lahoti v. Vericheck, Inc.*, 2007 U.S. Dist. LEXIS

18   91997 at *39 (W.D. Wash. 2007) (awarding $100,000 per infringing domain

19   name in part because of the defendant's "pattern and practice of registering

20   domain names that incorporate the trademarks of others"); *Citigroup Inc. and*

21   *Diners Club Intl. Ltd. v. Naresh Malik a/k/a Nick M., et. al.*, No. CV-07-1168

22   (E.D. Va. July 15, 2009) (awarding $100,000 per infringing domain name based

23   on magistrate's recommendation that the defendant was a "serial cybersquatter,

24   whose prior conduct indicates a pattern of wrongfully registering domain names

25   designed to infringe on trademarks").

26   Defendant operates a massive cybersquatting operation and has registered

27   and used thousands of domain names.  Bradley Decl., ¶ 11 and Exhibit 9 to the

28   Bradley Decl.  Defendant's bad faith is evident by the intentional registration and

use of at least 238 domain names which are confusingly similar to Plaintiffs' Marks and over 1,400 domain names confusingly similar to other famous marks. Bradley Decl., ¶¶ 11, 18 and Exhibits 9 and 13 to the Bradley Decl.   The extraordinary number of domain names that are confusingly similar to famous marks shows that Defendant intentionally targeted famous marks as part of his cybersquatting business.

## VI.  **PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION**

Injunctive relief is specifically authorized under 15 U.S.C. §1116(a) to prevent violations under the ACPA.  Moreover, "[i]njunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by defendant's continuing infringement." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175 (9th Cir. 1988); *Bellagio v. Denhammer*, 2001 U.S. Dist. LEXIS 24764 (D. Nev. July 10, 2001) (granting a plaintiff permanent injunction prohibiting Defendant from registering any other domain names that contain the Plaintiff's mark or variations thereof).

There is no question that Defendant is liable under the ACPA. Defendant has intentionally registered and used at least 238 domain names which are confusingly similar to Plaintiffs' Marks and over 1,400 domain names confusingly similar to other famous marks.  Bradley Decl., ¶¶ 11, 18 and Exhibits 9 and 13 to the Bradley Decl.

In light of Defendant's liability under the ACPA, Plaintiffs are entitled to a permanent injunction enjoining Defendant from registering, trafficking in or using any domain name that is identical or confusingly similar to the trade names and/or trademarks VERIZON, VERIZON WIRELESS, VZ, VZACCESS, VZEMAIL, VZGLOBAL, VZVOICE, VZW, FIOS and VERIZON FIOS, and assisting, aiding or abetting any other person or business entity in engaging in or performing any of these activities.

## VII. <u>THERE IS NO JUST REASON FOR DELAY AND DIRECT ENTRY OF A DEFAULT FINAL IS PROPER UNDER RULE 56(b)</u>

The Court Clerk for this Court entered a default judgment against Defendant on August 23, 2010. (Dkt. # 117). The Court previously entered final default judgment against two other defendants in this Action, Lead Networks Domains Private Limited and Naresh Malik a/k/a Nick M. (collectively, "Other Defendants"). (Dkt. # 87). However, neither the judgments against the Other Defendants, nor the applied for final default judgment against Defendant fully concludes this Action, because the Doe defendants remain active in the Action. However, there is no just reason to delay entry of the current judgment until final adjudications have been obtained against the Doe defendants. In fact, delaying entry of the current judgment until such final adjudications have been obtained will prejudice Plaintiffs.

Plaintiffs have been authorized by this Court to take discovery in order to ascertain the identities of the Doe defendants. (Dkt. # 82.). Plaintiffs have conducted discovery and have made progress in ascertaining the identities of the Doe defendants. Plaintiffs filed their Request for Status Conference concurrently with this Application For Final Default Judgment, and have requested a hearing on the Final Default Judgment on the same day. During the requested status conference Plaintiffs' counsel intend to update the Court about their progress identifying the Doe defendants and to discuss amending their Complaint.

It is expected that additional time will pass before the identities of the Doe defendants are ascertained, those defendants are served, and those defendants defend in this Action to a final adjudication. If entry of the current judgment were delayed until final adjudications have been obtained against all the remaining defendants, Plaintiffs would be unable to enforce their judgment against the Judgment Defendant for a long period of time. In the meantime, the Defendant, who has willfully violated federal law and who is a resident of a foreign county,

1  would be given the opportunity to sequester assets, including assets as evanescent
2  as electronic domain name registrations, in order to frustrate Plaintiffs' judgment
3  collection. Such a delay in enforcement of the current judgment would thus
4  prejudice Plaintiffs. Accordingly, Plaintiffs request immediate entry of final
5  judgment against Judgment Defendant under Federal Rules of Civil Procedure 54
6  and 55, substantially in the form lodged with this request.

7  ## VIII.  CONCLUSION

8  For the above reasons, Plaintiffs request that the Court enter final default
9  judgment against Defendant for his willful violation of the ACPA by registering,
10 trafficking in or using at least 238 domain names which are identical or
11 confusingly similar to Plaintiffs' Marks.  Plaintiffs further request final judgment
12 in the amount of $23,800,000 in statutory damages, an order requiring Defendant
13 to transfer all confusingly similar domain names to Plaintiffs and a permanent
14 injunction enjoining Defendant from registering, trafficking in or using any
15 domain name that is identical or confusingly similar to Plaintiffs' Marks and
16 assisting, aiding or abetting any other person or business entity in the same.

18 Dated:  December 3, 2010            Respectfully submitted,
19                                     CHRISTIE, PARKER & HALE, LLP

20                                     By  /s/ David J. Steele
                                             David J. Steele

21                                     Attorneys for Plaintiffs
22                                     VERIZON CALIFORNIA INC.
                                       VERIZON TRADEMARK SERVICES LLC
23                                     VERIZON LICENSING COMPANY

26 LLB IRV1120012.1-*-12/3/10 3:46 PM

# CERTIFICATE OF SERVICE

I certify that on December 3, 2010, pursuant to Federal Rules of Civil Procedure, a true and correct copy of the foregoing document described as **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR FINAL DEFAULT JUDGMENT AGAINST DEFENDANT MAHESH MALIK** was served on the party(ies) in this action as follows:

**MAHESH MALIK**

**By First Class International Air Mail to:**
707/C Neptune Apts, 4th Cross Lane,
Lokhandwala Complex, Andheri (West)
Mumbai Maharashtra 400053
India

**By Email to:**
Mahesh@LeadNetworks.in

I declare that I am employed by a member of the bar of this Court, at whose direction this service was made.

Executed on December 3, 2010 at Newport Beach, California.

Linda L. Bolter