1  **DAVID J. STEELE, CA Bar No. 209797**
   **Email:  djslit@cph.com**
2  **CHRISTIE, PARKER & HALE, LLP**
   **3501 Jamboree Road, Suite 6000 - North Tower**
3  **Newport Beach, CA 92660**
   **Telephone: (949) 476-0757**
4  **Facsimile:  (949) 476-8640**

5  **HOWARD A. KROLL, CA Bar No. 100981**
   **Email:  howard.kroll@cph.com**
6  **CHRISTIE, PARKER & HALE, LLP**
   **350 West Colorado Boulevard, Suite 500**
7  **Pasadena, California 91105**
   **Telephone: (626) 795-9900**
8  **Facsimile:  (626) 577-8800**

9  **SARAH B. DEUTSCH (Admitted *pro hac vice*)**
   **Email:  sarah.b.deutsch@verizon.com**
10 **VERIZON CORPORATE RESOURCES GROUP LLC**
   **1320 North Court House Road, 9th Floor**
11 **Arlington, VA 22201**
   **Telephone: (703) 351-3044**
12 **Facsimile:  (703) 351-3670**

13 Attorneys for Plaintiffs
   VERIZON CALIFORNIA INC.
14 VERIZON TRADEMARK SERVICES LLC
   VERIZON LICENSING COMPANY
15

16                UNITED STATES DISTRICT COURT

                  CENTRAL DISTRICT OF DISTRICT
17
                       WESTERN DIVISION

18 | VERIZON CALIFORNIA INC.; | Case No. CV 09-00613 ABC (CWx) |
19 | VERIZON TRADEMARK SERVICES LLC; and VERIZON LICENSING COMPANY, | **APPENDIX OF AUTHORITIES NOT AVAILABLE IN THE FEDERAL REPORTER CITED IN MEMORANDUM OF POINTS** |
20 | | **AND AUTHORITIES IN** |
21 | Plaintiffs, | **SUPPORT OF APPLICATION FOR FINAL DEFAULT JUDGMENT AGAINST** |
22 | vs. | **MAHESH MALIK** |
23 | LEAD NETWORKS DOMAINS PRIVATE LIMITED; NARESH MALIK a/k/a NICK M.; MAHESH MALIK; KEVIN DASTE; and DOES 1-100, | **DATE:    January 10, 2011** |
24 | | **TIME:    10:00 a.m.** |
25 | | **CTRM:    680** |
26 | Defendants. | **Hon. Audrey B. Collins** |

27

28

1
2
3
4
5

          Plaintiffs Verizon California Inc., Verizon Trademark Services LLC, and
Verizon Licensing Company submit the following Appendix of Authorities,
attached as Exhibit A, which contains cases cited in their Memorandum of Points
and Authorities in Support of Application for Final Default Judgment Against
Mahesh Malik that are not available in the Federal Reporter.

6
7
8

                              **APPENDIX**

9
10
11

**Cases**:

*Aztar Corp. v. MGM Casino*,
          2001 U.S. Dist. LEXIS 13118 (E.D. Va. 2001)

12
13

*Bellagio v. Denhammer*,
          2001 U.S. Dist. LEXIS 24764 (D. Nev. July 10, 2001)

14
15

*Biocryst Pharms, Inc. v. Namecheap.com*,
          Case No. CV-05-7615 JFW (C.D. Cal. Nov. 21, 2006)

16
17

*Citigroup Inc. and Diners Club International Ltd. v. Naresh Malik a/k/a
Nick M., et. al.*,
          Case No. CV-07-1168 (E.D. Va. July 15, 2009)

18
19

*Electronics Boutique Holdings Corp. v. Zuccarini*,
          2000 U.S. Dist. LEXIS 15719 (E.D. Pa. 2000)

20

*Johnson v. Connolly*,
          2007 U.S. Dist. LEXIS 31721 (N.D. Cal. 2007)

21
22

*Kiva Kitchen & Bath, Inc. v. Capital Distributing Inc.*,
          Case No. 08-20303, 2009 U.S. App. LEXIS 7344
          (5th Cir. Tex. 2009)

23
24

*Lahoti v. Vericheck, Inc.*,
          2007 U.S. Dist. LEXIS 91997 (W.D. Wash. 2007)

25
26
27
28

*Microsoft Corp. v. Evans*,
          2007 U.S. Dist. LEXIS 77088 (E.D. Cal. 2007)

1 | *Neiman Marcus Group, Inc. et al v. Rivard et al.,*
2 | Case No. CV-09-60594-WPD (S.D. Fla. July 28, 2009)

3

4 | CHRISTIE, PARKER & HALE, LLP

5 | Dated:  December 3, 2010          By   /s/ David J. Steele

6 | David J. Steele
   | Howard A. Kroll

7 | Attorneys for Plaintiffs
8 | VERIZON CALIFORNIA INC.
   | VERIZON TRADEMARK SERVICES LLC
9 | VERIZON LICENSING COMPANY

10

11

12

13 | LLB IRV1120013.1-*-12/3/10 1:21 PM

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A



LEXSEE 2001 U.S. DIST. LEXIS 13118

**AZTAR CORPORATION, Plaintiff, v. MGM CASINO, and TROPICANACASINO.COM, an Internet domain name, Defendants.**

**CIVIL ACTION NO. 00-833-A**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION**

**2001 U.S. Dist. LEXIS 13118; 59 U.S.P.Q.2D (BNA) 1460**

**March 12, 2001, Decided
March 12, 2001, Filed**

**SUBSEQUENT HISTORY:**    [*1] Adopting Order of April 9, 2001, Reported at: 2001 U.S. Dist. LEXIS 13110.

**DISPOSITION:**    Recommended that this entry of default judgment in favor of Plaintiff.

**COUNSEL:** For AZTAR CORPORATION, plaintiff: William MacK Webner, Sughrue, Mion, Zinn, Maepeak & Seas, LLC, Washington, DC.

**JUDGES:** Barry R. Poretz, United States Magistrate Judge.

**OPINION BY:** Barry R. Poretz

**OPINION**

REPORT AND RECOMMENDATION

I. Procedural History

This matter came before the Court on December 1, 2000 pursuant to Plaintiff's Motion for Default Judgment. Plaintiff filed its eight-count Complaint against Defendant MGM Casino ("MGM") and others [1] on May 19, 2000, alleging false designation of origin and trade name infringement under § 43(a) of the Lanham Act (count I), trademark and service mark infringement under

§ 32 of the Lanham Act (count II), counterfeiting under § 32(1)(a) of the Lanham Act (count III), dilution under § 43(c) of the Lanham Act (count IV), cyberpiracy under § 43(d) of the Lanham Act (count V), *in rem* cyberpiracy under § 43(d)(2) of the Lanham Act (count VI), [2] trademark and service mark infringement under the common law of Virginia (count VII), and unfair competition under the common law of Virginia (count VIII).

1    MGM is the sole remaining defendant in this matter. All defendants initially named in this lawsuit except MGM and the domain name "tropicanacasino.com" have been dismissed pursuant to a settlement agreement reached with Plaintiff.

The domain name "tropicanacasino.com" was named as a separate defendant as an alternative cause of action under the *in rem* provision of the Anticybersquatting Consumer Protection Act ("ACPA"). Plaintiff voluntarily dismissed its *in rem* claim (count VI) without prejudice, however, on February 26, 2001 because it believed that this Court had personal jurisdiction over MGM. *See* Pl.'s Supp. Mem. in Supp. of Pl.'s Mot. for Default J. at 6.

[*2]

2    Plaintiff voluntarily dismissed its *in rem* claim without prejudice on February 26, 2001, electing instead to proceed in personam against MGM. *See*

Case 2:09-cv-00613-ABC-CW   Document 120-1   Filed 12/03/10   Page 6 of 75   Page ID #:2393

Page 2

2001 U.S. Dist. LEXIS 13118, *2; 59 U.S.P.Q.2D (BNA) 1460

Pl.'s Supp. Mem. in Supp. of Pl.'s Mot. for Default J. at 6.

On June 13, 2000, Plaintiff filed the registrar certificate for the domain name "tropicanacasino.com," previously obtained from Network Solutions, Inc. ("NSI"), with the Court. Service on Defendant MGM was made in person on July 26, 2000 on John Becker. [3] Proof of service was filed with this Court on September 12, 2000. Defendant has not filed an answer or any other responsive pleadings in this case. The Clerk entered the default of Defendant MGM Casino on September 25, 2000. On December 1, 2000, the Court held a Hearing on *Ex Parte* Proof of Damages at which Plaintiff's counsel appeared.

> 3   Service of the Summons and Complaint was made in accordance with the Hague Convention, as authorized by Fed. R. Civ. P. 4(f). Specifically, service upon Defendant was effected by the Registrar of the High Court of Antigua, the Central Authority designated by Antigua to serve process pursuant to the Hague Convention. *See* Plaintiff's Exhibit S

[*3] This Court has subject matter jurisdiction over this matter pursuant to § 39 of the Lanham Act, 15 U.S.C. § 1121, 28 U.S.C. § 1331, 1332, and 1338(a), for the claims arising out of §§ 32(1)(a) and 43(a), (c), and (d) of the Lanham Act. This Court has supplemental jurisdiction under 28 U.S.C. 1367 for the claims arising out of Virginia's common law of trademark and service mark infringement. This Court has personal jurisdiction over Defendant MGM pursuant to the "tortious injury" provisions of Virginia's long arm statute. Va. Code Ann. § 8.01-328.1(A)(3) and (4). Defendant's interactive web site is accessible in Virginia and solicits Virginia residents to risk money through on-line gambling activities. Complaint P 7. Each act of access to Defendant's web site by a Virginia computer user constitutes a "tortious injury" by an act in Virginia. Va. Code Ann. § 8.01-328.1(A)(3); *see also Playboy Enterprises v. AsiaFocus Int'l., Inc.*, 1998 U.S. Dist. LEXIS 10359, No. Civ.A.97-734-A, 1998 WL 724000, *4-6 (E.D. Va. Feb. 2, 1998). Moreover, Defendant's continuous use of its infringing web site constitutes a tortious injury in Virginia [*4] by an act outside of Virginia. Va. Code Ann. § 8.01-328.1(A)(4); *see also Alitalia-Linee Aeree Italiane S.p.A. v. Casinoalitalia.com*, 128 F. Supp. 2d 340, 2001 U.S. Dist. LEXIS 534, at

*22-28 (E.D. Va. 2001).

II. Findings

Upon default, the facts alleged in the Complaint are deemed admitted. The Court, however, can determine whether the facts, as alleged, state a claim. *Bonilla v. Trebol Motors Corp.*, 150 F.3d 77, 80 (1st Cir. 1988). Upon a full review of all the submissions, the Magistrate Judge finds that Plaintiff has established the following facts by a preponderance of the evidence. Plaintiff Aztar Corporation is a Delaware corporation with a place of business in New Jersey. Complaint P 6. Plaintiff is the owner of U.S. Reg. No. 1,530,186 for the mark TROPICANA for entertainment services and U.S. Reg. No. 1,572,514 for the mark TROPICANA for casino services. *See* Plaintiff's Exhibits B and C. Plaintiff, through its predecessor-in-interest, has been using TROPICANA as a service mark for casino, hotel, and entertainment services in the United States as early as 1957. Complaint P 11.

Plaintiff operates hotels and casinos under the [*5] TROPICANA mark in Las Vegas and Atlantic City as well as riverboat gambling enterprises in Indiana and Missouri. *Id.* Plaintiff's TROPICANA mark is prominently displayed on signs, in advertising and promotional materials, and on collateral goods used in Plaintiff's casinos and hotels. Complaint P 12. Plaintiff's long use of TROPICANA in extensive sales, advertising and promotion, and the popularity of its gambling casinos have made the TROPICANA mark famous in the United States and abroad for casino services. The popularity and recognition of the TROPICANA mark has made it an asset of extraordinary value to Plaintiff.

Plaintiff also has used its TROPICANA mark to establish a significant presence on the Internet. Specifically, Plaintiff maintains several web sites including "tropicanaresort.com," "tropicanalasvegas.com," and "tropicana.net" that describe its casinos, products, and services. Complaint P 25. The word TROPICANA is used in the domain names, text, and metatags of Plaintiff's web sites. Plaintiff's long-standing use of the TROPICANA mark and variations thereof have caused the public to expect that domain names and web sites incorporating TROPICANA, or variations thereof, [*6] are owned by Plaintiff.

Defendant MGM Casino ("MGM") is a foreign

2001 U.S. Dist. LEXIS 13118, *6; 59 U.S.P.Q.2D (BNA) 1460

corporation with its principal place of business in St. John's Antigua. Complaint P 7. Defendant operates an interactive gambling web site under the name "Tropicana Casino" and uses the domain name "tropicanacasino.com" to divert the public to that web site. [4] In addition, Defendant uses the Tropicana mark as a metatag to ensure that its web site will appear when an Internet user enters the word TROPICANA into an Internet search engine. Complaint P 7. Defendant MGM has registered "tropicanacasino.com" with Network Solutions, Inc. ("NSI"), located in Herndon, Virginia. Complaint P 10. Defendant renewed its registration of the site on June 1, 2000 for an additional 5 years. *See* Plaintiff's Exhibit D. Defendant's use of the Tropicana mark occurred long after Plaintiff's use of that mark had made it famous and distinctive.

4   Although at the time the Complaint was filed the domain name "tropicanacasino.com" led to an interactive gambling web site, changes have subsequently been made to the site. The subject domain name currently leads to a screen which reads "You don't have permission to access / on this server." *See* Plaintiff's Exhibit N. Notwithstanding this change to the infringing web site, the Court finds that the instant matter presents a justiciable controversy due to the fact that the web site was operational before and at the time the Complaint was filed and because Defendant renewed its registration of the infringing site on June 1, 2000 for an additional 5 years and therefore could resume the site at any time. *See* Plaintiff's Exhibit D.

[*7] With respect to Plaintiff's individual counts, the Magistrate Judge finds as follows:

A. Count I: False Designation of Origin and Trade Name Infringement Under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)

Count II: Trademark and Service Mark Infringement Under § 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a)

Count III: Counterfeiting Under § 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a)

The Fourth Circuit has held that in order to prevail on a false designation of origin claim under §§ 32(1) and 43(a) of the Lanham Act, a plaintiff must demonstrate "that it has a valid, protected trademark and that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." *Lone Star Stakehouse & Saloon v. Alpha of Virginia*, 43 F.3d 922, 930 (4th Cir. 1995). In determining whether the subject domain name is likely to cause confusion among consumers, the Court is to examine the following factors: 1) the strength or distinctiveness of the plaintiff's mark; 2) the similarity of the two marks; 3) the similarity of the goods/services [*8] the marks identify; 4) the similarity of the facilities the two parties use in their businesses; 5) the similarity of the advertising used by the two parties; 6) the defendant's intent; and 7) the existence of any actual confusion. *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984). It is not necessary for all the factors to be implicated or found in the plaintiff's favor for a finding of likelihood of confusion. *Id.* The most important among the seven factors is the distinctiveness or strength of the mark.

In the instant case, the Court finds that Plaintiff has provided sufficient proof upon which to state a claim for violation of §§ 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1125(a) and 1114(1). Plaintiff has established itself as the owner of the famous, incontestable, federally registered TROPICANA mark. *See* Plaintiff's Exhibits B and C. The existence of Defendant's commercial "Tropicana Casino" web site with the "tropicanacasino.com" domain name is certain to cause confusion among consumers. Defendant's web site uses Plaintiff's mark in its entirety in connection with the identical services provided by Plaintiff, [*9] namely Internet gambling. As this Court previously has held, use of the identical mark "creates a presumption of likelihood of confusion among internet users as a matter of law." *PETA, Inc. v. Doughney*, 113 F. Supp. 2d 915, 919-20 (E.D. Va. 2000). An Internet user seeking Plaintiff's services by pointing his web browser to "tropicanacasino.com" or by entering the term "tropicana" or "tropicanacasino" into an Internet search engine is likely to find Defendant's web site instead, which is not owned, sponsored, or affiliated with Plaintiff.

As Defendant's use of Plaintiff's registered TROPICANA mark was in commerce, likely to cause consumer confusion, and without Plaintiff's permission, the Court finds that such use also constitutes a

Case 2:09-cv-00613-ABC-CW   Document 120-1   Filed 12/03/10   Page 8 of 75   Page ID
#:2395

Page 4

2001 U.S. Dist. LEXIS 13118, *9; 59 U.S.P.Q.2D (BNA) 1460

"counterfeit" use of Plaintiff's mark in violation of § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1)(a).

B. Count IV: Dilution Under § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c)

To show trademark dilution under § 43 of the Lanham Act, a plaintiff must prove first that the mark sought to be protected is "famous" and second that the accused mark has "diluted" the famous mark. [*10] *Playboy Enterprises v. AsiaFocus Int'l., Inc.*, 1998 U.S. Dist. LEXIS 10359, *20, No. Civ.A97-734-A, 1998 WL 724000, *7-8 (E.D. Va. Feb. 2, 1998). The statute defines "dilution" as "lessening the capacity of a famous mark to identify and distinguish goods and services, regardless of the presence of: (1) competition of the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127.

In the instant case, the Court finds that Plaintiff has made the requisite showing for dilution of its TROPICANA by Defendant. As stated previously, Plaintiff is the holder of famous and incontestable federal trademark registrations for the TROPICANA mark and has been using the TROPICANA mark since 1957 in connection with gambling and casino services. Defendant's use of Plaintiff's mark via its "Tropicana Casino" web site and "tropicanacasino.com" domain name has lessened the TROPICANA mark's power to exclusively identify Plaintiff Aztar as its owner. Where the defendant has used a plaintiff's trademark in a domain name, courts have found dilution as a matter of law. *See Panavision Int'l., L.P. v. Toeppen*, 141 F.3d 1316, 1326-27 (9th Cir. 1998) [*11] (holding that because of the unique nature of domain names, the exploitation of a trademark in a domain name establishes dilution as a matter of law).

Internet users quite instinctively would assume that a web site that offers Internet gambling under the title "Tropicana Casino" with the domain name "tropicanacasino.com" is connected to the world famous Aztar Tropicana Casinos. The consumer's perceived connection of Defendant's site with Plaintiff's mark is reinforced by using the fact that Defendant has used the TROPICANA mark as a metatag in its web site which causes Defendant's web site to appear in the results of an Internet search engine inquiry made for the word "tropicana." Internet users using search engines to locate Plaintiff's web sites would likely be diverted to Defendant's web site, mistakenly believing that

Defendant's web site is affiliated with Plaintiff. *See Playboy Enterprises*, 1998 WL 724000, at *8.

C. Count V: Cyberpiracy Under § 43(d)(1) of the Lanham Act, 15 U.S.C. § 1125(d)(1)

To state a claim for violation of the ACPA, the plaintiff must show that the defendant:1) had a bad faith intent to profit from the [*12] plaintiff's protected mark; and 2) registered or uses a domain name that is dilutive of, or identical or confusingly similar to, the plaintiff's mark. 15 U.S.C. § 1125(d)(1)(A)(i)-(ii). The statute enumerates nine non-exclusive factors for the Court to use in determining whether wether the defendant had a bad faith intent. *See* 15 U.S.C. § 1125(d)(1)(B)(i).

In the instant case, the Court finds that Plaintiff has established a claim for cyberpiracy against Defendant under § 43(d)(1) of the Lanham Act, 15 U.S.C. § 1125(d)(1). As stated previously, the Court finds that Defendant's domain name and web site are likely to cause consumer confusion and have diluted Plaintiff's TROPICANA mark. The Court further finds that Defendant MGM registered the "tropicanacasino.com" domain name with the bad faith intent to profit off the good will generated by Plaintiff in its TROPICANA mark. Defendant's domain name incorporates Plaintiff's mark in its entirety and leads to a web site that provides services identical to those of Plaintiff. Defendant clearly registered the "tropicanacasino.com" domain name and created the "Tropicana [*13] Casino" web site in an attempt to deceive and mislead Internet consumers into believing that its web site was owned by, or affiliated with, Plaintiff. *See Wynn Oil Co. v. American Way Serv. Corp.*, 943 F.2d 595, 603 (6th Cir. 1991) (holding that intent to deceive may be inferred from use of identical mark).

Defendant's bad faith is further evidenced by a consideration of the statutory factors. Specifically, the Court finds that with respect to the corresponding statutory factors: 1) Defendant has no trademark or any other intellectual property rights in the TROPICANA mark; 2) the "tropicanacasino.com" domain name does not consist of the legal name of Defendant and is not otherwise commonly used to identify that entity; 3) Defendant did not use its domain name prior to Plaintiff's registration and use of the TROPICANA mark; 4) Defendant is, or was at the time the Complaint was filed, using the domain name for commercial use, namely

2001 U.S. Dist. LEXIS 13118, *13; 59 U.S.P.Q.2D (BNA) 1460

Internet gambling services; 5) Defendant intended to divert Internet users seeking Plaintiff's web sites to Defendant's "Tropicana Casino" web site by causing consumer confusion as to its source, sponsorship, affiliation, or endorsement; [*14] 8) Defendant has registered multiple domain names that are identical or confusingly similar to other famous and distinctive marks; and 9) Plaintiff's TROPICANA mark is distinctive and famous.

D. Count VI: *In rem* Cyberpiracy Under § 43(d)(2) of the Lanham Act, 15 U.S.C. § 1125(d)(2)

This count was voluntarily dismissed without prejudice on February 26, 2001 by Plaintiff via its Supplemental Memorandum in Support of Plaintiff's Motion for Default Judgment. Accordingly, the Court will not address this count.

E. Count VII: Trademark and Service Mark Infringement Under Common Law

Count VIII: Unfair Competition Under Common Law

As the Fourth Circuit noted in *Lone Star Stakehouse*, 43 F.3d at 930 n.10, the test for trademark infringement and unfair competition under Virginia common law is essentially the same as that for trademark infringement under the Lanham Act because both address the likelihood of confusion as to the source of the goods or services involved. Therefore, for the reasons stated previously, the Court finds that Defendant has engaged in trademark and service mark infringement and unfair competition in violation [*15] of the common law of Virginia.

F. Damages and Attorney's Fees

The Lanham Act allows a plaintiff who has demonstrated a violation of § 1125(d)(1) of the Act to elect statutory damages of between $ 1,000 and $ 100,000 per domain name, as the court deems just, in lieu of actual damages and profits. 15 U.S.C. § 1117(d). Plaintiff in the instant case seeks statutory damages of $ 100,000.00 under this provision. As stated previously, the Court has found that Defendant's registration of the "tropicanacasino.com" domain name was in violation of § 1125(d)(1) of the ACPA. Given Defendant's bad faith attempt to deceive Internet consumers and profit from the good will Plaintiff has generated in its famous TROPICANA mark, which has injured Plaintiff by

diluting its TROPICANA mark, the Court finds that the $ 100,000 in statutory damages requested by Plaintiff is reasonable and just.

The Lanham Act also gives the Court discretion to grant an award of attorney's fees in "exceptional" cases brought under the Act. 15 U.S.C. § 1117(a). The Fourth Circuit has interpreted § 1117 to require a prevailing plaintiff to show that the defendant acted [*16] in bad faith. *Scotch Whisky Ass'n. v. Majestic Distilling Co., Inc.*, 958 F.2d 594, 599 (4th Cir. ), *cert. denied*, 506 U.S. 862, 121 L. Ed. 2d 126, 113 S. Ct. 181 (1992). In light of Defendant's wilful and bad faith infringement and dilution of Plaintiff's TROPICANA trademark even after having been put on notice by Plaintiff's cease and desist letter and Complaint, the Court finds that this is an "exceptional" case warranting an award of reasonable attorney's fees, to be determined upon the submission by Plaintiff of an affidavit in support of its request for attorney's fees.

RECOMMENDATION

The Magistrate Judge recommends entry of default judgment in favor of Plaintiff. Specifically, the Magistrate Judge recommends the following relief:

A. Entry of a judgment that Defendant MGM has violated the following provisions of the Lanham Act: 1) § 43(a), 15 U.S.C. § 1125(a); 2) 32(1)(a), 15 U.S.C. § 1114(1)(a); 3) 43(c), 15 U.S.C. § 1125(c); and 4) 43(d), 15 U.S.C. § 1125(d)(1);

B. Entry of a judgment that Defendant has engaged in trademark and service [*17] mark infringement and unfair competition in violation of the common law of Virginia;

C. Entry of an injunction restraining and enjoining Defendant, its agents, servants, employees, and attorneys, and all persons in active concert or participation with them, from making any present or future use of TROPICANA or any other marks or names confusingly similar thereto, or domain name, web site content, metatag, trademark, service mark, or trade name;

D. Entry of an Order directing NSI to transfer the domain name "tropicanacasino.com" to Plaintiff within 10 days after NSI receives a copy of the Court's Order;

E. Entry of an Order directing Defendant to pay

2001 U.S. Dist. LEXIS 13118, *17; 59 U.S.P.Q.2D (BNA) 1460

Plaintiff $ 100,000 in statutory damages pursuant to § 35 of the Lanham Act, 15 U.S.C. § 1117(d) within 30 days of the entry of this Order;

F. Entry of an Order directing Defendant to pay Plaintiff's attorney's fees and costs incurred in this action pursuant to 15 U.S.C. § 1117(a) within 30 days of the Court's final approval of the amount of those fees and costs;

G. Entry of an Order requiring Defendant to disseminate, within 20 days of the entry of this Order, corrective [*18] advertisements in a form approved by the Court to acknowledge its violations of §§ 43(a), (c), (d), and 32(1)(a) of the Lanham Act, the common law of trademark and service mark infringement and unfair competition, and to ameliorate the false and deceptive impressions produced by such violations.

NOTICE

The parties are advised that exceptions to this Report and Recommendation pursuant to 28 U.S.C. § 636 and Fed. R. Civ. P. 72(b) must be filed within ten (10) days after service. A failure to object to this Report and Recommendation waived appellate review of any judgment based on this Report and Recommendation.

Barry R. Poretz

United States Magistrate Judge

March 12, 2001

Alexandria, Virginia



LEXSEE 2001 U.S. DIST. LEXIS 24764

**BELLAGIO, a Nevada corporation, Plaintiff, vs. MARK A. DENHAMMER, an individual; ALLEN COMPUTERS, an unknown entity; JOHN DOES 1-X; and ROE CORPORATIONS 1-X, Defendants.**

**CV-S-00-1475-RLH-(PAL)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA**

**2001 U.S. Dist. LEXIS 24764**

**July 10, 2001, Decided**
**July 16, 2001, Entered and Served**

**DISPOSITION:**    [*1] Plaintiff's Motion for Default Judgment and an Award of Attorney's Fees and Statutory Damages (# 10) GRANTED. Judgment entered for the Plaintiff. Plaintiff awarded statutory damages, nominal damages and costs and attorney's fees.

**COUNSEL:** For Bellagio, PLAINTIFF: Michael McCue, Quirk & Tratos, Las Vegas, NV.

Denhammer, Mark A., DEFENDANT: No Counsel Assigned.

Allen Computers, DEFENDANT: No Counsel Assigned.

**JUDGES:** ROGER L. HUNT, U.S. District Judge.

**OPINION BY:** ROGER L. HUNT

**OPINION**

**ORDER**

(Motion for Default Judgment-- # 10)

Before the Court is Plaintiff's Motion for Default Judgment and an Award of Attorney's Fees and Statutory Damages (# 10, filed April 5, 2001). The Court has also considered Plaintiff's Supplemental Brief Regarding Statutory Damages Pursuant to the (# 13, filed May 29, 2001).

Anti-Cybersquatting Consumer Protection Act Plaintiff seeks to obtain a Default Judgment against Defendants in the amount of One Hundred One Thousand Dollars ($ 101,000) plus costs and attorney's fees. The Motion satisfies the requirements of Fed. R. Civ. P. 55(b)(2) for entry [*2] of Default Judgment by the Court, and will be granted.

....

In order to enter judgment in this matter, the Court must determine the remedies to which Plaintiff is entitled. As set forth below, the Court finds that Plaintiff is entitled to recover One Hundred Thousand Dollars ($ 100,000) in statutory damages for Defendant's violation of the Anti-Cybersquatting and Consumer Protection Act, One Thousand Dollars ($ 1,000) in Nominal Damages for corrective advertising, and Six Thousand Two Hundred Eleven Dollars and Forty-Five Cents ($ 6,211.45) for attorney's fees and costs. In addition, the Court will issue a permanent injunction prohibiting Defendants from further infringing Plaintiff's "Bellagio" servicemark.

Background

Plaintiff, Bellagio, owns the famous Bellagio resort hotel casino, which opened in October 1998.

Bellagiolasvegas.comBellagio has spent substantial

2001 U.S. Dist. LEXIS 24764, *2

sums of money to advertise and promote its name and business throughout the United States and around the world, in both print and broadcast media, and most recently, on the Internet, through the Bellagio website at <bellagiolasvegashotel.com>. At this Bellagio website, consumers may obtain information about the Bellagio resort hotel [*3] casino and make online hotel reservations.

The "Bellagio" name has been utilized on the interior and exterior of the hotel casino, on signage, on gaming chips and tokens, and on wearing apparel, consumer products, and novelty items sold at and by the resort hotel casino. The "Bellagio" name is also imprinted on numerous giveaway and promotional items used within the hotel casino, such as pens, notepads, toiletries and the like.

Millions of visitors from around the world have visited the Bellagio resort hotel casino and a vast number of products bearing the "Bellagio" name have been sold or given away by Bellagio since 1989.

The "Bellagio" name is a servicemark which is owned by Plaintiff. Bellagio owns numerous federal trademark and servicemark registrations bearing the "Bellagio" name, including, "BELLAGIO" registration number 2,232,486 for casino services, "BELLAGIO" registration number 2,232487, for hotel services, and "BELLAGIO" pending application number 76,096,893 for casino and entertainment services. All of these marks are in use at the Bellagio property and none have been abandoned, canceled or revoked.

On or about May 2000, Defendants, Mark Denhammer and Allen Computers [*4] [1], registered the <bellagiolasvegashotel.com> domain name at Register.com, a registrar for domain names. Plaintiff never consented to, approved or authorized Defendants' use of the "Bellagio" name for any purpose.

> 1   Plaintiff believes that Mr. Denhammer is an individual residing in Downey, California, and that Allen Computers is an unknown entity wholly owned and controlled by Mr. Denhammer.

On or about September 2000, <bellagiolasvegashotel.com> was linked to an online hotel reservation service purporting to offer hotel reservations for Plaintiff Bellagio. It appears that Defendants attempted to create an association between the <bellagiolasvegashotel.com> website and Plaintiff, by registering a domain name that contains Plaintiff's servicemark coupled with the words describing its location and services.

The Ninth Circuit has recognized that "a significant purpose of a domain name is to identify the entity that owns the web site," and "using a company's name or trademark as a domain name is also the easiest [*5] way to locate that company's web site." *See Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1327 (9th Cir. 1998). If customers use a search engine to find Plaintiff's web site and are forced to wade through hundreds of web sites, they may never find Plaintiff's official web site. *Id.* In addition, "prospective users of plaintiff's services who mistakenly access defendant's web site may fail to continue to search for plaintiff's own home page, due to anger, frustration or the belief that plaintiff's home page does not exist." *Id.* at 1327 (quoting District Court Judge Lechner, quoting, *Jews for Jesus v. Brodsky*, 993 F. Supp. 282, 306-07 (D.N.J 1998), quoting *Planned Parenthood v. Bucci*, 1997 U.S. Dist. LEXIS 3338, 1997 WL 133313 at *4.)

Therefore, it is highly likely that Defendants' unauthorized use of Bellagio's servicemark injured Plaintiff by confusing and/ or diverting customers seeking to obtain access to Bellagio's services through the Internet.

On or about September 20, 2000, Plaintiff sent a cease and desist letter to Defendants demanding that, among other things, Defendants cease all use of Plaintiff's trademarks and variations [*6] thereof and transfer ownership of the registration for the domain name containing Plaintiff's servicemark to Plaintiff. Plaintiff's counsel requested that Defendants respond in writing by September 29, 2000.

On September 24, 2000, Plaintiff's counsel received a response, wherein Defendants stated that they had removed the site from the Internet, however, they refused to surrender the domain name. Defendants offered to sell Plaintiff the domain name for One Thousand Dollars ($ 1,000).

On October 2, 2000, Plaintiff's counsel sent a second letter informing Defendants that they were infringing Plaintiff's servicemark and that they must assign the domain name to Bellagio. Defendants did not respond.

2001 U.S. Dist. LEXIS 24764, *6

....

On December 11, 2000, Plaintiff filed its Complaint for cybersquatting, trademark infringement, unfair competition, trademark dilution, common law trademark infringement, deceptive trade practices, and intentional interference with prospective economic advantage against Defendants. Defendants have not filed or served an answer or responsive pleading in accordance with Fed. R. Civ. P. 12.

Several weeks after the Complaint was filed, Plaintiff's counsel conducted an online investigation [*7] and discovered that Defendants had transferred the domain name <bellagiolasvegashotel.com> to a Mr. Wilhelm Hubmann who resides in Denmark. [2]

> [2]   In its motion, Plaintiff asserts that following the filing of the Complaint, Plaintiff's counsel received a letter from Defendant Denhammer indicating that Mr. Denhammer had transferred the domain name. However, this letter was not included as an exhibit and the supporting affidavit attached as an exhibit does not make any reference to any such letter.

Pursuant to Plaintiff's request, the Clerk of the Court entered a default against Defendants on March 19, 2001 (# 9).

Analysis

In order to enter judgment in this matter, it is necessary for the Court to determine the remedies to which Plaintiff is entitled. Plaintiff seeks to recover One Hundred Thousand Dollars ($ 100,000) in statutory damages under the Anti-Cybersquatting Consumer Protection Act, One Thousand Dollars ($ 1,000) as compensation for the corrective advertising necessary to remedy Defendants' dilution [*8] of the Bellagio servicemark, and Six Thousand Two Hundred Eleven Dollars and Forty-Five Cents ($ 6,211.45) in attorney's fees and costs. Plaintiff also seeks to obtain permanent injunctive relief prohibiting Defendants from registering any other domain names that contain the Plaintiff's mark or variations thereof.

Statutory Damages under Anti-Cybersquatting Consumer Protection Act

Plaintiff's seek an award of One Hundred Thousand

Dollars ($ 100,000) in statutory damages for Defendants' violation of the Anti-Cybersquatting Consumer Protection Act which provides:

> (1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person
>
> (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
>
> (ii) registers, traffics in, or uses a domain name that--
>
> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
>
> [or]
>
> (II) in the case of a famous mark that is famous [*9] at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark ... 15 U.S.C. § 1125(d).

Clearly, the domain name registered by Defendants is confusingly similar to Plaintiff's servicemarks, because the domain name consists of Plaintiff's mark coupled with a description of its property's location and services.

To demonstrated that it is entitled to statutory damages, however, Plaintiff must also show that Defendants acted in bad faith.

The Act provides a non-exhaustive list of nine factors to be considered in determining whether a person has a bad faith intent:

> (I) the trademark or intellectual property rights of the person, if any, in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the

person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name

(V) the person's intent to divert consumers from the mark owner's [*10] online location to a site accessible under the domain name that could harm the goodwill represented by the mark ..., by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services ...;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct.

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others ...; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous ... (15 U.S.C. § 1125 (d)(1)(B)(i)).

Plaintiff has presented evidence of bad faith under

several of the statutory factors. [*11] First, Defendants do not appear to have any trademark or intellectual property rights in the domain name. Second, the domain name does not consist of Defendants' legal names or a name otherwise used to identify them. Third, Defendants never used the Domain Names for the bona fide offering of services, because Defendants never had permission to offer hotel registration services for Bellagio. Fourth, Defendants refused to transfer the domain name to Plaintiff, but rather, offered to sell the domain name for One Thousand Dollars ($ 1,000). Fifth, the domain name itself indicates that Defendants intended to divert consumers from Plaintiff's web site, because it consists of Plaintiff's servicemark coupled with its location and services.

In addition, the most compelling evidence of bad faith in this matter is the fact that Defendants not only refused to transfer ownership of the domain name to Plaintiff, but went so far as to transfer ownership of the domain name to a foreign individual, *after* Defendants had already received two cease and desist letters and been notified that this lawsuit was pending.

Pursuant to 15 U.S.C. § 1117(d), Plaintiff may obtain statutory [*12] damages, in lieu of actual damages, for a violation of § 1125(c). Under the statute, the Court, in its discretion, may award statutory damages of not less than One Thousand Dollars ($ 1,000) and not more than One Hundred Thousand Dollars ($ 100,000).

The Court finds that due to the egregiousness and wilfulness of Defendants' conduct in first refusing to transfer ownership of the infringing domain name to Plaintiff, and subsequently transferring its ownership to a foreign individual, an award of the maximum amount of One Hundred Thousand Dollars ($ 100,000) in statutory damages is justified.

Nominal Damages for Corrective Advertising

Plaintiff also seeks nominal damages for corrective advertising, noting that in the Ninth Circuit, it is permissible for a court to award damages for prospective corrective advertising. *See Adray v. Adry-Mart, Inc.,* 68 F.3d 362, 36 U.S.P.Q.2d 1546 (9th Cir. 1995), *amended,* 76 F3d 984, 37 U.S.P.Q.2d 1872 (9th Cir. 1996). Plaintiff admits, however, that it is impossible to ascertain how many consumers may have been diverted to Defendants' website and seeks "nominal damages" in the amount of One Thousand Dollars [*13] ($ 1,000) for corrective

damages.

The Court derives its authority to award damages for corrective advertising from Section 1117 of the Lanham Act which provides for recovery of (1) defendant's profits, (2) plaintiff's damages, and (3) costs of the action.

....

In this case, Plaintiff is unable to determine Defendants' profits from their actions or to establish specific damages. However, "an inability to show actual damages does not alone preclude a recovery under section 1117." *Bandag, Inc. v. Al Bolster's Tire Stores, Inc.,* 750 F.2d 903, 919 (Fed. Cir. 1984). Section 1117 provides courts with considerable discretion to award damages based on equitable considerations. "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C § 1117(a). In fashioning such a remedy, the court should consider the particular circumstances of the case, such as the nature of the infringing actions and the intent with which they were motivated. *Cf. Bandag,* at 917-18.

[*14] The Court finds that the particular circumstances of this case warrant an award of damages, despite the fact that Plaintiff is unable to specify the exact amount necessary to undue the harm caused by Defendants through corrective advertising. In reaching this conclusion, the Court has considered the nature of Defendants' infringing actions, the wilfulness and likely intent with which they were motivated, and other relevant circumstances. Defendants' actions were particularly malicious in that Defendants not only refused to transfer the domain names to Plaintiff, but transferred ownership of the domain name to an individual in Denmark, after the initiation of this lawsuit.

Thus, it is very likely that Defendants' profited from the sale of Plaintiff's trademark, after the initiation of this lawsuit, and that Plaintiff will now be forced to pursue a second lawsuit to end the unauthorized use of its trademark in the <bellagiolasvegashotel.com> domain name.

Therefore, the Court finds that the equitable considerations in this case justify an award of One Thousand Dollars ($ 1,000) in nominal damages.

Attorney's Fees and Costs

Pursuant to 15 U.S.C. § 1117 [*15] (a) "the court in exceptional cases may award reasonable attorney fees to the prevailing party." In the Ninth Circuit, "generally a trademark case is exceptional for purposes of an award of attorneys' fees when the infringement is malicious, fraudulent or willful." *Lindy Pen Co., Inc. v. Bic Pen Corp.,* 982 F.2d 1400, 1409 (9th. Cir. 1993).

As discussed above, Defendant's conduct is indisputably willful. Therefore, the Court finds that exceptional circumstances warrant an award of attorney's fees in this case.

The Court finds Plaintiff's request for attorney's fees in the amount of Five Thousand Nine Hundred Fifty-Six Dollars and Twenty-Five Cents ($ 5,956.25) and costs in the amount of Two Hundred Fifty-Five Dollars and Twenty Cents ($ 255.20) to be reasonable and will award Plaintiff the total amount of Six Thousand Two Hundred Eleven Dollars and Forty-Five Cents ($ 6,211.45) in attorney's fees and costs.

Permanent Injunctive Relief

"Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by defendant's continuing infringement." *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175 (9th Cir. 1988). [*16] *See also,* 15 U.S.C. § 1116. Therefore Plaintiff is entitled to permanent injunctive relief against Defendants' continued infringement of its trademark.

In addition, the Anti-Cybersquatting Consumer Protection Act authorizes the Court to order the transfer of the domain name to the owner of the mark. *See* 15 U.S.C. § 1125(d)(1)(C). It is likely that Defendants transferred ownership of the domain name to a foreign individual in an effort to thwart Plaintiff's ability to obtain the domain name by Court Order in this action. However, to the extent that an order may assist Plaintiff in obtaining ownership of the domain name containing its mark, the Court will grant Plaintiff's request for such an order.

IT IS HEREBY ORDERED that Plaintiff's Motion for Default Judgment and an Award of Attorney's Fees and Statutory Damages (# 10) is GRANTED, and judgment is entered as follows:

2001 U.S. Dist. LEXIS 24764, *16

1. Plaintiff is awarded statutory damages in the amount of One Hundred Thousand Dollars ($ 100,000.00).

2. Plaintiff is awarded nominal damages in the amount of One Thousand Dollars ($ 1,000.00).

3. Plaintiff is awarded costs and attorney's fees [*17] in the amount of Six Thousand Two Hundred Eleven Dollars and Forty-Five Cents ($ 6,211.45).

4. Defendants are permanently enjoined from using Plaintiff's "Bellagio" name and servicemark, including its use in domain names and on the Internet.

5. Defendants are ordered to transfer their ownership of any registered domain names containing the "Bellagio" name to Plaintiff.

Dated: July 10, 2001.

**ROGER L. HUNT**

**U.S. District Judge**

JUDGMENT IN A CIVIL CASE - July 16, 2001 Date

**Decision by Court.** This action came before the Court and a decision has been rendered.

IT IS ORDERED AND ADJUDGED Judgment is entered for the Plaintiff and against the Defendant. Plaintiff is awarded statutory damages in the amount of $ 100,000.00, nominal damages in the amount of $ 1,000.00 and costs and attorney's fees in the amount $ 6,211.45. Defendants are permanently enjoined from using Plaintiff's "Bellagio" name and servicemark, including its use in domain names and on the Internet. Defendants are ordered to transfer their ownership of any registered domain names containing the "Bellagio" name to Plaintiff.

1 | J. Andrew Coombs (SBN 123881)
2 | andy@coombspc.com
J. Andrew Coombs, A Prof. Corp.
3 | 450 N. Brand Blvd., Suite 600
Glendale, California 91203-2349
4 | Telephone: (818) 291-6444
Facsimile: (818) 291-6446

5 | James L. Bikoff
David K. Heasley
6 | Silverberg, Goldman & Bikoff LLP
1101 30th Street, NW, Suite 120
7 | Washington, D.C. 20007
Telephone: (212) 944-3300
8 | Facsimile: (212) 944-3306

9 | Attorneys for Plaintiff BioCryst
Pharmaceuticals, Inc.

FILED
CLERK, U.S. DISTRICT COURT

NOV 21 2006

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

10

11

12 | UNITED STATES DISTRICT COURT

13 | CENTRAL DISTRICT OF CALIFORNIA

14 | BIOCRYST PHARMACEUTICALS, INC., ) Case No. CV 05-7615 JFW (RZx)
15 | ) [PROPOSED] JUDGMENT
Plaintiff, ) PURSUANT TO ENTRY OF
16 | ) DEFAULT
17 | v. )
)
18 | NAMECHEAP.COM, WHOISGUARD- )
NAMECHEAP.COM, RICHARD )
19 | KIRKENDALL, KUMAR PATEL, a )
United Kingdom resident, and Does 2 – )
20 | 10, inclusive, )
)
21 | Defendants. )

22 | This cause having come before this Court on the motion of Plaintiff BioCryst

23 | Pharmaceuticals, Inc. ("Plaintiff" or "BioCryst") for entry of default judgment and

24 | permanent injunction against Defendant Kumar Patel ("Defendant" or "Patel");

25

26 | DOCKETED ON CM

27 | NOV 22 2006

28 | BY _____ 053

BioCryst v. Patel: Proposed Judgment

ORIGINAL

Exhibit A
Page 15

AND, the Court, having read and considered the pleadings, declarations and exhibits on file in this matter and having reviewed such evidence as was presented in support of Plaintiff's Motion;

AND, GOOD CAUSE APPEARING THEREFORE, the Court finds the following facts:

BioCryst owns valid and subsisting registrations in and to United States trademarks for, among other things, the work mark BIOCRYST PHARMACEUTICALS, INC.®, which is the subject of United States Registration No. 2,902,002 ("Plaintiff's Trademark");

Plaintiff has complied in all respects with the laws governing trademarks and secured the exclusive rights and privileges in and to Plaintiff's Trademark;

The appearance and other qualities of Plaintiff's Trademark are distinctive and serve to identify Plaintiff as the source of products bearing the images and/or other qualities thereof;

Defendant Patel usurped Plaintiff's Trademark in the domain name BioCrystPharmaceuticals.com, in violation of Plaintiff's rights in and to its mark, constituting cybersquatting, false designation of origin, trademark infringement and dilution in violation of the Lanham Act, violation of California Business and Professions Code, Sections 17200, 17500 and 14330 *et seq.*, and conversion and trademark infringement under the common law of the State of California;

The Court specifically finds that Plaintiff is the prevailing party for purposes of entry of a default judgment, declaratory relief, a permanent injunction, and an award of damages and attorneys' fees. Plaintiff has instituted this action for an entirely proper and appropriate purpose, solely to vindicate and enforce compliance with its rights, which have been knowingly and willfully infringed by Defendant Patel. Plaintiff's action was not brought frivolously. Defendant Patel's infringing conduct is a clear and unmistakable violation of Plaintiff's rights. This Defendant's conduct has been patently unreasonable, willful and egregious, in violation of Plaintiff's rights. Defendant Patel appropriated Plaintiff's Trademark when Defendant intended, knew or should have known that such infringing activity would likely injure Plaintiff's name and reputation. Defendant's knowing and intentional wrongdoing has requiring Plaintiff to institute and prosecute this action, and to incur fees and costs in so doing, in order to redress Plaintiff's rights.

The liability of the Defendant in the above-referenced action for his acts in violation of Plaintiff's rights is knowing and willful, and as such the Court expressly finds that there is no just reason for delay in entering the default judgment sought herein.

Therefore, based upon the foregoing facts, and

GOOD CAUSE APPEARING THEREFORE, THE COURT ORDERS that this Judgment shall be and is hereby entered in the within action as follows:

BioCryst v. Patel : Proposed Judgment

3

1) This Court has jurisdiction over the parties to this action and over the subject matter hereof pursuant to 15 U.S.C. § 1051 et seq., 28 U.S.C. §§ 1331 and 1338, and 28 U.S.C. § 1367. Service of process was properly made on Defendant Patel.

2) Plaintiff has alleged that Defendant Patel has made unauthorized uses of Plaintiff's Trademark or confusingly similar likenesses or colorable imitations thereof.

3) The Court declares and finds that Defendant Patel's unauthorized uses of Plaintiff's Trademark or confusingly similar likenesses or colorable imitations thereof constitute cybersquatting, false designation of origin, trademark infringement and dilution, in violation of the Lanham Act; and constitute violations of California Business and Professions Code, Sections 17200, 17500 and 14330 et seq; and constitutes conversion and trademark infringement under the common law of the State of California.

4) Defendant Patel is hereby directed that registration and ownership of the Internet domain names BioCrystPharmaceutical.com and BioCrist.com be transferred to Plaintiff, BioCryst Pharmaceuticals, Inc.;

5) Defendant Patel, and each of his employees, agents, servants, attorneys, successors and assigns, and all those in privity or acting in concert with Defendant Patel, who receive actual notice of the injunction, are hereby permanently restrained and enjoined from registering, using, owning, selling or offering to sell any internet domain names using or containing the word mark BIOCRYST PHARMACEUTICALS, INC.®, the word BIOCRYST or any words confusingly similar thereto, including misspellings, such as BIOCRIST.

6) Defendant Patel, having knowingly and willfully registered and used three different domain names that infringed upon Plaintiff's Trademark, in violation of 15 U.S.C. § 1125(d)(1), and having knowingly provided false contact information concealing his registration and use of www.BioCrystPharmaceuticals.com, is

liable to Plaintiff, BioCryst Pharmaceuticals, Inc. for statutory damages, as provided in 15 U.S.C. § 1117(d)(1), in the amount of $300,000.00.

7) The Court, finding that Defendant Patel has acted maliciously, fraudulently, deliberately or willfully in registering domain names similar to Plaintiff's marks in order to divert members of the public who were trying to contact the Plaintiff, and that Plaintiff has been obliged to expend significant attorneys' fees to redress Defendant Patel's infringements, awards Plaintiff BioCryst Pharmaceuticals, Inc. judgment against Defendant Patel for its reasonable attorneys' fees incurred in this case, in the amount of $71,373.58, plus costs.

8) The Court shall retain jurisdiction of this action to entertain such further proceedings and to enter such further orders as may be necessary or appropriate to implement and enforce the provisions of this Judgment.

Dated: **NOV 2 1 2006**

Hon. John F. Walter
Judge, United States District Court for
the Central District of California

PRESENTED BY:

J. Andrew Coombs
A Professional Corporation

By:
J. Andrew Coombs
Attorneys for Plaintiff BioCryst
Pharmaceuticals, Inc.

BioCryst v. Patel : Proposed Judgment                    5

# PROOF OF SERVICE

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, and not a party to the above-entitled cause. I am employed by a member of the Bar of the United States District Court of California. My business address is 450 North Brand Boulevard, Suite 600, Glendale, California 91203-2349.

On October 25, 2006, I served on the interested parties in this action with the:

[PROPOSED] JUDGMENT PURSUANT TO ENTRY OF DEFAULT

for the following civil action:

BIOCRYST v. NAMECHEAP.COM, et al.

by placing a true copy thereof in an envelope to be immediately sealed thereafter. I am readily familiar with the office's practice of collecting and processing correspondence for mailing. Under that practice it would be deposited with the United States Postal Service on the same day with postage thereon fully prepaid at Glendale, California in the ordinary course of business. I am aware that on motion of the party served, service presumed invalid if postal cancellation date or postage meter is more than one day after date of deposit for mailing in affidavit.

Kumar Patel
5 Stanborough House
Wisbech, Cambridgeshire, PE14 9 QB
United Kingdom

Place of Mailing: Glendale, California

Executed on October 25, 2006 at Glendale, California

Annie Wang

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED

JUL 1 5 2009

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| CITIGROUP INCORPORATED, DINERS CLUB INTERNATIONAL LIMITED, <br><br> Plaintiffs, <br><br> v. <br><br> NARESH MALIK a/k/a NICK M., et al., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No. 1:07cv1168

**ORDER**

This matter comes before the Court on the Report and Recommendation of the Magistrate Judge dated June 16, 2009. Defendants have not filed any objections to the Report and Recommendation. Based on a de novo review of the evidence in this case, the Court adopts the findings and recommendation of the Magistrate Judge. And it is hereby,

ORDERED that default judgment is entered for plaintiffs with respect to defaulting defendants Malik and Watch My Domain as well as Infringing Domain Name <wwwcitibankonline.com> for violations of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125 (d).

It is further ORDERED that, pursuant to 15 U.S.C. § 1117(d), plaintiffs are awarded $200,000 in statutory damages against defendants Monga, Malik, Watch My Domain and Lead Networks,

Exhibit A
Page 21

jointly and severally, for registering Infringing Domain Names <wwwdinersclubus.com> and <citifin.com> with a bad-faith intent to profit.  The Court further finds that this is an "exceptional" case under 15 U.S.C. § 1117(a) because defendants acted willfully, deliberately, and in bad faith in their registration and use of the Infringing Domain Names.  Accordingly,

It is further ORDERED that defendants are required to compensate plaintiffs for all reasonable attorneys fees associated with this action.  Plaintiffs had twenty (20) days from the date of the Report and Recommendation to submit a statement of fees from which the Court will determine an award.

It is further ORDERED that defendants Malik and Watch My Domain and their respective agents, representatives, servants, employees, attorneys, officers, directors, shareholders, licensees, affiliates, joint venturers, parents, subsidiaries, related corporations and all others in privity or acting in concert with them be permanently enjoined from:

(a) Using, linking to, transferring, selling, exercising control over, or otherwise owning Infringing Domain Names <wwwdinersclubus.com>, <citifin.com>, <wwwcitibankonline.com> or any other domain name or trademark or service mark that incorporates, in whole or in part, plaintiffs' Marks;

(b) Using false representations or descriptions in commerce

2

or using false designations of origin that are likely to cause confusion, or to cause mistake, as to deceive as to the affiliation, connection, or association of defaulting defendants with plaintiffs, or as to the origin, sponsorship, or approval of defaulting defendants' services by plaintiffs;

(c) Otherwise infringing plaintiffs' Marks; and

(d) Unfairly competing with plaintiffs or otherwise injuring their business reputation in any manner.

_____/s/_____

Claude M. Hilton
United States District Judge

Alexandria, Virginia
July 15, 2009

3



LEXSEE 2000 U.S. DIST. LEXIS 15719

**ELECTRONICS BOUTIQUE HOLDINGS CORP., Plantiff, v. JOHN ZUCCARINI,
individually and trading as Cupcake Patrol and/or Cupcake Party, Defendant**

**CIVIL ACTION NO. 00-4055**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA**

**2000 U.S. Dist. LEXIS 15719; 56 U.S.P.Q.2D (BNA) 1705**

**October 30, 2000, Decided
October 30, 2000, Filed, Entered**

**DISPOSITION:** [*1] JUDGMENT ENTERED in
favor of plaintiff Electronics Boutique Holdings
Corporation and against defendant John Zuccarini,
individually and trading as Cupcake Patrol and/or
Cupcake Party, on plaintiff's claims under the ACPA.
JUDGMENT ENTERED in the amount of $ 500,000 ($
100,000 statutory damages per infringing domain name)
in favor of plaintiff Electronics Boutique Holdings
Corporation and against Defendant John Zuccarini,
individually and trading as Cupcake Patrol and/or
Cupcake Party. Plaintiff's remaining claims, brought
under other federal statutes and common law,
DISMISSED WITHOUT PREJUDICE.

**COUNSEL:** For ELECTRONICS BOUTIQUE
HOLDINGS CORP., PLAINTIFF: GLENN A.
WEINER, KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS, PHILA, PA USA.

JOHN ZUCCARINI, DEFENDANT, Pro se,
ANDALUSIA, PA USA.

**JUDGES:** Berle M. Schiller, J.

**OPINION BY:** Berle M. Schiller

**OPINION**

*FINDINGS OF FACT, CONCLUSIONS OF LAW AND*

*ORDER*

Schiller, J.

October 30, 2000

Presently before the court is plaintiff Electronics
Boutique Holding Corporation's action for Internet
cybersquatting [1] against defendant John Zuccarini. A
hearing on the merits consolidated with a hearing on
damages was held on October 10, 2000. For the reasons
[*2] set forth below, I find in favor of plaintiff
Electronics Boutique Holdings Corporation.

> 1   Cybersquatting (or cyberpiracy) "refers to the
> deliberate, bad-faith, and abusive registration of
> Internet domain names in violation of the rights of
> trademark owners." S. REP. No. 106-140 (1999).

I. Procedural background

On August 10, 2000, plaintiff Electronics Boutique
Holding Corporation ("EB") filed a complaint against
defendant John Zuccarini ("Mr. Zuccarini"), individually
and trading as Cupcake Patrol and/or Cupcake Party,
alleging violations of the Anticybersquatting Consumer
Protection Act of 1999, 15 U.S.C. § 1125(d) ("ACPA"),
violations of section 43(a) of the Lanham Act, 15 U.S.C.
§ 1125(a), dilution, common law service mark
infringement and unfair competition.

Also on August 10, 2000, I granted EB's motion for a

2000 U.S. Dist. LEXIS 15719, *2; 56 U.S.P.Q.2D (BNA) 1705

temporary restraining order, enjoining the use of domain names "www.electronicboutique.com," "www.eletronicsboutice.com," "www.electronicbotique. [*3] com," "www.ebwold.com," "www.ebworl.com." (collectively "domain misspellings") or any other domain name or mark identical to or confusingly similar to EB's registered service marks until August 20, 2000, and directing Mr. Zuccarini to deactivate the domain misspellings and present the Court with evidence of the deactivations within three days of the Court's Order. [2] Additionally, I scheduled a hearing on EB's motion for a preliminary injunction to take place on August 15, 2000.

> [2]   Although Mr. Zuccarini failed to disable the domain misspellings, they were disabled in accordance with the Court's Order by the web server that hosts the sites.

On August 15, 2000, upon representations by EB that its attempts to effect service upon Mr. Zuccarini at his home, which is also his workplace, were unsuccessful, [3] I granted EB's motion for alternative service, extension of the temporary restraining order, and continuance of the hearing on EB's motion for a preliminary injunction. I authorized EB to effect service through [*4] the United States Marshals' service. [4] The hearing on EB's motion for preliminary injunction was continued until August 29, 2000.

> [3]   EB made several attempts at service. After being informed by Howard Neu, Esquire, an attorney who had represented Mr. Zuccarini in other matters, that he was not retained to represent Mr. Zuccarini in this matter, counsel for EB left two voice messages for Mr. Zuccarini informing him of the filing of the complaint and motion for temporary restraining order and preliminary injunction. (First Weiner Decl. at P 2). That evening, counsel for EB left another voice message informing Mr. Zuccarini of the entry of the temporary restraining order and directives of the Court's August 10 Order. (First Weiner Decl. at P 3). In each message, counsel for EB requested that Mr. Zuccarini return his call or retain counsel to return his call. (First Weiner Decl. at P 3-4). Mr. Zuccarini did not respond and no one responded on his behalf. (First Weiner Decl. at P 4). In addition, plaintiff's counsel forwarded a copy of the complaint and motion for a temporary restraining order to Mr. Neu. (First

Weiner Decl. at P 7; Neu letter, First Weiner Decl. at Exh. 1). Via letter to counsel for EB dated August 10, 2000, Mr. Neu stated that he would forward the pleadings in this matter to Mr. Zuccarini by United States mail. (Neu letter, First Weiner Decl. at Exh. 1). Also on August 10, 2000, EB sent a process server to Mr. Zuccarini's residence. (Pl. motion for alternative service at Exh. B P 2). Under oath on February 23, 2000, Mr. Zuccarini confirmed his address and stated that he has lived there for "approximately 15 years." (Pl. Exh. 5, Zuccarini Dep. at 9, *Shields v. Zuccarini*, No. 00-494 (E.D. Pa)). Mr. Zuccarini lives in an apartment unit inside a building with an outer security door. (Pl. motion for alternative service at Exh. B P 2). In order to gain access to the individual apartment units, a resident must unlock the security door. (Pl. motion for alternative service at Exh. B P 2). A sign was posted on this outer security door reading, "Deliveries for D-6[.] There is no one available to accept deliveries for D-6 nor will there be for a number of days. Please return to sender all items." (Pl. motion for alternative service at Exh. B P 3). The process server rang the buzzer for Mr. Zuccarini's apartment, but no one answered. (Pl. motion for alternative service at Exh. B P 4). The next day, the process server returned and spoke to an individual in the management office who confirmed that Mr. Zuccarini was still paying rent and had refused service of process by other persons. (Pl. motion for alternative service at Exh. B P 5). The same note remained on the security door and no one answered when the server rang the buzzer. (Pl. motion for alternative service at Exh. B P 5). On August 11, 2000, a process server attempted to effect service by ringing the buzzer on the security door and by knocking directly on Mr. Zuccarini's apartment door. (Pl. motion for alternative service at Exh. C P 4-6). There was no response. (Pl. motion for alternative service at Exh. C P 4-6). Neighbors identified Mr. Zuccarini's car which was in a parking lot near the apartment building. (Pl. motion for alternative service at Exh. C P 7). Counsel for EB left another voice message for Mr. Zuccarini on August 14, 2000, requesting a return call, but received no response. (First Weiner Decl. at P 5).

[*5]

> [4]   The United States Marshals' Service's attempts

2000 U.S. Dist. LEXIS 15719, *5; 56 U.S.P.Q.2D (BNA) 1705

to serve Mr. Zuccarini were unsuccessful as Mr. Zuccarini did not answer his door or respond to a phone message left by the Marshals' Service. (Pl. Exh. 14). In addition, on August 25, 26, 27, and 28, EB attempted to complete service on Mr. Zuccarini through process servers that waited for several hours at Mr. Zuccarini's apartment building. (Pl. Exh. 13). *See Electronics Boutique Holdings Corp. v. Zuccarini*, 2000 U.S. Dist. LEXIS 17970, No. 00-4055, (E.D. Pa. Aug. 29, 2000) (order granting preliminary injunction).

Mr. Zuccarini failed to appear, through counsel or otherwise, for the August 29 hearing. On that date, I granted EB's motion for preliminary injunction based on its ACPA claims, finding that Mr. Zuccarini had actual notice of this matter [5] and that the requirements for the issuance of a preliminary injunction had been satisfied. I scheduled a hearing on the merits of EB's ACPA claims for October 10, 2000. [6]

5   Tom Fisher, general manager of Cavecreek Wholesale Internet Exchange, the company that maintained the servers for the domain misspellings, sent Mr. Zuccarini an e-mail on Monday, August 14, 2000, at 1:40 p.m. notifying Mr. Zuccarini that the domain misspellings were being disabled in accordance with the temporary restraining order issued by this Court. (Pl. Exh. 16 at Exh. Fisher 3). On Tuesday, August 15, 2000, at 3:35 a.m., Mr. Zuccarini replied by e-mail, asking Mr. Fisher to "please reactivate the domains as soon as possible." (Pl. Exh. 16 at Exh. Fisher 4). Mr. Zuccarini wrote, "Tom, I have received absolutely nothing about this electronic [sic] boutique case and neither has my lawyer. Any restraining order would be directed at me not your company, and I have received nothing, thererfore [sic] the restraining order is invalid. I must be served before it can take effect and I have not been. As a hosting company you are not responsible for the content of my websites. Your company is not in jepordy [sic]." (Pl. Exh. 16 at Exh. Fisher 4). Thus, it is plainly apparent that Mr. Zuccarini is in fact aware of these proceedings.

[*6]

6   EB then attempted to serve Mr. Zuccarini through both certified and regular mail sent on August 30, 2000. (Pl. Exh. 24, Second Weiner

Decl. at P 2). The certified mail was returned marked "unclaimed." (Pl. Exh. 24, Second Weiner Decl. of at P 3). The regular mail was returned with a handwritten notation on the envelope reading, "moved, no forwarding address." (Pl. Exh. 24, Second Weiner Decl. of at P 3). Notably, on September 26, 2000, Mr. Zuccarini sent a package via Federal Express on which he listed the address to which EB sent its August 30 package and its process servers as his return address. (Pl. Exh. 24, Second Weiner Decl. at Exh. "A", Pl. Exhs. 13, 14, 21-23). The package was sent to an attorney representing plaintiffs in an action alleging similar conduct on the part of Mr. Zuccarini pending in the United States District Court for the Southern District of New York. (Pl. Exh. 24).

Mr. Zuccarini failed to obtain counsel and refused to appear himself for the October 10, 2000, hearing.

II. Findings of Fact

At the October 10, 2000, hearing I found as follows: [7] EB, a specialty [*7] retailer in video games and personal computer software, operates more than 600 retail stores, primarily in shopping malls, and also sells its products via the Internet. EB has registered several service marks on the principal register of the United States Patent and Trademark Office for goods and services of electric and computer products, including "EB" and "Electronics Boutique." (Pl. Exh. 1). EB has applications for several other service marks on the principal register of the United States Patent and Trademark Office for goods and services of electric and computer products, including "ebworld.com." (Pl. Exh. 2). EB has continuously used its service marks in its business since 1977. They have appeared in print, trade literature, advertising, and on the Internet.

7   Unless otherwise noted, I base my findings on the testimony of Seth P. Levy, senior vice president and chief information officer of EB, and EB's first request for admissions (Pl. Exh.5) deemed admitted pursuant to FED. R. CIV. P. 36(a) because Mr. Zuccarini failed to timely respond or object.

[*8]   EB's online store can be accessed via the Internet at "www.ebworld.com" and "www.electronicsboutique.com." EB registered its

Case 2:09-cv-00613-ABC-CW   Document 120-1   Filed 12/03/10   Page 29 of 75   Page ID
#:2416

Page 4

2000 U.S. Dist. LEXIS 15719, *8; 56 U.S.P.Q.2D (BNA) 1705

"EBWorld" domain name on December 19, 1996 and its "Electronics Boutique" domain name on December 30, 1997. EB has invested heavily in promoting its website to online customers. EB has expended a considerable amount of resources towards making its website consumer friendly. An easy-to-use website is critical to EB's ability to generate revenue directly through Internet customers and indirectly as support for EB's "brick and mortar" stores. Over the last eight months, online purchases have yielded an average of more than 1.1 million in sales per month and EB has logged more than 2.6 million online visitors.

On May 23, 2000, Mr. Zuccarini registered the domain names "www.electronicboutique.com," and "www.electronicbotique.com." (Pl. Exh. 3). One week later, Mr. Zuccarini registered the domain names "www.ebwold.com" and "www.ebworl.com." (Pl. Exh. 3). When a potential or existing online customer, attempting to access EB's website, mistakenly types one of Mr. Zuccarini's domain misspellings, he is "mousetrapped" [8] in a barrage of advertising windows, featuring [*9] a variety of products, including credit cards, internet answering machines, games, and music. (Pl. Exh. 4). The Internet user cannot exit the Internet without clicking on the succession of advertisements that appears. Simply clicking on the "X" in the top right-hand corner of the screen, a common way to close a web browser window, will not allow a user to exit. (Pl. Exh. 5, Zuccarini Prelim. Inj. Hearing Testimony at 119, *Shields v. Zuccarini*, 89 F. Supp. 2d 634 (E.D. Pa. 2000)). Mr. Zuccarini is paid between 10 and 25 cents by the advertisers for every click. (Pl. Exh. 5, Zuccarini Dep. at 54-5, *Shields v. Zuccarini*, No. 00-494, (E.D. Pa.)). Sometimes, after wading through as many as 15 windows, the Internet user could gain access to EB's website.

8   The term "mousetrapped" was used by Judge Dalzell, United States District Judge for the Eastern District of Pennsylvania, to describe the situation an Internet user encounters upon accessing one of Mr. Zuccarini's domain names in a matter in which Mr. Zuccarini was sued by a different plaintiff for similar conduct. *See Shields v. Zuccarini*, 89 F. Supp. 2d 634, 635 (E.D. Pa. 2000).

[*10]  III. Conclusions of law [9]

9   The majority of my conclusions of law were

deemed admitted by Mr. Zuccarini by his failure to respond or object to EB's first set of requests for admissions. (Pl. Exh. 5). I supplement those admissions with other evidence.

A. EB's request for a permanent injunction

In determining whether the issuance of a permanent injunction is appropriate, a court must determine: (1) whether the moving party has actually succeeded on the merits; (2) whether the moving party will be irreparably injured by denial of the relief; (3) whether granting the permanent relief will result in even greater harm to the nonmoving party; and (4) whether granting permanent relief will be in the public interest. *See ACLU v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1477 nn.2-3 (3d Cir. 1996).

1. Success on the merits

On August 29, 2000, I concluded that EB was likely to succeed on the merits of its ACPA claim. No facts to suggest to the contrary have been offered, as Mr. Zuccarini [*11] has failed to appear before this Court himself or through counsel, in person or through the filing of appropriate documents, and has not taken discovery. I will, nevertheless, evaluate EB's claim under the ACPA.

Under the ACPA, a person who registers, traffics in, or uses a domain name that is identical or confusingly similar to a distinctive or famous mark registered to someone else with a bad-faith intent to profit from that mark is subject to suit. *See* 15 U.S.C. § 1125(d)(1)(A). In order to determine whether EB is entitled to relief under the ACPA, this Court must evaluate the following: (1) whether EB's service marks are distinctive or famous; (2) whether Mr. Zuccarini's domain misspellings are identical or confusingly similar to EB's marks; and (3) whether Mr. Zuccarini registered the domain misspellings with a bad-faith intent to profit from them. *See Shields*, 89 F. Supp. at 638. In addition, I must determine whether Mr. Zuccarini is entitled to protection under the safe harbor provided by 15 U.S.C. § 1125(d)(1)(B)(ii). *See id.*

a. Distinctive or famous

A court may consider the following factors in [*12] determining whether a mark is distinctive or famous:

2000 U.S. Dist. LEXIS 15719, *12; 56 U.S.P.Q.2D (BNA) 1705

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods and services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and the channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(1).

I find that EB's marks are both distinctive and famous; therefore, they are entitled to protection. Since 1977, EB has used and traded under the "Electronics Boutique" name, which was registered on the principal register of the United States Patent and Trademark Office in January of 1987 [*13] and is incontestable. (Pl. Exh. 1, United States Trademark Registration No. 1,425,236). The name "Electronics Boutique" has been used for more than 20 years in connection with the sale of video games and computer software. Via the Internet, EB has traded under the name "Electronics Boutique" through its website, which can be accessed by both "www.ebworld.com" and "www.electronicsboutique.com," since the registration of those domain names on December 19, 1996, and December 30, 1997, respectively. (Pl. Exh. 12). EB has pending applications for several other service marks on the principal register of the United States Patent and Trademark Office for goods and services of electric and

computer products, including "EBWorld.com." (Pl. Exh. 2, United States Trademark Serial No. 75,829,090). Registration of EB's marks entitles EB to a "presumption that its registered trademark is inherently distinctive." *Morrison & Foerster LLP v. Wick*, 94 F. Supp. 2d 1125, 1130 (D. Colo. 2000) (citation and quotation omitted). Mr. Zuccarini opted not to rebut this presumption through the presentation of evidence before this Court.

Additionally, over more than 20 years, EB has spent tens [*14] of millions of dollars on advertising utilizing the EB service marks. EB's advertising campaigns have been widespread, reaching national and international audiences. The EB service marks are recognized throughout the electronic games and computer software industry and among the general public. EB has spent millions of dollars advertising to promote its website in print, on television, on the radio, and on the Internet. One way that EB advertises is on the Internet through partnerships formed with other online entities who display EB's artwork and provide links to EB's website. 10 It has become well-known to consumers of electronic games and computer software and throughout the industry that EB's website provides information about new products and opportunities to buy those products.

10   For example, ign.com, an entity that reviews and previews new electronic entertainment products online, provides a link on its website to EB's website which permits users to purchase the reviewed or previewed products.

In its [*15] last fiscal year, EB earned revenues of 273 million dollars using its marks. During the last eight months, EB has averaged more than 1.1 million dollars in sales per month from its website and 2.6 million people visited EB's website.

Mr. Zuccarini does not and has never offered any goods or services of his own for sale using any of the domain misspellings. Instead, Mr. Zuccarini's "business" consists entirely of trading on the goodwill developed by EB. 11 Furthermore, no other entity uses trade names or service marks similar to the ones used by EB.

11   I note that EB is not the only victim of Mr. Zuccarini's "business practices." Mr. Zuccarini is a notorious cybersquatter. By his own admission, Mr. Zuccarini has registered thousands of domain names through various host companies. (Pl. Exh. 5, Zuccarini Prelim. Inj. Hearing Testimony at

2000 U.S. Dist. LEXIS 15719, *15; 56 U.S.P.Q.2D (BNA) 1705

106, *Shields v. Zuccarini*, 89 F. Supp. 2d 634 (E.D. Pa. 2000)). The majority of those domain names are misspellings of famous names. (Pl. Exh. 20, Zuccarini's response to plaintiff's first request for inspection and production of documents pursuant to Fed. R. Civ. P. 34, *Dennis Maxim, Inc. v. Zuccarini*, No. 00-2104, (S.D.N.Y.)).

[*16] b. "Identical or confusingly similar"

Next, I must consider whether the domain misspellings are identical or confusingly similar to EB's marks. I note at the outset that the profitability of Mr. Zuccarini's enterprise is completely dependent on his ability to create and register domain names that are confusingly similar to famous names. [12] (Pl. Exh. 5, Zuccarini Dep. at 41-45, *Shields v. Zuccarini*, 89 F. Supp. 2d 634 (E.D. Pa. 2000)). As the similarity in the spellings of Mr. Zuccarini's domain names to popular or famous names increases, the likelihood that an Internet user will inadvertently type one of Mr. Zuccarini's misspellings (and Mr. Zuccarini will be compensated) increases. Through an e-mail message it received, EB is aware of at least one customer who was in fact confused by the domain misspellings and who believes that EB is associated with the domain misspelling "www.electronicbotique.com." [13] (Pl. Exh. 25). Thus, it is without hesitation that I find that the domain misspellings are confusingly similar to EB's marks.

12   Mr. Zuccarini admitted registering the domain name "sportillustrated.com" because of its similarity to the magazine *Sports Illustrated*. (Pl. Exh. 5, Zuccarini Dep. at 67, *Shields v. Zuccarini*, No. 00-494, (E.D. Pa.)). Mr. Zuccarini made similar admissions regarding his domain names containing misspellings of many famous names, including Michael Jordan, Tarzan, America Online, Yahoo!, Minolta, the Mayo Clinic, National Rent-A-Car, Elvis Presley, the prescription weight loss drug Xenical, Alicia Silverstone, Ricky Martin, Britney Spears, the Backstreet Boys, Star Wars, and Disney. (Pl. Exh. 5, Zuccarini Dep. at 67-76, *Shields v. Zuccarini*, No. 00-494, (E.D. Pa.)).

[*17]

13   Plaintiff's Exhibit 25 is a printout of an e-mail message sent to the webmaster at EBWorld.com stating, in part, "I do not know if you are affiliated with www.electronicbotique, but I believe you are."

c. Bad-faith intent to profit

Finally, I must consider whether Mr. Zuccarini acted with a bad-faith intent to profit from EB's marks, and if so, whether he is entitled to the protection of the safe harbor of § 1125(d)(1)(B)(2). In making that determination, I am guided by the following nine factors provided by § 1125(d)(1)(B):

(I) the trademark or other intellectual property rights of the[alleged cybersquatter], if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the [alleged cybersquatter] or a name that is otherwise commonly used to identify [the alleged cybersquatter];

(III) the [alleged cybersquatter's] prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the [alleged cybersquatter's] bona fide noncommercial or fair use of the mark in a site accessible under the [*18] domain name;

(V) the [alleged cybersquatter's] intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the [alleged cybersquatter's] offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such

Case 2:09-cv-00613-ABC-CW   Document 120-1   Filed 12/03/10   Page 32 of 75   Page ID #:2419

Page 7

2000 U.S. Dist. LEXIS 15719, *18; 56 U.S.P.Q.2D (BNA) 1705

conduct;

(VII) the [alleged cybersquatter's] provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the [alleged cybersquatter's] prior conduct indicating a pattern of such conduct;

(VIII) the [alleged cybersquatter's] registration or acquisition of multiple domain names which the person knows are identical or confusingly [*19] similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the [alleged cybersquatter's] domain name registration is or is not distinctive and famous.

15 U.S.C. § 1125(d)(1)(B).

Mr. Zuccarini's bad-faith intent to profit from the domain misspellings is abundantly clear. Mr. Zuccarini registered the domain misspellings in order to generate advertising revenue for himself, despite being aware of the Electronics Boutique stores and website. Mr. Zuccarini believes that Internet users will misspell the domain names of the websites they intend to access and instead access one of Mr. Zuccarini's websites. (Pl. Exh. 5, Zuccarini Dep. at 44, *Shields v. Zuccarini*, No. 00-494, (E.D. Pa.)). Mr. Zuccarini then profits each time an Internet user makes a typing or spelling mistake which Mr. Zuccarini correctly forecasts.

In addition, the domain misspellings quite obviously do not consist of names used to identify [*20] Mr. Zuccarini, legally or otherwise. Also, Mr. Zuccarini has no bona fide business purpose for registering the domain misspellings, as he does not and has not offered any goods or services that relate to EB or electronic products. Lastly, Mr. Zuccarini has no intellectual property rights at issue in this matter. I find that Mr. Zuccarini specifically

intended to prey on the confusion and typographical and/or spelling errors of Internet users to divert Internet users from EB's website for his own commercial gain.

Section 1125(d)(1)(B)(ii) provides a safe harbor available to Mr. Zuccarini if he establishes that he reasonably believed that his use of the domain misspellings was fair and lawful. Mr. Zuccarini declined to claim the protections of the safe harbor by refusing to participate in this matter. [14]

14  I note that even if Mr. Zuccarini had been present or had retained counsel to act on his behalf, the facts suggest that he would have been unable to demonstrate that he reasonably believed his use of the domain misspellings was lawful. Mr. Zuccarini registered the domain misspellings at issue in the instant matter after being preliminarily enjoined from using similar misspellings in another action. *See Shields v. Zuccarini*, 89 F. Supp. 2d 634, 642-43 (E.D. Pa. 2000). In addition, at the time that Mr. Zuccarini registered the domain misspellings, suit for similar conduct had been commenced against him in the Southern District of New York. (Pl. Exh. 11, *Dennis Maxim, Inc. v. Zuccarini*, No. 00-2104, (S.D.N.Y.) (action pending)).

[*21] 2. Irreparable harm

The second inquiry I must undertake in deciding whether a permanent injunction is appropriately granted is into whether EB will suffer irreparable injury if the injunction does not issue. In a trademark infringement action, the Third Circuit observed that "grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will." *See Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 195 (3d Cir. 1990). Additionally, our court of appeals noted that a finding of irreparable injury "can also be based on likely confusion." *Id.* at 196. Although, as this court has previously noted, the "confusingly similar" language of the ACPA governs cybersquatting actions rather than the probability of "likely confusion" standard applied in trademark infringement cases, the consideration of factors articulated by the Third Circuit in *Opticians Association* is appropriate in cybersquatting cases. [15] *See Shields v. Zuccarini*, 89 F. Supp. 2d 634, 641 (E.D. Pa. 2000).

15  Although the ACPA clearly guards against

Case 2:09-cv-00613-ABC-CW   Document 120-1   Filed 12/03/10   Page 33 of 75   Page ID
#:2420

Page 8

2000 U.S. Dist. LEXIS 15719, *21; 56 U.S.P.Q.2D (BNA) 1705

the use and registration of domain names that are "confusingly similar" to a famous or distinctive mark, Congress expressly permitted courts to consider whether the alleged cybersquatter "intended to divert consumers from the mark owner's online location . . . by creating a *likelihood of confusion* as to the source, sponsorship, affiliation, or endorsement of the site" in evaluating bad-faith intent to profit. 15 U.S.C. § 1125(d)(1)(B)(i)(V) (emphasis added).

[*22] It is impossible to determine the number of potential and existing customers diverted from EB's website by Mr. Zuccarini's domain misspellings. A user-friendly website is important to EB's online success. There must be as few steps, or clicks, as possible between initially accessing EB's website and the completion of the transaction as each computer click represents a significant amount of time. Those who get lost in the advertisements may abandon their intention to purchase from EB. Others simply may never find EB's website. These customers may not only be discouraged from shopping at EB online, but may also be discouraged from shopping at EB's outlets in person as well.

Furthermore, it is impossible to calculate the loss of reputation and goodwill caused by Mr. Zuccarini's domain misspellings. An essential component of a successful online business is trust. In order to purchase goods through the Internet, customers must supply personal information, including their credit card numbers. One customer, who believed that EB was associated with one of the domain misspellings sent an e-mail to EB expressing concern about a "possible security problem." (Pl. Exh. 25).

3. Balance of hardships

[*23] Third, I must balance the hardships to the parties resulting from an injunction issued by this Court. Mr. Zuccarini's failure to respond to this matter forces me to conclude that he willfully avoided service and that he made a conscious choice to allow this matter to proceed in his absence. The hardship was visited on the plaintiff alone.

4. Public interest

Finally, I must determine whether an injunction would further the public interest. As the Third Circuit observed in *Opticians Association* with regard to

trademark cases, the public interest suffers when the public's right not to be deceived is violated. *See Opticians Association*, 920 F.2d at 197, *Shields*, 89 F. Supp. 2d at 641-42. Mr. Zuccarini's profitability is directly proportional to the number of Internet users that he deceives. Therefore, the fourth requirement is fulfilled.

B. EB's request for statutory damages

Pursuant to 15 U.S.C. § 1117(d), a plaintiff seeking recovery under the ACPA may elect to recover statutory damages in lieu of actual damages and profits. [16] A court may award statutory damages in an amount between $ 1,000 and $ 100,000 per infringing [*24] domain name based on the court's determination of what is just. *See* 15 U.S.C. § 1117(d). EB has elected to recover statutory damages in this matter. (Pl. Pretrial Memo at 13). The recovery of "statutory damages in cybersquatting cases, both [] deters wrongful conduct and [] provides adequate remedies for trademark owners who seek to enforce their rights in court." S. REP. No. 106-140 (1999).

> 16   The ACPA allows "trademark owners to sue anyone who engages in [cybersquatting] for the higher of actual damages or statutory damages of $ 1,000 to $ 100,000 for each domain name." S. REP. No. 106-140 (1999).

I emphasize that the actual damages suffered by EB as a result of lost customers and goodwill is incalculable. In proceedings before this Court, Mr. Zuccarini admitted that he yields between $ 800,000 and $ 1,000,000 annually from the thousands of domain names that he has registered. *See Shields v. Zuccarini*, 2000 U.S. Dist. LEXIS 15223, No.00-494, 2000 WL 1053884, at *1 (E.D. Pa. July 18, 2000). [*25] Advertisers pay Mr. Zuccarini between 10 and 25 cents each time an Internet user clicks on one of their ads posted on Mr. Zuccarini's websites. (Pl. Exh. 5, Zuccarini Dep. at 54-5, *Shields v. Zuccarini*, No. 00-494, (E.D. Pa.)). Many of the domain names registered by Mr. Zuccarini are misspellings of famous names and infringe on the marks of others. (Pl. Exh. 20, Zuccarini's response to plaintiff's first request for inspection and production of documents pursuant to Fed. R. Civ. P. 34, *Dennis Maxim, Inc. v. Zuccarini*, No. 00-2104, (S.D.N.Y.)).

In addition, Mr. Zuccarini has victimized a wide variety of people and entities. This Court has permanently enjoined Mr. Zuccarini from using domain names that are "substantially similar" to the marks of

another plaintiff, finding Mr. Zuccarini's "conduct utterly parasitic and in complete bad faith." *Shields v. Zuccarini*, 2000 U.S. Dist. LEXIS 15225, No.00-494, 2000 WL 1056400, at *1 (E.D. Pa. June 5, 2000). Other cases alleging similar conduct have been brought against Mr. Zuccarini by Radio Shack, Office Depot, Nintendo, Hewlett-Packard, the Dave Matthews Band, *The Wall Street Journal*, *Encyclopedia Britannica*, the distributor of Guinness [*26] beers and Spiegel's catalog in various federal courts and arbitration fora. (Pl. Exhs. 18, 20). Demands regarding similar conduct have been made on Mr. Zuccarini by the Sports Authority, Calvin Klein, and Yahoo!. (Pl. Exhs. 18, 20). Mr. Zuccarini's conduct even interferes with the ability of the public to access health information by preying on hospitals and prescription drugs. (Pl. Exh. 5, Zuccarini Dep. at 70, 73, *Shields v. Zuccarini*, No. 00-494, (E.D. Pa.) (admitting the registration of domain names containing misspellings of the Mayo Clinic and the weight loss drug Xenical).

I also note that Mr. Zuccarini's conduct is not easily deterred. *See Shields*, 2000 U.S. Dist. LEXIS 15223, No. 00-494, 2000 WL 1053884, at *1 (E.D. Pa. July 18, 2000) (observing that Mr. Zuccarini failed to get the "crystalline message" of the Court in its March 22 Opinion and June 5 Order). Strikingly, Mr. Zuccarini registered the domain misspellings at issue in this matter after this Court preliminarily enjoined him from using misspellings of another individual's mark. (Pl. Exh. 3) *See Shields*, 89 F. Supp. 2d at 642-43.

Furthermore, since this Court permanently enjoined Mr. Zuccarini from using [*27] other domain misspellings, assessed statutory damages in the amount of $ 10,000 per infringing domain name against him, and required him to bear the plaintiff's costs and attorneys' fees, Mr. Zuccarini has unexplainedly registered hundreds of domain names which are misspellings of famous people's names, famous brands, company names, television shows, and movies, victimizing, among others, the Survivor television show, Play Station and Carmageddon video game products, singers Kylie Minogue, Gwen Stefani and J.C. Chasez, *The National Enquirer*, and cartoon characters the Power Puff Girls. (Pl. Exh. 10) Mr. Zuccarini boldly thumbs his nose at the rulings of this court and the laws of our country. Therefore, I find that justice in this case requires that damages be assessed against Mr. Zuccarini in the amount of $ 100,000 per infringing domain name, for a total of $ 500,000.

## C. Attorneys' fees and costs

EB has requested that it be awarded attorneys' fees and the costs of this litigation. The ACPA authorizes this Court to award "reasonable attorney fees to the prevailing party" in "exceptional cases." 15 U.S.C. § 1117(a). In determining whether a case is "exceptional" [*28] under § 1117(a), the Third Circuit has required "a finding of culpable conduct on the part of the losing party, such as bad faith fraud, or knowing infringement." *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.*, 952 F.2d 44, 47 (3d Cir. 1991). As described above, Mr. Zuccarini acted in complete bad faith by knowingly and intentionally trading on the goodwill and reputation of EB in an attempt to mislead the public. Therefore, I find that EB is entitled to attorney's fees.

In determining the reasonableness of a fee request, courts in this circuit utilize the lodestar method. *See Washington v. Philadelphia Cty. Court of Common Pleas*, 89 F.3d 1031, 1035 (3d Cir. 1996). In accordance with this method, the number of hours reasonably expended by counsel is multiplied by the attorney's reasonable hourly rate. *Id.* EB has requested fees for legal services in the amount of $ 27,487.00. The majority of the fees for legal services constitute compensation for the time of lead counsel, Glenn A. Weiner, Esq., who billed 116.95 hours at a rate of $ 210 per hour. Additionally, four other attorneys associated with Mr. Weiner logged a total of 13.25 hours at rates ranging [*29] from $ 140 to $ 300 per hour based on experience and level of skill. An additional seven hours of legal services were provided by paralegals and a law librarian, totaling $ 590. I note that EB's request did not include compensation for legal services and costs expended after October 17, 2000, observing that EB's submission to the Court regarding the amount of fees and costs spent in this matter was filed on October 24, 2000. Furthermore, Mr. Zuccarini did not object or respond to EB's request for fees. I find that "the time expenditures were reasonable and directly related to the claims at issue in this matter" and that "the rates are reasonable according to the prevailing market rates in Philadelphia." *Shields v. Zuccarini*, 2000 U.S. Dist. LEXIS 15223, 2000 WL 1053884, at *2 (E.D. Pa. July 18, 2000).

EB also requested costs of litigation in the amount of $ 3,166.34, which represents documented expenses incurred through October 17, 2000. EB does not seek legal expenses incurred after the 17th of October. Section

2000 U.S. Dist. LEXIS 15719, *29; 56 U.S.P.Q.2D (BNA) 1705

1117(a) permits the assessment of costs against the losing party. Again, Mr. Zuccarini declined to object or respond to EB's request. I find that the expenses incurred by EB in this matter [*30] are reasonable.

I will award EB the full amount of its $ 30,653.34 request.

IV. Conclusion

For the aforementioned reasons, I find in favor of plaintiff EB on its claims brought pursuant to the ACPA. I am satisfied that the requirements for the issuance of a permanent injunction have been fulfilled. In addition, I find that EB is entitled to recover statutory damages in the amount of $ 500,000 and legal costs in the amount of $ 30,653.34. An Order follows.

AND NOW, this 30th day of October 2000, after a hearing held on October 10, 2000, on the merits of Plaintiff's claims under the Anticybersquatting Consumer Protection Act of 1999, 15 U.S.C. § 1125(d) ("ACPA") and on damages, it is hereby ORDERED as follows:

1. JUDGMENT IS ENTERED in favor of plaintiff Electronics Boutique Holdings Corporation and against defendant John Zuccarini, individually and trading as Cupcake Patrol and/or Cupcake Party, on plaintiff's claims under the ACPA;

2. By November 6, 2000, defendant shall TRANSFER domain names "www.electronicboutique.com," "www.eletronicsboutique.com," "www.electronicbotique.com," "www.ebwold.com," "www.ebworl.com."

to plaintiff and pay all [*31] costs associated therewith;

3. Defendant is PERMANENTLY ENJOINED from using any domain name substantially similar to plaintiff's marks;

4. Pursuant to 15 U.S.C. § 1117(d), JUDGMENT IS ENTERED in the amount of $ 500,000 ($ 100,000 statutory damages per infringing domain name) in favor of plaintiff Electronics Boutique Holdings Corporation and against Defendant John Zuccarini, individually and trading as Cupcake Patrol and/or Cupcake Party;

5. Pursuant to 15 U.S.C. § 1117(a), defendant is assessed the costs of this action, consisting of plaintiff's attorneys' fees in the amount of $ 27,487.00 and costs in the amount of $ 3,166.34;

6. The $ 100.00 cash bond posted by plaintiff as security for the temporary restraining order and preliminary injunction entered by the Court is released;

7. Plaintiff's remaining claims, brought under other federal statutes and common law, are DISMISSED WITHOUT PREJUDICE.

BY THE COURT:

Berle M. Schiller, J.



LEXSEE 2007 U.S. DIST. LEXIS 31721

**STEVEN JOHNSON, Plaintiff, v PATRICK CONNOLLY, Defendant.**

**No C 06-6414 VRW**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2007 U.S. Dist. LEXIS 31721**

**April 18, 2007, Filed**

**COUNSEL:** [*1] For Steven Johnson, an individual doing business as Cowboy's Fuzzy Duds, Plaintiff: Eric J. Farber, LEAD ATTORNEY, Farber & Company, Attorneys, San Francisco, CA.

**JUDGES:** VAUGHN R WALKER, United States District Judge.

**OPINION BY:** Vaughn R. Walker

**OPINION**

ORDER

Plaintiff alleges that defendant infringes his trademark rights under the Lanham Act, 15 USC § 1114, and violates the Anti-cybersquatting Consumer Protection Act (ACPA), 15 USC § 1125(d). Doc # 1. Plaintiff now moves for default judgment, seeking statutory damages, injunctive relief and attorney fees. Doc ## 18, 19. For the reasons that follow, the court GRANTS plaintiff's motion for default judgment, GRANTS injunctive relief, DENIES statutory damages and GRANTS an award of attorney fees and expenses.

Plaintiff asserts that he created Cowboy's Fuzzy Duds, a line of clothing made entirely of patterned and solid fleece cloth. Doc # 1, P 1. After creating a prototype, Doc # 22, P 2, plaintiff registered "Cowboy's Fuzzy Duds" as a business name with the Contra Costa County clerk's office on March 20, 2002. Doc # 22, Ex B. Plaintiff then registered the domain name www.cowboysfuzzyduds.com with Network [*2]

Solutions on October 14, 2002. Doc # 22, P 9. Two months later, plaintiff filed an application for federal trademark registration for "Cowboy's Fuzzy Duds," which was granted on August 23, 2005. Doc # 22, P 10; id, Ex C. Plaintiff's clothing line displays this trademark in the lower right hand corner of the clothing. Doc # 1, P 1.

Defendant, who met plaintiff during the development of plaintiff's product, Doc # 22, 11, registered the domain name *www.fuzzyduds.com* on June 29, 2003, id, Ex F, and allegedly began producing nearly identical patterned fleece clothing bearing the mark "Fuzzy Duds." Doc # 1, P 1. Plaintiff's prior counsel sent defendant two cease-and-desist letters in early 2004, Doc # 22, Ex G-H, but plaintiff received no reply from defendant, Doc # 22, PP 15-16. On September 17, 2006, defendant allegedly contacted plaintiff and demanded $ 20,000.00 in exchange for transfer of defendant's domain name. Doc # 1, P 24.

Plaintiff asserts that defendant infringes his trademark rights by selling identical clothing via the domain *www.fuzzyduds.com.* Doc # 1. Although served with summons and complaint on November 11, 2005, see Doc # 13, defendant never filed an answer [*3] or responsive pleading. Upon plaintiff's motion, the clerk entered default on December 28, 2006, in accordance with FRCP 55(a). Doc # 16.

Subsequently, plaintiff moved for default judgment on February 8, 2007, requesting that defendant pay $ 50,000.00 in statutory damages pursuant to the Lanham

2007 U.S. Dist. LEXIS 31721, *3

Act, 15 USC § 1114, and that defendant transfer ownership of the domain name *www.fuzzyduds.com* pursuant to the Federal Anti-cybersquatting Privacy Act, 15 USC § 1125(d). Doc # 18. Plaintiff also seeks to recover attorney fees and costs. Id.

I

A

The court first addresses plaintiff's motion for default judgment. "Courts have inherent equitable powers to dismiss actions or enter default judgments for failure to prosecute, contempt of court, or abusive litigation practices." *Televideo Systems, Inc v Heidenthal,* 826 F.2d 915, 917 (9th Cir 1987) (citing *Roadway Express, Inc v Piper,* 447 U.S. 752, 764, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980); *Link v Wabash RR,* 370 U.S. 626, 632, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962); *United States v Moss-American, Inc,* 78 F.R.D. 214, 216 (ED Wis 1978)).

"The general rule of law is that upon default the factual allegations [*4] of the complaint, except those relating to the amount of damages, will be taken as true." *Televideo Systems,* 826 F.2d at 917-18 (quoting *Geddes v United Financial Group,* 559 F.2d 557, 560 (9th Cir 1977)). "Upon entry of default judgment, facts alleged to establish liability are binding upon the defaulting party, and those matters may not be relitigated on appeal." *Danning v Lavine,* 572 F.2d 1386, 1388 (9th Cir 1978)(citations omitted). Following default judgment, a defendant is deemed to have admitted the well-pleaded allegations in the complaint. *Benny v Pipes,* 799 F.2d 489, 495 (9th Cir 1986), amended, 807 F.2d 1514 (9th Cir 1987) (citing *Thomson v Wooster,* 114 U.S. 104, 114, 5 S. Ct. 788, 29 L. Ed. 105, 1885 Dec. Comm'r Pat. 279 (1884); *In re Visioneering Construction,* 661 F.2d 119, 124 (9th Cir 1981)).

Defendant responded to neither plaintiff's complaint, the clerk's entry of default nor plaintiff's motion for default judgment. By refusing to defend this suit, defendant leaves no other remedy to plaintiff than default judgment. Plaintiff's motion for default judgment is therefore GRANTED and the court takes the well-pleaded allegations [*5] in plaintiff's complaint as true and binding upon defendant. *Danning,* 572 F2d at 1388; *Geddes,* 559 F2d at 560.

B

Liability for infringement of a registered trademark is created by § 32 of the Lanham Act, which forbids a person from using a mark in commerce that is confusingly similar to a registered trademark. 15 USC § 1114(1)(a). Plaintiff alleges that defendant knowingly sells and distributes infringing clothing and uses the Cowboy's Fuzzy Duds mark to advertise these goods in a manner that is likely to cause consumer confusion. Doc # 1, PP 25-30. Accordingly, the factual allegations of plaintiff's complaint, admitted by defendant through default, establish that defendant violated the plaintiff's rights under § 1114(1)(a) of the Lanham Act.

To remedy trademark infringement under § 1114, the Lanham Act authorizes a plaintiff to recover defendant's profits; this award may be trebled if the defendant's conduct qualifies as willful. 15 USC § 1117(a)-(b). Alternatively, § 1117(c) permits a plaintiff to elect statutory damages in cases involving the use of counterfeit marks in connection with the sale [*6] of goods. 15 USC § 1117(c).

Plaintiff elects to recover statutory damages but misapprehends the statutory prerequisites. The Lanham Act does not provide statutory damages to all victims of infringement, only those whose goods have been counterfeited. To be eligible for the special civil monetary remedies against counterfeiting, the defendant's non-genuine mark must be "identical with or substantially indistinguishable from" the plaintiff's registered mark. 15 USC § 1116(d)(1)(B). The Lanham Act distinguishes between counterfeiting and mere "colorable imitation," which occurs when a mark so resembles a registered mark "as to be likely to cause confusion or mistake or to deceive." 15 USC § 1127. Apart from omitting the word "Cowboy's," defendant's mark also uses block font, as opposed to plaintiff's jagged font. See Doc # 22, Ex A & E. Hence, although defendant's mark amounts to "colorable imitation," as plaintiff alleges, it is not a counterfeit of plaintiff's mark. Accordingly, the court DENIES plaintiff's request for statutory damages.

C

Plaintiff also claims that defendant's website, *www.fuzzyduds.com,* [*7] violates the Anti-cybersquatting Consumer Protection Act (ACPA), 15 USC § 1125(d), which aims to prevent the use of domain names that are confusingly similar to registered trademarks. See *Sporty's Farm v Sportsman's Market,* 202 F3d 489 (2d Cir 2000). Section 1125(d) provides that

Exhibit A
Page 35

"[a] person shall be liable in a civil action by the owner of a mark * * * if * * * that person has a bad faith intent to profit from that mark [and] * * * registers, traffics in, or uses a domain name that * * * in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark." 15 USC 1125(d)(1)(A)(ii)(I).

The court agrees with plaintiff that the term "Fuzzy Duds," as used in connection with plaintiff's clothing line, is inherently distinctive -- a finding that accords with the Lanham Act's statutory presumption for registered marks. See 15 USC § 1115(a). The well-pleaded allegations in plaintiff's complaint that defendant has admitted by default satisfy the remaining requirements under the ACPA. Namely, defendant registered and used the name [*8] *www.fuzzyduds.com* in bad faith with the intent to trade upon the goodwill of plaintiff's mark and in a manner that is likely to cause consumer confusion. Doc # 1, PP 34-41. Accordingly, the factual allegations of plaintiff's complaint establish that defendant violated the plaintiff's rights under § 1125 of the ACPA.

Upon a finding of liability, the ACPA provides that "a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." See 15 USC § 1125(d)(1)(C). Pursuant to the ACPA, the court finds that plaintiff is entitled to the transfer of defendant's domain name.

D

Finally, the court takes up plaintiff's request for attorney fees. Section 1117(a) gives the court discretion to award reasonable attorney fees in "exceptional cases." 15 USC § 1117(a). The term "exceptional" is generally accepted to mean cases in which trademark infringement is "deliberate and willful." See *Lindy Pen Co v Bic Pen Corp,* 982 F2d 1400, 1409 (9th Cir 1993). Yet a case may also be deemed "exceptional" - and merit an award of attorney fees under the Lanham Act - when a defendant [*9] disregards the proceedings and does not appear. *Taylor Made Golf Co, Inc v Carsten Sports Ltd,* 175 FRD 658, 663 (SD Cal 1997). The court finds this case exceptional due to the nature of defendant's infringement and his unwillingness to appear in this case.

Plaintiff's counsel Eric J Farber submits in his declaration that he worked 24.57 hours on this case, bills $ 350 per hour for intellectual property litigation, has over 13 years of trademark litigation experience and

practices in San Francisco. Doc # 27 (Farber decl PP 4-6). Farber's paralegal, James Ball, spent 7.1 hours on this case at a billing rate of $ 85 per hour. Doc # 27.

The court first evaluates whether the number of hours expended by counsel are appropriate to the requirements of the particular case. Plaintiff's counsel gathered investigative information, prepared documents and pleadings and moved for default judgment. Doc # 27. Counsel expended a total of 24.57 hours accomplishing these tasks, which the court finds reasonable. Plaintiff's counsel's work product was at least of the quality of a reasonably skilled attorney, and the number of hours expended are reasonable in light of the fairly simple [*10] -- but not utterly trivial -- nature of the papers that plaintiff needed to file.

The court further finds the claimed rates of $ 350/hour for Farber and $ 85/hour for Ball reasonable, as they comport with rates the court has found reasonable in similar circumstances. See, e g, *Chanel v Brandon Doan,* 2007 US Dist LEXIS 22691 *17-*19 (ND Cal 2007) (finding that a billing rate of 350/hour for counsel with ten years of experience was less than the amount provided under the Laffey matrix). Accordingly, the court awards attorney fees in the amount of $ 9,220.50.

Finally, plaintiff requests recovery of court costs in the amount of $ 765. The plaintiff's application for default judgment includes a breakdown of these costs, Doc # 27 P 23, which the court finds reasonable. Accordingly, the court awards plaintiff his costs in the amount of $ 765.

II

For the foregoing reasons, the court GRANTS plaintiff's motion for default judgment and, pursuant to the ACPA, the court ORDERS defendant to transfer the domain name www.fuzzyduds.com to the plaintiff. Additionally, defendant is ORDERED to pay plaintiff his attorney fees and costs in the amount of $ 9985.50. The clerk [*11] is DIRECTED to enter judgment for plaintiff, close the file and terminate all motions.

IT IS SO ORDERED.

VAUGHN R WALKER

United States District Judge



LEXSEE 2009 U.S. APP. LEXIS 7344

**KIVA KITCHEN & BATH INC, Plaintiff - Appellee v. CAPITAL DISTRIBUTING INC; JOHN MICHAEL DAVIS also known as, John Davis also known as, Michael Davis, Defendants - Appellants**

**No. 08-20303**

**UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

**319 Fed. Appx. 316; 2009 U.S. App. LEXIS 7344**

**April 2, 2009, Filed**

**NOTICE:** PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** [**1]
    Appeal from the United States District Court for the Southern District of Texas. USDC No. 4:06-CV-2562. Kiva Kitchen & Bath, Inc. v. Capital Distrib., 2007 U.S. Dist. LEXIS 70496 (S.D. Tex., Sept. 24, 2007)

**COUNSEL:** For KIVA KITCHEN & BATH INC, Plaintiff - Appellee: David L. Burgert, Paul Andrew Dyson, Peter G. Irot, Houston, TX.

For CAPITAL DISTRIBUTING INC, JOHN MICHAEL DAVIS, also known as Michael Davis, also known as John Davis, Defendants - Appellants: Thomas Viggers Murto, III, MaddenSewell, Dallas, TX.

**JUDGES:** Before SMITH, GARZA, and CLEMENT, Circuit Judges.

**OPINION BY:** EDITH BROWN CLEMENT

**OPINION**

    [*318]  EDITH BROWN CLEMENT, Circuit Judge: *

    *  Pursuant to 5TH CIR. R. 47.5, the court has

determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

    Kiva Kitchen & Bath Inc. ("Kiva") sued Capital Distributing Inc. ("Capital") and Capital's owner, John Michael Davis ("Davis," and together with Capital, the "Capital Defendants"), for various violations of trademark laws. Kiva was awarded statutory damages and attorneys' fees following a jury trial, and the Capital Defendants appeal.

**FACTS AND PROCEEDINGS**

    Kiva owns four stores that sell high-end kitchen and bath appliances in various Texas cities: AABC Appliance Gallery in Houston, Jarrell Appliance Gallery [**2] in Dallas, Stone Appliance Gallery in San Antonio, and McNairs Appliance Gallery in Austin. Capital operates a retail appliance store in Dallas and is thus a direct competitor of Kiva through its Jarrell store. In December 2005, Davis, on behalf of Capital, began registering internet domain names that incorporated the trade names (or similar spellings thereof) of numerous Texas appliance stores, including Kiva's. [1] Further, the domain names of Capital's competitors in Dallas, including Kiva's Jarrell store, were forwarded to Capital's website--so that an internet user who typed one of the Jarrell domain names in her browser would be redirected to Capital's website.

1    With respect to Kiva's stores, Capital registered the following eight domain names: jarrellappliancegallery.com, jarrellappliance.com, and jarrellgallery.com (collectively, the "Jarrell domain names"); and aabcappliancegallery.com, stoneappliancegallery.com, mcnairappliance.com, mcnairsappliance.com, and mcnairappliancegallery.com (collectively, the "non-Jarrell domain names").

Kiva discovered the registration of its trade names and the use of this forwarding feature in the summer of 2006. In August 2006, Kiva filed this [**3] suit against the Capital Defendants [2] in Texas federal court, seeking damages and injunctive relief. It brought claims for trademark infringement under the Lanham Act, 15 U.S.C. § 1125(a), and violation of the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), as well as several state law claims. The Capital Defendants filed third-party claims against BringMeBiz, Inc. ("BMB")--the company hired by Capital in 2005 to optimize its website--and BMB's owner, Todd McCally ("McCally"), for breach of contract, negligence, and fraud.

2    The initial complaint also named Jennifer Tyrrell--Davis's daughter and Capital's marketing manager--as a defendant, but Kiva later dismissed its claims against her.

The district court conducted a six-day jury trial in January-February 2008. The jury found the Capital Defendants liable for trademark infringement with respect to the Jarrell mark and violation of the ACPA with respect to all Kiva domain names, and awarded Kiva compensatory damages in the amount of $ 257,232. The jury also found that the case was "exceptional" because the Capital Defendants had acted "willfully, maliciously, fraudulently, or deliberately." It awarded Kiva punitive [**4] damages in the amount of $ 200,000. Finally, the jury found that BMB and McCally were not liable to the Capital Defendants.

In its post-trial briefing, Kiva sought an enhancement of the jury's damages award, [*319] and requested that the district court award the greater of these enhanced damages or the statutory damages provided under the ACPA. Ultimately, the district court issued a final judgment enjoining the Capital Defendants from registering or otherwise infringing on Kiva's trade names, and awarding Kiva $ 500,000 in statutory damages. Relying on the jury's finding that the case was

"exceptional," the district court also awarded Kiva $ 500,960 in attorneys' fees under the Lanham Act. The Capital Defendants appeal the award of damages and attorneys' fees, and also contend that a portion of Davis's testimony at trial was erroneously admitted.

## DISCUSSION

### A. Award of Statutory Damages

"A district court's damages award is a finding of fact, which this court reviews for clear error." *Jauch v. Nautical Servs., Inc.,* 470 F.3d 207, 213 (5th Cir. 2006). However, "[t]he conclusions of law underlying the award are reviewed *de novo.*" *Id. See also Ford Motor Co. v. Catalanotte,* 342 F.3d 543, 545-46 (6th Cir. 2003) [**5] ("In reviewing the district court's award of statutory damages [under the ACPA], we will not disturb the district court's findings of fact unless they are clearly erroneous, but we review any issues of law *de novo.*").

Under the ACPA, the prevailing "plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $ 1,000 and not more than $ 100,000 per domain name, as the court considers just." 15 U.S.C. § 1117(d). The Capital Defendants first argue that the district court's award of statutory damages is invalid because Kiva did not specifically "elect" to recover statutory damages in the proceedings below. In support of their argument, they rely on case law relating to 17 U.S.C. § 504(c)(1), which contains a similar statutory damages provision for copyright infringement cases. *See E. & J. Gallo Winery v. Spider Webs Ltd.,* 286 F.3d 270, 278 (5th Cir. 2002) (noting that "[t]he statutory damages provisions in the ACPA . . . are akin to the statutory damages provisions of the copyright laws"). However, the copyright cases cited by the Capital Defendants [**6] are inapposite.

In *Jordan v. Time, Inc.,* the plaintiff in a copyright infringement action obtained a jury verdict awarding actual damages and elected instead to recover statutory damages assessed by the district court. 111 F.3d 102, 104 (11th Cir. 1997). The plaintiff appealed the jury's award of actual damages, challenging a jury instruction on damage calculations. *Id.* The court held that the plaintiff's timely election to receive statutory damages mooted all questions regarding actual damages, and the plaintiff was therefore precluded from appealing the jury's award. *Id.* Similarly, the plaintiff in *Twin Peaks Productions, Inc. v.*

*Publications International, Ltd.* had also opted for a statutory award. 996 F.2d 1366, 1380 (2d Cir. 1993). When the defendants appealed both awards, the plaintiff cross-appealed, seeking an increase in the amount of actual damages. *Id.* The court refused to address the arguments on cross-appeal, holding that the plaintiff had "given up the right to seek actual damages and [could] not renew that right on appeal by cross-appealing to seek an increase in the actual damages." *Id.*

These two cases are not pertinent to the present situation; they merely stand for [**7] the proposition that, once a plaintiff elects to recover statutory damages, an appeal to obtain an increase in the actual damages award is not permitted. Clearly, this is not what happened here--Kiva is not appealing the jury award of actual damages, [*320] the Capital Defendants are in fact arguing that Kiva did *not* properly elect statutory damages. While *Jordan* and *Twin Peaks* prevent a plaintiff from pursuing both remedies *on appeal*, the Capital Defendants have cited no authority limiting a plaintiff's ability to select the desired remedy at any time *before* final judgment is rendered by the district court.

On the contrary, our review of the case law suggests that a plaintiff is authorized to make an informed election of remedy even after the jury has rendered a verdict, with knowledge of the amount of both awards. *See Feltner v. Columbia Pictures Television, Inc.,* 523 U.S. 340, 347 n.5, 118 S. Ct. 1279, 140 L. Ed. 2d 438 (1998) (stating that "[t]he parties agree, and we have found no indication to the contrary, that election [of remedies for copyright infringement] may occur even after a jury has returned a verdict on liability and an award of actual damages"); *Twin Peaks,* 996 F.2d at 1380 (noting that the plaintiff elected [**8] a statutory damages award knowing that its amount was lower than the amount of actual damages awarded by the jury because it believed statutory damages were more likely to be sustained on appeal). Further, we see no reason to limit the manner in which a plaintiff may elect statutory damages; in particular, nothing indicates that a request by a plaintiff that the court award the greater of the two remedies is an invalid election.

The Capital Defendants' challenge to the amount of statutory damages is equally without merit. The district court awarded $ 500,000 in statutory damages, including $ 100,000 for each of the three Jarrell domain names and $ 40,000 for each of the five non-Jarrell domain names.

This satisfies the ACPA requirement that the amount of statutory damages be "not less than $ 1,000 and not more than $ 100,000 per domain name." 15 U.S.C. § 1117(d). However, the Capital Defendants contend that this award was not "just" under Section 1117(d) because there is insufficient evidence that Kiva suffered damages as a result of the improper registrations and forwarding. We disagree.

The alleged lack of damages suffered by Kiva is controverted by the sales data and expert testimony [**9] presented by Kiva at trial, which resulted in a jury award of $ 257,232 in actual damages. Further, the statutory damages provisions in the ACPA are designed not only to "compel[] restitution of profit and reparation for injury" but also "to discourage wrongful conduct." *E. & J. Gallo,* 286 F.3d at 278 (quoting *F.W. Woolworth Co. v. Contemporary Arts, Inc.,* 344 U.S. 228, 233, 73 S. Ct. 222, 97 L. Ed. 276 (1952)). In the copyright context, appellate courts have noted that "[i]f statutory damages are elected, the [trial] court has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima." *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.,* 259 F.3d 1186, 1194 (9th Cir. 2001) (quotation omitted). *See also Broad. Music, Inc. v. Xanthas, Inc.,* 855 F.2d 233, 237 (5th Cir. 1988).

We agree with the district court that the maximum statutory award for the Jarrell domain names was warranted in light of Davis's bad faith intent to divert potential customers to Capital's website and because Jarrell is a direct competitor of Capital in Dallas. *See, e.g., Citigroup, Inc. v. Shui,* No. 08-0727, 611 F. Supp. 2d 507, 2009 U.S. Dist. LEXIS 14707, 2009 WL 483145, at *4 (E.D. Va. Feb. 24, 2009) [**10] (finding that the defendant's violation of the ACPA "ha[d] been established as sufficiently willful, deliberate, and performed in bad faith to merit the maximum statutory award of $ 100,000 and an award of attorneys' fees"); *Aztar Corp. v. MGM Casino,* No. 00-833-A, 2001 U.S. Dist. LEXIS 13110, 2001 WL 939070, at *4-6 (E.D. Va. April 9, 2001) (awarding maximum [*321] statutory award of $ 100,000 when "Defendant's web site used Plaintiff's mark in its entirety in connection with the identical services provided by Plaintiff" in a "bad faith attempt to deceive Internet consumers"). Further, the Capital Defendants had refused to stop forwarding the infringing domain names or to transfer them to Kiva until just a few weeks before trial. *See Bellagio v. Denhammer,*

No. CV-S-00-1475, 2001 U.S. Dist. LEXIS 24764, 2001 WL 34036599, at *4 (D. Nev. July 10, 2001) (considering the defendants' refusal to transfer the infringing domain name to the plaintiff as one of the factors justifying the imposition of a $ 100,000 award).

With respect to the non-Jarrell domain names, the district court declined to impose the maximum statutory award, noting that the other stores--which are not located in the Dallas area--do not directly compete with Capital. Instead, it awarded [**11] Kiva $ 40,000 for each non-Jarrell domain name, which is well within the range of statutory damages award for such bad faith violations of the Lanham Act. *See PetMed Express, Inc. v. MedPets.Com, Inc.,* 336 F. Supp. 2d 1213, 1221-22 (S.D. Fla. 2004) (awarding $ 50,000 per domain name in statutory damages); *E. & J. Gallo,* 286 F.3d at 278 (holding that an award of $ 25,000 per domain name in statutory damages was not clearly erroneous, even though that "did not present evidence that it actually lost any business due to [the defendant's] actions").

Accordingly, we hold that the district court properly awarded statutory damages, and that the amount of the award--$ 500,000--was "just" under the circumstances. [3]

> 3   Because we affirm the award of statutory damages, we do not address the Capital Defendants' challenge to the jury instruction given by the district court concerning the assessment of actual damages. *See BUC Int'l Corp. v. Int'l Yacht Council Ltd.,* 489 F.3d 1129, 1139 n.22 (11th Cir. 2007) (noting that "[a]ny error the court may have committed in charging the jury [with respect to statutory damages] was rendered moot because [the plaintiff] elected to accept actual damages").

**B.** [**12] **Award of Attorneys' Fees**

This court "review[s] the award of attorneys' fees under the Lanham Act for abuse of discretion, and the court's finding as to whether the case is exceptional for clear error." *Proctor & Gamble Co. v. Amway Corp.,* 280 F.3d 519, 528 (5th Cir. 2002).

The prevailing party in a trademark infringement action may be awarded reasonable attorneys' fees only "in exceptional cases," 15 U.S.C. § 1117(a), and such party bears the burden of demonstrating the exceptional nature of the case. *See Schlotzsky's, Ltd. v. Sterling Purchasing & Nat'l Distrib. Co., Inc.,* 520 F.3d 393, 402 (5th Cir.

2008). "An exceptional case involves acts that can be called malicious, fraudulent, deliberate, or willful." *Id.* (internal quotations omitted). Here, the jury determined, and the district court agreed, that Kiva had properly demonstrated that its case was exceptional, in light of Davis's bad faith intent to divert potential Kiva customers to Capital's website. Accordingly, the district court awarded Kiva $ 500,960 in attorneys' fees, based on its review of affidavits presented by Kiva's attorneys and its own adjustments and calculations.

The Capital Defendants neither dispute that the case [**13] is exceptional nor challenge the amount of attorneys' fees assessed by the district court. Rather, they argue that "[b]ecause Kiva did not properly elect statutory damages, and because Kiva did not present evidence with respect to Capital's sales attributed to the infringing activity, it cannot be considered [*322] the prevailing party." Kiva's contention is without merit. The district court's alleged errors in its award or assessment of statutory damages under § 1117(d) are irrelevant to its award of attorneys' fees under § 1117(a). Here, final judgment was rendered in favor of Kiva, and Kiva was awarded $ 500,000 in statutory damages; Kiva is clearly the prevailing party. *See e.g.,* BLACK'S LAW DICTIONARY 1145 (7th ed. 1999) (defining a "prevailing party" as "[a] party in whose favor a judgment is rendered, regardless of the amount of damages awarded"). *See also Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.,* 532 U.S. 598, 603, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001) (quoting Black's Law Dictionary and noting that "[t]his view that a 'prevailing party' is one who has been awarded some relief by the court can be distilled from our prior cases").

Accordingly, we hold that the district court did not [**14] err in awarding Kiva attorneys' fees.

**C. Evidentiary Ruling**

This court "review[s] a trial court's evidentiary ruling under an abuse-of-discretion standard when the party challenging the ruling makes a timely objection." *United States v. Hawley,* 516 F.3d 264, 266 (5th Cir. 2008), *cert. denied,* 129 S. Ct. 994, 173 L. Ed. 2d 291 (2009). Federal Rule of Evidence 103 requires that this "timely objection . . . stat[e] the specific ground" on the record. Here, the Capital Defendants failed to object on the basis of the best evidence rule, which is the sole ground raised by them on appeal. Accordingly, our review is for plain error

only. *See United States v. Thompson,* 454 F.3d 459, 464 (5th Cir. 2006).

During trial, Kiva obtained archived copies of Capital's website proving that Capital had been using its competitors' names as meta tags for its website as early as 2002 [4] --but the Capital Defendants successfully objected to the introduction of this document into evidence. However, when Davis testified that, to his knowledge, Capital's website had never used competitors' names as meta tags prior to 2005, Kiva's attorney was authorized by the court to show Davis the document indicating a 2002 date. Presenting the [**15] document to Davis, Kiva's attorney asked him if it refreshed his recollection as to what might have been on Capital's website at that time, and proceeded to question him on the presence of these meta tags since 2002.

> [4]  Meta tags are "hidden text," *i.e.,* keywords not visible on a website but that are used by certain search engines when indexing website pages. Thus, when an internet user searched for a Capital competitor's name on one of those search engines, Capital's website was listed in the search results.

On appeal, the Capital Defendants contend that the admission of Davis's testimony to prove the contents of the document violated Federal Rule of Evidence 1002, commonly known as the best evidence rule. Under Rule 1002, "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." Thus, the best evidence rule "comes into play only when the terms of a writing are being established," not when a witness's testimony is based on personal knowledge. *In re Mobilift Equip. of Fla., Inc.,* 415 F.2d 841, 844 (5th Cir. 1969). *See also* WEINSTEIN'S FEDERAL EVIDENCE § 1002.04 [**16] (stating that the best evidence rule is not applicable when a "witness's testimony is based on first-hand knowledge of an event, as opposed to knowledge gained from a writing, recording, or photograph depicting the event"). Here, Kiva's attorney was attempting to elicit testimony [*323] concerning Davis's personal knowledge of the meta tags on Capital's website, not the authenticity of the document presented. Further, the document at issue was merely presented to Davis to refresh his recollection; the use of a document for refreshment purposes does not trigger the best evidence rule. *See* WEINSTEIN'S FEDERAL EVIDENCE § 1002.04; *Weir v. Comm'r,* 283 F.2d 675, 678 (6th Cir. 1960) (holding that the best evidence rule is not involved when a document is not offered in evidence, but only used to refresh a witness's recollection).

Accordingly, the district court did not err in admitting Davis's testimony.

**CONCLUSION**

For the foregoing reasons, the judgment of the district court is AFFIRMED.



LEXSEE 2007 U.S. DIST. LEXIS 91997

**DAVID LAHOTI, Plaintiff, v. VERICHECK, INC., Defendant.**

**CASE NO. C06-1132JLR**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON**

**2007 U.S. Dist. LEXIS 91997**

**December 3, 2007, Decided**
**December 3, 2007, Filed**

**PRIOR HISTORY:** Lahoti v. Vericheck, Inc., 2007 U.S. Dist. LEXIS 64666 (W.D. Wash., Aug. 30, 2007)

**COUNSEL:** [*1] For David Lahoti, an individual, Plaintiff: Derek Alan Newman, LEAD ATTORNEY, Randall Moeller, LEAD ATTORNEY, Derek Linke, John David Du Wors, NEWMAN & NEWMAN, SEATTLE, WA.

For Vericheck Inc, a Georgia Corporation, Defendant, Counter Claimant: Shannon M Jost, LEAD ATTORNEY, STOKES LAWRENCE, SEATTLE, WA.

For David Lahoti, an individual, Counter Defendant: Derek Linke, Derek Alan Newman, John David Du Wors, NEWMAN & NEWMAN, SEATTLE, WA.

**JUDGES:** JAMES L. ROBART, United States District Judge.

**OPINION BY:** JAMES L. ROBART

**OPINION**

FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came for a bench trial that began on November 6, 2007. Plaintiff/Counterclaim Defendant David Lahoti was represented by John Du Wors and Derek Linke of Newman & Newman, Attorneys at Law, LLP. Defendant Vericheck, Inc. ("Vericheck") was

represented by Shannon Jost of Stokes Lawrence, P.S. At the conclusion of the case, the court took the case under advisement. The court has considered the evidence and exhibits admitted at trial, the findings and conclusions reached in the court's order on summary judgment ("SJ Order") (Dkt. # 52), and counsels' arguments. Being fully advised, the court makes its Findings of Fact and Conclusions of Law.

**I. FINDINGS** [*2] **OF FACT**

**Background**

1. Vericheck, a Georgia corporation, is a national provider of electronic payment transaction processing services, and has been using the VERICHECK mark (or, "the mark") in connection with its business since at least 1992. In 2003, Vericheck attempted to register the mark with the United States Patent and Trademark Office ("PTO") but was unable to do so because an Arizona company successfully registered VERICHECK as a word mark in 1975. Sec. Hannah Decl. at P 8 (Dkt. # 26); Exs. 7, 8.

2. According to Vericheck's Chief Executive Officer ("CEO") Jerry Hannah, who purchased the company in 1995, Vericheck has maintained a world wide web presence at <vericheck.net> since 1999 and began offering its services online about a year later. Sec. Hannah Decl. at P 2. The company also registered the domain names <vericheck.org>, <vericheck.cc>, <vericheck.us>, and <vericheck.biz>, many of which

2007 U.S. Dist. LEXIS 91997, *2

redirect visitors to <vericheck.net>. Vericheck now conducts its business primarily over the Internet and through its resellers and independent sales offices ("ISOs"), who rely on the Internet, including Vericheck's websites, as a primary mode of communication with Vericheck. On August 31, [*3] 2001, the company successfully registered a service mark with the State of Georgia, described as "a depiction of a check mark over the word 'vericheck.'" Sec. Jost Decl. P 3, Ex. B (Dkt. # 28).

3. Mr. Lahoti is an adjudicated cybersquatter who has registered thousands of domain names and prospectively registers domain names of services he "might offer" based on his "ideas for new ventures." Lahoti Decl. at PP 7-8 (Dkt. # 31); Jost Decl., Ex. B (Dkt. # 16) (E-Stamp Corp. v. Lahoti, Case No. 2:99-CV-9287-GAF-MAN (C.D. Cal. Jun. 12, 2000)); Supp. Jost Decl., Ex. K (Dkt. # 23); SJ Order at 12 n.9. After having tracked <vericheck.com> (or, "Domain Name") for five years, Mr. Lahoti, a self-described "Internet entrepreneur," registered the Domain Name in March 2003. Lahoti Decl. at PP 3, 11. The Domain Name incorporates the VERICHECK mark. Mr. Lahoti uses <vericheck.com> in connection with a directory website providing links to companies that compete with Vericheck. See Ex. A-10.

4. Prior to Mr. Lahoti purchasing the Domain Name, it was owned by a Canadian company. For several years, Mr. Hannah and other Vericheck representatives attempted to secure rights to <vericheck.com> from the Canadian [*4] company. Once Mr. Lahoti purchased the Domain Name, he expressed a willingness to sell the Domain Name to Vericheck at prices that ranged from $ 48,000 to $ 100,000. SJ Order at 3-4.

5. In June 2006, Vericheck filed a complaint with the National Arbitration Forum ("NAF") pursuant to the Uniform Domain-Name Dispute-Resolution Policy seeking an order transferring <vericheck.com> to Vericheck. Mr. Lahoti responded and objected. In August 2006, the arbitrator issued a decision ordering transfer of the Domain Name to Vericheck.

6. Mr. Lahoti filed the instant action for declaratory relief challenging NAF's decision pursuant to 15 U.S.C. § 1114(2)(D)(v), which allows a registrant whose domain name has been suspended, disabled, or transferred, to file a civil action to establish that his use of the domain name is lawful. He seeks a declaratory judgment that his use

the Domain Name does not contravene the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), or any other provision of the Lanham Act, 15 U.S.C. § 1051 et seq. In its answer, Vericheck pleads the following counterclaims: violation of the ACPA; Lanham Act false designation of origin, 15 U.S.C. § 1125(a); common [*5] law trademark infringement and trade name infringement; common law unfair competition and misappropriation; and a violation of Washington's Consumer Protection Act ("CPA"), RCW § 19.86.020. Vericheck seeks transfer of the Domain Name, statutory damages, and attorneys' fees.

7. The parties filed cross-motions for summary judgment. On August 30, 2007, the court denied Mr. Lahoti's motion and granted in part and denied in part Vericheck's motion. The court found the following: Mr. Lahoti registered and used <vericheck.com> in bad faith, SJ Order at 12-14; Mr. Lahoti is not entitled to take refuge in the "safe harbor" provision of Lanham Act § 43(d), 15 U.S.C. § 1125(d)(1)(B)(ii), SJ Order at 14; the Domain Name and the VERICHECK mark are identical or confusingly similar, id. at 6, 17; Vericheck's use of the mark predates Mr. Lahoti's registration of the Domain Name, id. at 7 n.5; Mr. Lahoti's use of the Domain Name for a directory website and his offers to sell the Domain Name constitute "commercial use," id. at 15; and both parties use the Internet as a marketing channel, id. at 17.

8. With respect to liability, the court found that there were issues of fact with regards to: (1) the distinctiveness [*6] of the VERICHECK mark; and (2) the likelihood of consumer confusion caused by Mr. Lahoti's use of the mark. The first issue affects all five of Vericheck's counterclaims. The second issue affects all claims except for the ACPA counterclaim.

9. At the bench trial, Vericheck called two witnesses to testify: Vericheck CEO Mr. Hannah and Mr. Lahoti. Mr. Lahoti called a single witness, Tom Nort, to testify telephonically in rebuttal to Mr. Hannah's deposition testimony of November 5, 2007. Mr. Nort sold the VERICHECK mark and business to Mr. Hannah.

10. Because the court had already determined that Mr. Lahoti used the VERICHECK mark in bad faith, on the second day of the trial the parties agreed that the court could determine statutory damages and attorneys' fees on the existing record without need for trial testimony.

**Vericheck's Business, Its Services, and Consumer**

**Confusion**

11. In 1992, Mr. Nort started Vericheck in Georgia. Vericheck was a verification company for check processing that appeared to employ a unique system for tracking account information.

12. Mr. Hannah met Tom Nort in 1992 or 1993. In 1995, Mr. Hannah purchased Vericheck from Mr. Nort. The assets included in the sale were [*7] the company's computer programs, computers, processing equipment, and the name Vericheck, Inc. Mr. Hannah continued to do business as Vericheck and has always used the name Vericheck to brand the company's services. Mr. Nort thereafter changed the name of his business so that he could offer services that he had not sold to Mr. Hannah as part of the sale of the Vericheck business. *See* Ex. A-21.

13. Mr. Nort was called to testify telephonically as a rebuttal witness to challenge Mr. Hannah's deposition testimony that Vericheck had been doing business under the Vericheck name since 1991 or 1992. Mr. Nort instead corroborated Mr. Hannah's testimony, testifying that Vericheck began offering services in 1991 or 1992 and, when pressed, said that he would have to settle in "around 1992." Mr. Nort further testified that salesmen used the VERICHECK mark to solicit business in Atlanta, Georgia and the surrounding area, as well as in Gainesville, Georgia.

14. Mr. Hannah registered Vericheck, Inc. with the State of Georgia on September 7, 1999. Exs. 4, 5. He testified credibly that his delay in registering the company was due to the death of one parent and the debilitating illness of his other parent [*8] around the same time that he began operating Vericheck. Vericheck owns a State of Georgia trademark registration, No. S-19547, for the mark VERICHECK & Design, issued August 31, 2001. Ex. A-3.

15. Vericheck provides a broad array of financial and merchant solutions, including check and other financial verification services; check guarantee services; check collection and prosecution of delinquent payments; verification of account information, balance, and positive or bad/fraudulent account transaction history; monitoring and reporting of check transaction history; payment processing services (credit card, debit card, echecks, electronic benefit transfer ("EBT"), wireless payments, stored value or purchasing cards, and personal or merchant check); and related transactional and technical

support services. *See, e.g.,* Exs. A-4, A-9, 4, 5, 15. The vast majority of Vericheck's business involves automated check handling ("ACH"), which includes prearranged payment debits ("PPD"); commercial cash debits ("CCD"); accounts receivable conversion ("ARC"); telephone transactions; back office conversion ("BOC"); point-of-purchase transactions ("POP"); returned check collection ("RCK"); and consolidated [*9] returns ("RCC"). Of these ACH transactions, ARC, BOC, POP, RCK, and RCC depend upon the existence of a physical check.

16. There are approximately 1,500 merchants conducting electronic transactions through Vericheck. Its customers include large private corporations such as the home security company ADT, as well as county and city governments, law firms, and professional organizations. Mr. Hannah testified that Vericheck's sales volume in 1995 was "minuscule," but the company now is involved with approximately $ 300 million in transactions per year, which translates to approximately 300,000 transactions. According to Mr. Hannah, in 2001-2002, Vericheck's business "really took off" and the "trajectory was straight up"; this increase in business was related to Vericheck's partnership with USA ePay. Presently, Vericheck grosses approximately $ 60,000 per month.

17. Vericheck promotes its name and services through trade shows; banking shows; and electronic transactions exhibitions in Las Vegas and San Jose; merchant's forums in Eureka, California, southern Tampa, Florida, and Atlanta, Georgia; and vendor groups sponsored by regional and national banks. Mr. Hannah personally attends two to [*10] three trade shows per year, distributing material and business cards, all of which prominently display the VERICHECK mark. It costs approximately $ 5,000 to register for a trade show and additional expenses are incurred for setting up a booth. Vericheck also offers incentives to promote its services, for example, waived application fees for vendors, and asks that its ISOs and resellers participate in promoting these incentives.

18. Mr. Hannah testified that approximately 90% of Vericheck's business is conducted through the Internet. This includes Vericheck's secure network and merchant transactions. Vericheck, its resellers, and ISOs also direct merchants to the website posted at Vericheck's <vericheck.net> to fill out applications, service agreements, and for further information. Vericheck, its

resellers, and ISOs use VERICHECK as a trademark regularly. *See, e.g.,* Exs. A-4 (using the mark on the website posted at <vericheck.net>), A-9 (using the mark on the website posted at <USAePay.com>).

19. Mr. Hannah testified that he personally receives two or three calls per day from Vericheck resellers who say that customers are confused by visiting the website posted at <vericheck.com> and [*11] cannot find the Vericheck merchant application. According to Mr. Hannah, these resellers ask what the company is doing to increase Vericheck's presence on the Internet and eliminate the confusion when merchants attempt to locate the Vericheck application online and visit Mr. Lahoti's website posted at <vericheck.com> instead of the website posted at Vericheck's <vericheck.net>.

**The VERICHECK Mark and Distinctiveness**

20. An Arizona company successfully registered VERICHECK as a word mark in 1975. Exs. 7, 8. These registrations were not renewed by the trademark owner and have expired. Exs. 9-10. There is no evidence in the record that the Arizona company ever used the VERICHECK mark.

21. Mr. Hannah testified credibly that the Arizona company has never and does not presently offer services similar to those of Vericheck. According to Mr. Hannah, the Arizona company is primarily a civil collections firm. Mr. Hannah has spoken with the Arizona company's principal and Vericheck presently has a referral agreement with that company: once checks are processed through the RCK process, Vericheck will refer the "hard collections" to the Arizona company. Mr. Hannah believes that the Arizona company [*12] does business under a name other than "Vericheck."

22. In July 2007, Vericheck applied for registration of the VERICHECK mark. Ex. 30. The PTO recently completed its initial examination of Vericheck's application for registration of the VERICHECK mark, and has approved Vericheck's application for publication for opposition. Ex. A-22. Mr. Lahoti has opposed Vericheck's application.

23. At trial, Mr. Lahoti testified inconsistently and evasively about his research into the <vericheck.com> domain name. In his answers to interrogatories, Mr. Lahoti stated that he began researching domain names with the "VERI-" prefix in 1998, discovering that

<vericheck.com> was, at that time, registered to a Canadian company; searched the PTO's online database, finding that an Arizona company had registered the VERICHECK mark; and then conducted an Internet search, determining that "the Arizona entity was no longer using the alleged mark VERICHECK," and that "a number of other third parties were using terms identical or similar to VERICHECK in connection with their goods or services." Ex. A-23, at 9. Mr. Lahoti testified: (1) he could not verify that his answers to interrogatories were accurate; (2) he [*13] may not have verified or reviewed the answers to interrogatories before they were served on opposing counsel; (3) he was unaware of any duty to ensure that his answers were accurate; and (4) his attorney told him that any inaccuracies could be sorted out at trial.

24. Mr. Lahoti testified that he did an Internet search for "Vericheck" and that the Arizona company did not appear in any of the results. He further stated that he did not take specific notice of Vericheck's presence on the Internet because he was "overwhelmed" by the number of companies doing business on the Internet as "Vericheck."

25. Mr. Lahoti has earned $ 724 in revenue from owning <vericheck.com>. He received this revenue from Oversee.net, which pays Mr. Lahoti based upon the number of times a visitor to <vericheck.com> clicks through links on the page. He testified that he did not know how much he earned per click, and could not recall the number of times that visitors clicked through the links. He said that he did not scrutinize the statistics provided by Oversee.net closely enough to hazard a guess as to how his revenue was earned.

26. Vericheck's use of the VERICHECK mark predates nearly all of the alleged users [*14] cited by Mr. Lahoti. Several of the purported third-party uses either are unsupported, irrelevant, or support the distinctiveness of the VERICHECK mark as used by Vericheck to describe its services.

27. Most of the alleged uses upon which Mr. Lahoti relies are in unrelated services. For example, "VeriCheck Information Services" offers background investigation services, Exs. 20, 21; "Vericheck, Inc." offers pre-employment background services, Exs. 22, 23; VeriCheck provides "Professional Pre-employment Verification Service," Ex. 24; and "VERI-CHECK" offers an ultraviolet counterfeit money detector, Moeller Decl. (Dkt. # 32), Ex. 25.

2007 U.S. Dist. LEXIS 91997, *14

28. Mr. Lahoti argued in his trial brief that another company, GLA, Inc., had an earlier use of a "vericheck" designation. However there is no evidence of record showing any use whatsoever by GLA, Inc. of the mark, and the slim documentation provided by Mr. Lahoti, Ex. 17, indicates that GLA registered the trade name VERICHECK in Hawaii in 1997, at least five years after Vericheck adopted the mark.

29. Mr. Lahoti also cites VeriChek, Inc., a Texas company, Ex. 13; however, the earliest alleged use of the mark by that company is 1995, at least three years after [*15] Defendant adopted the VERICHECK mark.

30. Mr. Lahoti references three third-party uses that allegedly commenced before Vericheck first adopted the VERICHECK mark in 1992: Credit Associates of Maui; Veri-Cheque of Canada, Ex. 18; and Vericheck Services, Inc. of Arizona, Exs. 7-10. There is no evidence indicating whether or the extent to which Credit Associates of Maui or Veri-Cheque of Canada actually used and promoted any mark in connection with their services. The sole evidence presented by Mr. Lahoti concerning Veri-Cheque of Canada's alleged use of a mark are a page printed from an Internet archive from 1998, six years after Defendant adopted its VERICHECK mark, and a page printed from Veri-Cheque's current website in June 2007, fifteen years after Defendant adopted its VERICHECK mark. Moreover, Veri-Cheque is a Canadian company, and aside from a statement on the website that it operates in "North America" there is no evidence of actual goods or services provided in the United States.

31. The court finds that the evidence introduced at trial about the Arizona company supports Vericheck's contention that the mark is distinctive. The Arizona company does not use the mark in connection [*16] with services that compete with Vericheck. Mr. Lahoti's own investigation showed that the company did not use the VERICHECK mark, at least on the Internet, and he has not produced evidence to contradict his own investigation. Furthermore, that the PTO allowed the Arizona company to register the now expired VERICHECK mark without requiring proof of secondary meaning affords a rebuttable presumption that the mark is inherently distinctive for "check verification services." Ex. 7 (capitalization removed); *see Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 11 (2d Cir. 1976).

32. The VERICHECK mark has no common English

meaning, and appears in no dictionary. If the term VERICHECK is understood by the average consumer to suggest Vericheck's services, such understanding requires imagination and creativity, or a mental leap by the consumer, in order to become apparent. The court therefore finds the VERICHECK mark to be inherently distinctive.

33. Vericheck has also presented substantial proof of the VERICHECK mark's strength in the marketplace in the form of Vericheck's extensive and longstanding use and promotion of the mark as well as the company's expanding territory, client [*17] list, and sales figures.

## II. CONCLUSIONS OF LAW

1. Vericheck has presented facts that establish the distinctiveness of the VERICHECK mark and the likelihood of consumer confusion caused by Mr. Lahoti's use of the mark. Given that the mark is strong and protectable, Vericheck is entitled to judgment on its five counterclaims: (1) violation of the ACPA; (2) Lanham Act false designation of origin; (3) common law trademark infringement and trade name infringement; (4) common law unfair competition and misappropriation; and (5) violation of the Washington CPA. Mr. Lahoti's claims are dismissed.

## Counterclaim I: Anti-Cybersquatting Consumer Protection Act

2. The ACPA, which Congress incorporated into the Lanham Act in 1999, sets forth the elements of a cybersquatting claim. To prevail, Vericheck must prove that it holds a distinct mark, that Mr. Lahoti had a "bad faith intent to profit" from the mark, and that Mr. Lahoti "register[ed], traffic[ked] in, or use[d] [1] a domain name" that is identical to, or confusingly similar to that mark. *See* 15 U.S.C. § 1125(d)(1)(A)(i)-(ii). The ACPA protects both federally-registered marks as well as unregistered marks. *DaimlerChrysler v. The Net Inc.,* 388 F.3d 201, 205 (6th Cir. 2004) [*18] (citing *Two Pesos Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992)); *see also* 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:78 (4th ed. 2007) (hereinafter "MCCARTHY").

> 1   Unlike a trademark infringement claim, a claim under the ACPA does not require the claimant to prove that the alleged cybersquatter

made *commercial* use of the mark. *See Bosley Medical Institute, Inc. v. Kremer,* 403 F.3d 672, 680-81 (9th Cir. 2005).

3. The Court already concluded that Mr. Lahoti registered and used the domain name <vericheck.com> in bad faith, and that he made commercial use of the mark and Domain Name. SJ Order at 11-13, 15-16. Likewise, "[t]here is no dispute that vericheck.com and the VERICHECK mark are identical or confusingly similar." *Id.* at 6. Thus the remaining issue for trial was the distinctiveness of the VERICHECK mark.

4. There are five categories of trademarks: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.,* 419 F.3d 925, 927 (9th Cir. 2005). Word marks that are "'arbitrary' ('Camel' cigarettes), 'fanciful' ('Kodak' film), or 'suggestive' ('Tide' laundry detergent)" are [*19] inherently distinctive. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 210-11, 120 S. Ct. 1339, 146 L. Ed. 2d 182 (2000). These three categories are entitled to trademark protection because they "serve[ ] to identify a particular source of a product . . . ." *Two Pesos,* 505 U.S. at 768. A term is suggestive "if imagination or a mental leap is required in order to reach a conclusion as to the nature of the product being referenced." *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.,* 198 F.3d 1143, 1147 (9th Cir. 1999). By contrast, "descriptive" marks simply "define a particular characteristic of the product in a way that does not require any exercise of the imagination." *Yellow Cab,* 419 F.3d at 927 (internal citation and quotation omitted). A descriptive mark receives trademark protection only when it establishes "secondary meaning" in the marketplace. *Id.* Generic marks receive no protection because they simply identify the product, rather than the source of the product. *Id.* (internal citation omitted). "Placement on the spectrum of distinctiveness does not end the enquiry as to the strength of a mark: it is only the first step. The second step is to determine the strength of this mark in the marketplace. [*20] That is, to ascertain its degree of recognition in the minds of the relevant customer class." 2 MCCARTHY §11.2.

5. Vericheck contends that the VERICHECK mark is inherently distinctive and is protectable as a trademark even without evidence of secondary meaning. Also, the VERICHECK mark has acquired distinctiveness in the minds of consumers as a result of Vericheck's long use,

advertising and promotion, and extensive sales of Vericheck's financial transaction processing services, all in connection with the VERICHECK mark. Mr. Lahoti contends that the VERICHECK mark is generic or descriptive, and thus either unprotectable under any circumstance, or protectable only on a showing of secondary meaning.

6. The distinctiveness of a mark must be assessed not in the abstract, but in relation to the applicable goods or services, the context in which the mark is used and encountered in the marketplace, and the significance the mark in that context is likely to have to the average consumer. In assessing mark strength, it is improper to dissect a mark and to separately analyze the individual words which it may incorporate. *See In re Hutchinson Tech., Inc.,* 852 F.2d 552, 554-55 (Fed. Cir. 1988). A [*21] combination of words or word parts in a mark, which might themselves be descriptive if taken separately, are not necessarily descriptive if used as a mark. *See e.g., Equine Techs., Inc. v. Equitechnology, Inc.,* 68 F.3d 542, 545 (1st Cir. 1995) (holding that "EQUINE TECHNOLOGIES" in its entirety is not descriptive of hoof pads for horses, notwithstanding that "equine" describes horses).

7. Taken in its entirety, the VERICHECK mark is suggestive. The term VERICHECK has no common English meaning, and does not appear in any dictionaries. The VERICHECK mark does not call to mind Vericheck's broad array of financial transaction processing services without need for the exercise of imagination or creativity by the consumer. Vericheck's long use of the VERICHECK mark as a trademark, and not as a descriptor of its goods and services, also supports the court's finding that the mark is protectable.

8. Mr. Lahoti improperly breaks down the mark into two component parts, "veri" and "check," in order to argue that consumers will immediately presume that Vericheck provides "check verification" services. *See e.g., Equine Techs.,* 68 F.3d at 545; *In re Hutchinson Tech.,* 852 F.2d at 554-55. Even if the [*22] mark were parsed, the result would not immediately call to mind the broad array of electronic transaction processing services that Vericheck provides. "Veri" has no independent meaning and could refer to *"veritas"* ("truth") or "veritable" as easily as "verification." "Check" could refer to a noun, a verb, an interjection, and has a myriad of meanings. *See Dictionary.com, Dictionary.com*

Unabridged (v 1.1), Random House, Inc., http://dictionary.reference.com/browse/check (last visited November 28, 2007) (referring to 46 separate meanings). Following Mr. Lahoti's reasoning, the recombinant VERICHECK mark could conceivably describe a process for stopping the truth from being transmitted (*"veritas"* and "check" definition number 1), or a reliable form of checking baggage at the airport ("veritable" and "check" definition number 10). *See id.*

9. Most of Mr. Lahoti's evidence supports a finding that the VERICHECK mark is suggestive, strong, and protectable. As the court recognized on summary judgment, evidence that "the VERICHECK mark could denote a wide variety of products" supports a finding that the mark "require[s] a [*23] consumer's imagination to connect the term to Vericheck's particular services." SJ Order at 10; *see also Playtex Prods., Inc. v. Georgia-Pacific Corp.,* 390 F.3d 158, 164 (2d Cir. 2004) (finding the term "Wet Ones," like "Wite-Out," to be suggestive because it "could plausibly describe a wide variety of products"). An ultraviolet counterfeit money detector (checking into the truth of the currency) and pre-employment background verification (a verifying background check)--uses which would be suggested by an improper parsing of the VERICHECK mark--differ significantly from the many financial services offered by Vericheck. *See, e.g.,* Moeller Decl., Ex. 25; Exs. 22.

10. Similarly, evidence that the Arizona company obtained two trademark registrations (now expired) for marks incorporating the term VERICHECK plus a design component indicates that the PTO did not consider the mark to be descriptive or generic as applied to that company's services. *See* 2 MCCARTHY § 11:69 (citing *Borinquen Biscuit Corp. v. M.V. Trading Corp.,* 443 F.3d 112, 119-20 (1st Cir. 2006) (holding that the PTO's acceptance of other marks incorporating the same term for a registration supports the inherent distinctiveness [*24] of the mark at issue)); *see, e.g.,* Ex. 7 (Arizona company's registration of VERICHECK mark for "check verification services") (capitalization removed).

11. Mr. Lahoti argues that the VERICHECK mark has been rendered weak and, therefore, unprotectable by a crowded field of third-party use of the mark. However, most of the alleged third-party uses cited by Mr. Lahoti are in unrelated fields, and "[e]vidence of other unrelated potential infringers is irrelevant to claims of trademark infringement and unfair competition under federal law."

*Eclipse Assoc. Ltd. v. Data Gen. Corp.,* 894 F.2d 1114, 1119 (9th Cir. 1990); *see also Electropix v. Liberty Livewire Corp.,* 178 F. Supp. 2d 1125, 1130 (C.D. Cal. 2001) (rejecting relevance of trademark report showing 200 companies using the mark where only two of the companies were using the mark in the same or a similar industry).

12. Mr. Lahoti cites three prior users of the mark in the same industry as Vericheck: Credit Associates of Maui, Veri-Cheque of Canada, and Vericheck Services, Inc. of Arizona. Federal registration of the mark by a single company, along with scant evidence about two other purported users, constitute a far cry from a multitude [*25] of registrations and uses that might suggest a weak mark. *See, e.g., Petro Stopping Ctrs., L.P. v. James River Petroleum,* 130 F.3d 88, 94 (4th Cir. 1997) (referring to 2,700 companies, 117 third-party federal registrations, 63 users within the same product area, and 42 prior registrations of the mark "PETRO" supported a finding that plaintiff had a weak mark); *Estee Lauder Inc. v. The Gap, Inc.,* 108 F.3d 1503, 1511 (2d Cir.1997) (holding that weakness of mark was demonstrated by over 70 trademark registrations, pending applications for registration or renewal, or publications-for-opposition that included the term used in plaintiff's mark); *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.,* 856 F.2d 1445, 1449 (9th Cir. 1988) (approving district court's finding of a relatively weak mark where "[m]ost other pageants use a mark which is composed of a marital prefix and a defining geographic term. As a result any combination of a marital prefix and geographic term 'means' beauty pageant."), *abrogation recognized, Eclipse Assoc.,* 894 F.2d at 1116 n.1 (referring to the standard of review); *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 259-60 (5th Cir. 1980) (holding relevant [*26] the evidence of 72 third-party uses and registrations of the appellant's mark); *cf.* 3 MCCARTHY § 17:17 (noting that third-party use and a plaintiff's failure to police a mark are relevant as to whether widespread use has led to the weakening of the mark).

13. Mr. Lahoti presented no credible evidence that Credit Associates of Maui, Veri-Cheque of Canada, and Vericheck Services, Inc. of Arizona have used the VERICHECK mark in the United States to compete with Vericheck. Mr. Lahoti never attempted to admit at trial his exhibit verifying Credit Associates of Maui's use of the VERICHECK mark, Ex. 16, and no reference to the

VERICHECK mark is navigable from that company's website. *See* http://www.creditassoc.com/ (last accessed November 28, 2007).

14. There is no credible evidence of Veri-Cheque of Canada's use of the VERICHECK mark prior to Vericheck's use in 1992, and there is no evidence of the Canadian company's use of the mark in the United States. Trademark rights are territorial in nature, and possible use outside the United States does not bear on the protectability of the VERICHECK mark in this country. "Priority of trademark rights in the United States depends solely upon priority [*27] of use in the United States, not on priority of use anywhere in the world." *Grupo Gigante SA De CV v. Dallo & Co., Inc.,* 391 F.3d 1088, 1093 (9th Cir. 2004) (quoting 4 MCCARTHY § 29:2).

15. The evidence presented with respect to the Arizona company supports Vericheck's position. Mr. Lahoti failed to present any evidence whatsoever that the Arizona company actually used the VERICHECK mark to compete with Vericheck's services. Mr. Lahoti testified that his own independent Internet search verified that the Arizona company was not using the mark, at least on the Internet. That the PTO allowed the Arizona company to register the now expired VERICHECK mark without requiring proof of secondary meaning affords a rebuttable presumption that the mark is inherently distinctive. *See Abercrombie & Fitch Co.,* 537 F.2d at 11. Furthermore, Mr. Hannah's unrebutted testimony established that: (1) Vericheck has a continuing business relationship with the Arizona company; (2) the Arizona company does not offer the same services as Vericheck; and (3) the Arizona company does not use the VERICHECK mark.

16. Mr. Lahoti argues, nonetheless, that the Arizona company's prior registration of the VERICHECK mark, [*28] without any evidence of the company's use of the mark, precludes Vericheck's ability to raise counterclaims against him. He relies upon the principle that a senior registrant's prior registration of a mark on the PTO's Principal Register constitutes prima facie evidence of the validity of the registered mark and of the senior registrant's exclusive right to use the mark on the goods and services specified in the registration. *See* 15 U.S.C. §§ 1057(b), 1115(a); *Brookfield Commun'ns v. W. Coast Entm't Corp.,* 174 F.3d 1036, 1047 (9th Cir. 1999).

17. Mr. Lahoti's argument is a *jus tertii* defense, i.e., he asserts that a third party, the Arizona company, has rights superior to Vericheck and, therefore, "[s]omebody

has a right to sue me, but it's not you." 6 MCCARTHY § 31:157 (internal marks omitted). Modern courts and the Trademark Board have rejected the *jus tertii* defense. *Id.* § 31:160; *see Comm. for Idaho's High Desert, Inc. v. Yost,* 92 F.3d 814, 820 (9th Cir. 1996) ("[A] third party's prior use of a trademark is not a defense in an infringement action."); *Bishops Bay Founders Group, Inc. v. Bishops Bay Apartments, LLC,* 301 F. Supp. 2d 901 (W.D. Wis. 2003) (holding that whether a third [*29] party might have trademark rights superior to plaintiff "has no effect on this lawsuit"); *General Cigar Co. v. G.D.M. Inc.,* 988 F. Supp. 647, (S.D.N.Y. 1997) (holding that a third party's possibly superior rights cannot be a defense); *Krug Vins Fins de Champagne v. Rutman Wine Co.,* 197 U.S.P.Q. 572, 574 (T.T.A.B. 1977) ("The fact that the third persons might possess some rights in their respective marks which they could possibly assert petitioner in a proper proceeding can avail respondent nothing herein since respondent is not in privity with nor is the successor in interest to any rights which such persons have acquired in their marks."). This court follows suit. Mr. Lahoti acquired rights to the Domain Name more than a decade after Vericheck began using the mark. "So long as plaintiff proves rights superior to defendant, that is enough. Defendant is no less an infringer because it is brought to account by a plaintiff whose rights may or may not be superior to the whole world." 6 MCCARTHY § 31:160; *Comm. for Idaho's High Desert,* 92 F.3d at 821 (citing MCCARTHY).

18. In sum, the court finds the VERICHECK mark to be suggestive and, therefore, inherently distinctive. The mark's [*30] strength in the marketplace is amply supported by Vericheck's long use of the mark; the mark's promotion through advertising, trade shows, and promotional incentives; and the expansion of Vericheck's territory and client list along with an increase in sales. The VERICHECK mark is therefore entitled to protection. Because Vericheck has already satisfied the other elements under the ACPA, the court grants judgment in favor of Vericheck on its ACPA counterclaim.

**Counterclaims II, III, and IV: Infringement Claims**

19. To prevail on its claims of false designation of origin, common law trademark infringement, and unfair competition (collectively, "infringement claims"), [2] Vericheck must show that it holds a protectable mark,

and that Mr. Lahoti made commercial use of a mark that is similar enough to cause confusion in the minds of consumers about the origin of the goods or services in question. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,* 543 U.S. 111, 117, 125 S. Ct. 542, 160 L. Ed. 2d 440 (2004). At summary judgment, the court found that Mr. Lahoti made commercial use of the VERICHECK mark, and has determined, above, that Vericheck holds a protectable mark. The remaining element of Vericheck's infringement claims [*31] is, therefore, whether Mr. Lahoti's use of the mark was likely to cause confusion in the minds of consumers. *See Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1355 n.5 (9th Cir. 1985) (noting that "the question of likelihood of confusion is routinely submitted for jury determination as a question of fact").

2   The familiar "likelihood of confusion" test is the standard for liability, whether the claim is one for unfair competition, false designation of origin, or infringement. *See New West Corp. v. NYM Co. of Cal., Inc.,* 595 F.2d 1194, 1201 (9th Cir.1979) ("Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical -- is there a 'Likelihood of Confusion?'"); *see also* 4 MCCARTHY § 23:1 (same as to common law trademark infringement).

20.  The following eight factors first announced in *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348-49 (9th Cir. 1979), guide the court's analysis on likelihood of confusion:

(1) the similarity of the marks;

(2) the marketing channels used to promote the marks;

(3) the relatedness of the goods or services promoted under the marks;

(4) the strength of the plaintiff's mark;

(5)   [*32] evidence of actual confusion;

(6) likelihood of expansion of either parties' product lines;

(7) the degree of care a potential

purchaser is likely to exercise; and

(8) the defendant's intent in selecting the mark.

In the context of the Web, the three most important *Sleekcraft* factors for determining likelihood of confusion are (1) similarity of the marks, (2) relatedness of the goods or services, and (3) the simultaneous use of the Web as a marketing channel. *Goto.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1205 (9th Cir. 2000).

21.  Application of the *Sleekcraft* Internet troika shows that confusion is likely. First, the court has already determined that the VERICHECK mark and <vericheck.com> are identical or confusingly similar. *See* SJ Order at 6, 17.

22.  Second, Mr. Lahoti uses the Internet in connection with competing services. Vericheck uses the mark in connection with financial transaction processing services. Mr. Lahoti uses the Domain Name in connection with a "directory"-style website that includes links to companies offering services that compete with those of Vericheck, such as <safepayment.com>, as well as to web sites that offer "Online Payments" and "Merchant Processing." Ex. [*33] A-10, at 110, 111, 113; *see* SJ Order at 15.

23.  Third, both Mr. Lahoti and Vericheck use the Internet as a marketing channel. The crux of Vericheck's business is merchants', ISOs', and resellers' ability to easily access Vericheck's website in order to facilitate the provision of Vericheck's services. Many of these customers and affiliates, in attempting to reach Vericheck's website and to access Vericheck's services, would -- and do -- naturally type <vericheck.com> and would and are immediately sent to Mr. Lahoti's competing website. *See also* SJ Order at 15.

24.  As discussed earlier, the mark is inherently distinctive and the strength of the VERICHECK mark is supported by Vericheck's long and substantial use of the mark since at least 1992; the company's expansion nationwide; its fulfillment of hundreds of thousands of financial transactions worth millions of dollars; and substantial advertising and promotion of the mark by Vericheck, its resellers, and ISOs through the Internet, in print and electronic advertising, and through participation in industry trade shows.

25. The remaining *Sleekcraft* factors either favor
Vericheck or are neutral. Though uncorroborated, Mr.
Hannah presented [*34] credible testimony that he
received two to three calls per day from Vericheck
resellers about merchant confusion regarding the
<vericheck.com> website. Neither party presented
evidence regarding the likelihood of expansion into other
product lines, though Mr. Lahoti testified that he
discussed licensing the VERICHECK mark from the
Hawaiian company GLA, Inc. for unspecified purposes.
This factor is nonetheless irrelevant here. *See Victoria's
Secret Stores v. Artco Equip. Co.,* 194 F. Supp. 2d 704,
728 (S.D. Ohio 2002) (holding that likelihood of
expansion of product lines irrelevant where parties
already directly compete). Exercising an average degree
of care, a potential purchaser could conceivably visit
<vericheck.com> instead of <vericheck.net> and
consequently become frustrated or confused by the
myriad links found there. *See Electropix v. Liberty
Livewire Corp.,* 178 F. Supp. 2d 1125, 1134 (C.D. Cal.
2001) ("[V]irtually no amount of consumer care can
prevent confusion where two entities have the same
name."). Finally, the court has already found that Mr.
Lahoti acted with bad faith intent in selecting the mark.
SJ Order at 12-14.

26. The court grants judgment in favor of Vericheck
[*35] on the infringement claims: Lanham Act false
designation of origin; common law trademark
infringement and trade name infringement; and common
law unfair competition and misappropriation.

**Counterclaim V: Washington Consumer Protection
Act**

27. To prevail on its CPA claim, Vericheck must
show: (1) an unfair or deceptive act or practice; (2)
occurring in the conduct of trade or commerce; (3)
affecting the public interest; (4) injuring its business or
property; and (5) a causal link between the unfair or
deceptive act and the injury suffered. *Nordstrom, Inc. v.
Tampourlos,* 107 Wn.2d 735, 733 P.2d 208, 210 (Wash.
1987). The court already has determined that Mr. Lahoti's
registration and use of <vericheck.com> constitute use in
commerce. SJ Order at 15-16.

28. Absent unusual or unforeseen circumstances, the
analysis of a CPA claim will follow that of the trademark
infringement and unfair competition claims: it will turn
on the likelihood of consumer confusion regarding a
protectable mark. *See Seattle Endeavors,* 123 Wn.2d 339,

868 P.2d 120, 127 (1994) (citing *Nordstrom, Inc. v.
Tampourlos,* 107 Wn.2d 735, 733 P.2d 208, 212 (1987)
(noting that confusion of the public sufficient to meet the
public interest requirement of the CPA)).

29. The court [*36] grants judgment in Vericheck's
favor on its CPA counterclaim for the reasons discussed
earlier: the VERICHECK mark is strong and inherently
distinctive and Mr. Lahoti intentionally infringed the
VERICHECK mark by his registration and use of the
<vericheck.com> domain name, which confused and
diverted Vericheck's customers.

**Mr. Lahoti's Affirmative Defenses**

30. All but one of the affirmative defenses raised by
Mr. Lahoti fail in light of the proof offered by Vericheck
in support of its counterclaims. *See* Pretrial Order at 2-3
(Dkt. # 71). Mr. Lahoti's only remaining affirmative
defense, that Vericheck's claims are barred by the
doctrine of "unclean hands," is unsupported in fact or
law.

31. The equitable defense of unclean hands is a
defense to a Lanham Act infringement suit. *See
Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d
837, 847 (9th Cir. 1987). The party seeking application of
the doctrine of unclean hands "must demonstrate that the
plaintiff's conduct is inequitable and that the conduct
relates to the subject matter of its claims." *See Levi
Strauss & Co. v. Shilon,* 121 F.3d 1309, 1313 (9th Cir.
1997) (quoting *Fuddruckers*).

32. Mr. Lahoti argues that Vericheck's counterclaims
[*37] are barred by the doctrine of unclean hands because
Vericheck was not justified in adopting the VERICHECK
mark in light of the Arizona company's registration of the
VERICHECK mark. This argument is essentially the *jus
tertii* defense the court has already rejected. Regardless,
nothing on the record supports Mr. Lahoti's position. As
Mr. Hannah testified, he is and was aware of the Arizona
company, and knows that it does not and has not offered
services that compete with those of Vericheck. Mr.
Lahoti himself stated that he conducted an Internet search
and concluded, "the Arizona entity was no longer using
the alleged mark VERICHECK." Ex. A-23 at 9. The two
registrations issued to the Arizona company have expired.
*See* Exs. 7-8 (trademark registration records), 9-10 (status
reports for cancelled trademark registrations). The court
therefore rejects Mr. Lahoti's affirmative defense of
unclean hands.

2007 U.S. Dist. LEXIS 91997, *37

**Relief Sought by Vericheck**

**Vericheck is entitled to an injunction, including mandatory transfer of the <vericheck.com> domain name to Vericheck**

33. "Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused [*38] by a defendant's continuing infringement." *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1180 (9th Cir. 1988); 15 U.S.C. § 1116 (injunctive relief for violation of Lanham Act 43(a) or (d)); RCW § 19.86.090 (injunctive relief for violation of Washington CPA). Section 43(d) of the Lanham Act specifically authorizes district courts to order transfer of an infringing domain name to the mark owner. "In any civil action involving the registration, trafficking, or use of a domain name under this paragraph, a court may order . . . the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C).

34. Vericheck is entitled to an injunction against Mr. Lahoti, prohibiting him and his affiliates from using the term VERICHECK in any manner, including as a domain name, and requiring him to transfer the <vericheck.com> domain name to Vericheck. The injunction sought is narrowly tailored to address the specific harm that is suffered by Vericheck and to remedy actual and likely consumer confusion caused by Mr. Lahoti's acts.

35. The court directs Vericheck to file a proposed order for injunctive relief within ten days.

**Vericheck is entitled to an award of statutory damages**

36. [*39] Vericheck requests statutory damages of $ 100,000 on its cybersquatting claim. 15 U.S.C. § 1117(d) provides that "[i]n a case involving a violation of section 1125(d)(1) of this title, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $ 1,000 and not more than $ 100,000 per domain name, as the court considers just."

37. Vericheck is entitled to the maximum amount of statutory damages, $ 100,000, based on the totality of facts in this case including, without limitation, Mr. Lahoti's bad faith and his deliberate and knowing acts, his

pattern and practice of registering domain names that incorporate the trademarks of others, his efforts to extort thousands of dollars in exchange for transfer of the Domain Name, his disregard for the submission of inaccurate answers to interrogatories, and the actual confusion which is occurring in the marketplace as a result of Mr. Lahoti's use of the Domain Name in connection with a commercial website offering links to third parties that compete with Vericheck. *See, e.g., Elec. Boutique Holdings Corp. v. Zuccarini,* 56 U.S.P.Q.2d 1705, 1710 n.11, 1713-14 (E.D. Pa. 2000) [*40] (awarding $ 100,000 statutory damages per domain name with $ 27,487 attorneys' fees against "notorious cybersquatter" who "thumbs his nose at the rulings of this court and the laws of our country"); *Mirage Resorts, Inc. v. Cybercom Prods.,* 228 F. Supp. 2d 1141, 1142-43 (D. Nev. 2002) (awarding statutory damages on default of $ 100,000, plus $ 13,763 attorneys' fees, and $ 1,000 for corrective advertising); *Graduate Mgmt. Admission Council v. Raju,* 267 F. Supp. 2d 505, 512-13 (E.D. Va. 2003) (awarding statutory maximum of $ 100,000 per domain name in addition to other remedies); *Pinehurst, Inc. v. Wick,* 256 F. Supp. 2d 424, 433 (M.D.N.C. 2003) (awarding statutory damages of $ 50,000 per domain name plus attorneys' fees and costs based on defendant's willful and deliberate conduct).

**Vericheck is entitled to an award of its attorneys' fees and costs**

38. An award of Vericheck's attorneys' fees and costs is authorized by the Washington CPA, which provides for an award of attorneys' fees and costs to prevailing plaintiffs. RCW § 19.86.090.

39. Vericheck also seeks recovery of its reasonable attorneys' fees because this is an "exceptional" case under 15 U.S.C. § 1117(a). The Lanham Act permits [*41] an award of reasonable attorneys' fees to prevailing plaintiffs 3 for violations of 15 U.S.C. § 1125(a) and § 1125(d) in "exceptional cases." 15 U.S.C. § 1117(a). "Exceptional" is defined as "malicious, fraudulent, deliberate or willful." *Gracie v. Gracie,* 217 F.3d 1060, 1068 (9th Cir. 2000) (citation omitted); *see Lindy Pen Co., Inc. v. Bic Pen Corp.,* 982 F.2d 1400, 1409 (9th Cir. 1993).

    3   Here, although technically the defendant, Vericheck is in the position of plaintiff.

40. Mr. Lahoti's acts include: willful registration and use of the Domain Name; attempts to extort thousands of

2007 U.S. Dist. LEXIS 91997, *41

dollars from Vericheck in exchange for the Domain Name; disregard of Vericheck's trademark rights notwithstanding his clear knowledge and actual notice of them; a pattern and practice of cybersquatting, including a pattern and practice of abusive litigation practices as a means to convince trademark owners to drop their domain name claims or to pay for domain names; and his disregard for the submission of inaccurate answers to interrogatories. Such conduct renders this an "exceptional" case. *See, e.g., Elec. Boutique,* 56 U.S.P.Q.2d 1705; *Mirage Resorts,* 228 F. Supp. 2d 1141; *Pinehurst,* 256 F. Supp. 2d 424; [*42] Jost Decl., Ex. B, at 36-37, 42-43 (finding, *in E-Stamp Corp. v. Lahoti,* that case was exceptional and awarding attorneys fees where Mr. Lahoti engaged in pattern and practice of registering domain names with a bad faith intent to profit from them); *E-Stamp Corp. v. Lahoti,* Case No. 2:99-CV-9287-GAF-MAN, Judgment on Court Trial and Permanent Injunction, at 2 (C.D. Cal. Aug. 1, 2000) (awarding $ 305,612,20 in attorneys' fees based on exceptional nature of Mr. Lahoti's conduct).

41. The court grants Vericheck leave to submit a tabulation of its attorneys' fees and costs in this matter.

Dated this 3rd day of December, 2007.

/s/ James L. Robart

JAMES L. ROBART

United States District Judge



LEXSEE 2007 U.S. DIST. LEXIS 77088

**MICROSOFT CORPORATION, a Washington corporation, Plaintiff, v.
MATTHEW EVANS, an individual, Defendant.**

**1:06-cv-01745-AWI-SMS**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
CALIFORNIA**

**2007 U.S. Dist. LEXIS 77088**

**October 16, 2007, Decided
October 17, 2007, Filed**

**SUBSEQUENT HISTORY:** Adopted by, Motion granted by, Judgment entered by Microsoft Corp. v. Evans, 2007 U.S. Dist. LEXIS 87524 (E.D. Cal., Nov. 27, 2007)

**COUNSEL:** [*1] For Microsoft Corporation, Plaintiff: Katherine M. Dugdale, LEAD ATTORNEY, Perkins Coie LLP, Santa Monica, CA; Jennifer N. Chiarelli, Perkins Coie LLP, Seattle WA.

Matthew Evans, Defendant, Pro se, Riverbank, CA.

**JUDGES:** Sandra M. Snyder, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** Sandra M. Snyder

**OPINION**

FINDINGS AND RECOMMENDATION RE: PLAINTIFF'S APPLICATION FOR DEFAULT JUDGMENT AND PERMANENT INJUNCTION (DOC. 11)

Plaintiff is proceeding with a civil action in this Court. The matter has been referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 72-302(c)(19). Pending before the Court is Plaintiff's motion for default judgment for statutory damages, attorney's fees and costs, and a permanent injunction, which was filed on August 20, 2007, with a supporting

memorandum and declaration of Katherine M. Dugdale, and was served on Defendant Matthew Evans by mail at the address listed on the proof of service of summons.

The motion came on regularly for hearing on October 12, 2007, at 9:30 a.m. in Courtroom 7 before the Honorable Sandra M. Snyder, United States Magistrate Judge. Katherine M. Dugdale appeared telephonically on behalf of Plaintiff; Defendant Matthew Evans appeared on his own behalf, [*2] and his father was also present. The Court had received and reviewed all the papers. The Court had a colloquy with Defendant Evans; however, the Court informed Defendant that pursuant to Local Rule 78-230(c), because Defendant had not filed opposition, Defendant would not be allowed to be heard in opposition to the motion. [1] After argument by Plaintiff, the matter was submitted to the Court.

1   Although there was some discussion of Defendant's unsuccessful efforts to find counsel and his confusion with respect to court papers, Defendant had not and has not moved to set aside his default; thus, these matters were not before the Court at the hearing. The Court informed Defendant that it would proceed to file findings and recommendations, and thereafter there would be a period within which to file objections.

I. *Entitlement to Default Judgment*

A court has the discretion to enter a default judgment

against one who is not an infant, incompetent, or member of the armed services where the claim is for an amount that is not certain on the face of the claim and where 1) the defendant has been served with the claim; 2) the defendant's default has been entered for failure to appear; 3) if the defendant [*3] has appeared in the action, the defendant has been served with written notice of the application for judgment at least three days before the hearing on the application; and 4) the court has undertaken any necessary and proper investigation or hearing in order to enter judgment or carry it into effect. Fed. R. Civ. P. 55(b); *Alan Neuman Productions, Inc. v. Albright,* 862 F.2d 1388, 1392 (9th Cir. 1988). Factors that may be considered by courts in exercising discretion as to the entry or setting aside of a default judgment include the nature and extent of the delay, *Draper v. Coombs,* 792 F.2d 915, 924-925 (9th Cir. 1986); the possibility of prejudice to the plaintiff, *Eitel v. McCool,* 782 F.2d 1470, 1471-72 (9th Cir.1986); the merits of plaintiff's substantive claim, *id.*; the sufficiency of the allegations in the complaint to support judgment, *Alan Neuman Productions, Inc.,* 862 F.2d at 1392; the amount in controversy, *Eitel v. McCool,* 782 F.2d at 1471-1472; the possibility of a dispute concerning material facts, *id.*; whether the default was due to excusable neglect, *id.*; and the strong policy underlying the Federal Rules of Civil Procedure that favors decisions on the merits, *id.*

A default [*4] judgment generally bars the defaulting party from disputing the facts alleged in the complaint, but the defaulting party may argue that the facts as alleged do not state a claim. *Alan Neuman Productions, Inc. v. Albright,* 862 F.2d 1388, 1392. Thus, well pleaded factual allegations, except as to damages, are taken as true; however, necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default. *Cripps v. Life Ins. Co. of North America,* 980 F.2d 1261, 1267 (9th Cir. 1992); *TeleVideo Systems, Inc. v. Heidenthal,* 826 F.2d 915, 917 (9th Cir. 1987).

A. *Service, Default*

The proof of service filed on December 14, 2006, establishes that service of the summons, complaint, and related documents on Defendant was effected on December 4, 2006, by personal delivery of the documents upon Defendant Matthew Evans at an address located in Riverbank, California.

This service complies with Fed. R. Civ. P. 4(e)(2).

The Court notes that the docket does not reflect that Defendant ever responded to the complaint, and the declaration of Jennifer N. Chiarelli in support of the request for entry of default filed on January 26, 2007, establishes that Defendant [*5] did not plead in response to the complaint or otherwise defend against the complaint. (Decl. at 2.) At the hearing, counsel for Defendant represented to the Court that Defendant had called Plaintiff's counsel's firm after the time to answer had passed, but Dugdale did not speak with Defendant personally.

The docket reflects that Defendant's default was entered on February 1, 2007.

B. *Notice*

A defaulting party is entitled to written notice of the application for default judgment unless the party has not appeared in the action. Fed. R. Civ. P. 55(b)(2). An appearance for the purpose of Rule 55 need not be a formal one and may consist even of informal contacts made by the defaulting party where the defaulting party demonstrates a clear purpose to defend the suit. *In re Roxford Foods v. Ford,* 12 F.3d 875, 879-81 (9th Cir. 1993).

Here, there is no information regarding the extent of any contacts by Defendant with the Plaintiff or Plaintiff's counsel in the declaration submitted in support of the motion. However, the proofs of service attached to the application reveal that the moving papers were served by mail on Defendant on August 20, 2007, at the address at which service of the summons and [*6] complaint was effected and which Defendant confirmed at the hearing on the motion was his address. Thus, regardless of Defendant's status with respect to appearance, it appears that Defendant has received notice of the application for default judgment.

C. *Liability*

Because claims that are legally insufficient are not established by a party's default, a court in considering an application for default judgment must determine whether the claims upon which a plaintiff seeks a default judgment are legally sufficient. It is the party's burden to demonstrate to the Court that under the pertinent law, the Plaintiff's claims, as alleged, are legally sufficient.

Plaintiff asserts that the facts alleged in the

complaint establish claims of copyright infringement, trademark infringement, violation of the Lanham Act by false designation of the origin of the software, and unfair competition.

### 1. *Copyright Claim*

An infringer of copyright is liable for actual damages and any additional profits of the infringer attributable to the infringement. 17 U.S.C. § 504(a). An infringer is anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118. 17 U.S.C. § 501(a). [*7] Copyright protection subsists in original works of authorship, including pictorial and graphic works. 17 U.S.C. § 102. The owner of a copyright has the exclusive rights to perform or authorize the reproduction of the copyrighted work in copies, prepare derivative works based on the copyrighted work, distribute copies to the public by sale or other transfer of ownership, and display the copyrighted work publicly. 17 U.S.C. § 106.

Thus, to prevail on a claim for infringement of copyright under 17 U.S.C. § 501, Plaintiffs must establish that Defendant violated an exclusive right of the copyright owner as provided in 17 U.S.C. §§ 106, 501(a). *Elektra Entertainment Group Inc. v. Crawford,* 226 F.R.D. 388, 392-93 (C.D.Cal. 2005). This means that to establish a prima facie case of direct infringement, Plaintiffs must show 1) ownership of the allegedly infringed material, and 2) the infringer's violation of at least one exclusive right granted to copyright holders under 17 U.S.C. § 106. *Marder v. Lopez,* 450 F.3d 445, 453 (9th Cir. 2006).

Here, Plaintiff alleged that it develops, markets, distributes, and licenses computer software programs, including Microsoft Windows XP Professional (Windows [*8] XP Pro), an operating system for which it holds a valid copyright, duly registered with the United States Copyright Office. (Cmplt. pp. 2-3.) Defendant advertised, marketed, and distributed computer software, including software bearing Microsoft's registered copyrights; in or about February 2006, Defendant distributed counterfeit Windows XP Pro software components to a customer. Thereafter, Plaintiff notified Defendant by letter that the distribution infringed Plaintiff's property rights and further demanded cessation of the infringing conduct, but in October 2006, Defendant distributed to an investigator counterfeit Windows XP Pro software components.

Thus, the complaint adequately stated a claim for infringement of copyright. *See, Microsoft Corp. v. Sellers,* 411 F.Supp.2d 913, 918-19 (E.D.Tenn 2006) (unauthorized dealing in infringing copies of copyrighted software Windows XP Pro and Windows 2000 Pro constituted copyright infringement).

### 2. *Trademark Claim*

As to the claim regarding infringement of a federally registered trademark, 15 U.S.C. § 1114(1)(a) provides that a person is liable in a civil action by a registrant of a registered mark for various remedies if the person, without the [*9] consent of the registrant, uses in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive. It has been held that in order to prevail on such a claim, the Plaintiff must establish a protected interest in the thing infringed as well as a likelihood of consumer confusion; registration is prima facie evidence of a protected interest, and establishing that a substantial segment of consumers and potential consumers have mentally associated the mark and a single source of the product is also sufficient. *Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1354-55 (9th Cir. 1985).

Plaintiff alleges that it had duly and properly registered specified trademarks and a service mark in the United States Patent and Trademark Office on the principal register, including for Microsoft Windows. (Cmplt. p. 3.) Further, Defendant advertised, marketed, and distributed computer software, including software imitating software bearing Microsoft's registered trademarks, [*10] logos, and service mark; in or about February 2006, Defendant distributed counterfeit Windows XP Pro software components to a customer. Thereafter, Plaintiff notified Defendant by letter that the distribution infringed Plaintiff's property rights and further demanded cessation of the infringing conduct, but in October 2006, Defendant distributed to an investigator counterfeit Windows XP Pro software components. (*Id.* p. 4.)

It was also alleged that Defendant's conduct constituted infringement of Plaintiff's federally registered trademarks and service mark in violation of the Lanham Trademark Act, including but not limited to 15 U.S.C. § 1114(1). The trademarks and service mark were the

means by which Plaintiff's software was distinguished from the software or products of others in the same or related fields; because of Plaintiff's long, continuous, and exclusive use of the marks, they have come to mean and are understood by customers, end users, and the public to signify software or service of Plaintiff, and the infringing materials that Defendant has and is continuing to use, offer, and distribute are likely to cause confusion, mistake, or deception as to source, origin, or authenticity. [*11] (Cmplt. p. 6.) Defendant's conduct was undertaken with the purpose of misleading, deceiving, or confusing customers and the public as to the origin and authenticity of the infringing materials, and of trading upon Plaintiff's goodwill and business reputation. (*Id.* p. 7.)

Plaintiff has thus adequately alleged a claim for trademark infringement under the Lanham Act. *See Microsoft Corp. v. Sellers,* 411 F.Supp.2d 913, 918-19 (E.D.Tenn. 2006) (dealing in commerce by unauthorized distribution of registered Microsoft software constituted, under circumstances in which consumers were sure to be confused, constituted a violation of the Lanham Act).

3. *False Designation of Origin, etc.*

As to Plaintiff's claim of false designation of origin and unfair competition, 15 U.S.C. § 1125(a) provides:

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, [*12] connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic

origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

The statute covers misrepresentation of the origin of production as well as geographic origin. *Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23, 29, 123 S. Ct. 2041, 156 L. Ed. 2d 18 (2003). It requires determination of whether or not the public is likely to be deceived or confused by the similarity of the marks. *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1178 (9th Cir. 1988)

Plaintiff alleged that the long, continuous, and exclusive use of the trademarks and service mark, which distinguished Plaintiff's product from the software of others in the same or related fields, as well as distinctive displays, logos, icons, graphic images, and packaging (all collectively referred to "Microsoft visual designs") [*13] had caused them to come to mean and to be understood by customers, end users, and the public to signify software or services of Plaintiff; however, Defendant had used Plaintiff's name, marks, visual designs, and packaging that was virtually indistinguishable from Microsoft visual designs in connection with its goods and services, with the wilful purpose of misleading, deceiving, or confusing customers and the public as to the origin and authenticity of the goods and services offered, marketed, or distributed in connection with Plaintiff's marks, name, and imitation visual designs, and of trading upon Plaintiff's goodwill and business reputation. Such conduct constituted false designation of origin, false description, and false representation that the imitation visual images originated from or were authorized by Plaintiff, in violation of the Lanham Trademark Act, 15 U.S.C. § 1125(a). (Cmplt. p. 8.)

Plaintiff alleged the necessary facts concerning the Defendant's conduct and the likelihood of confusion. Distribution of unauthorized and infringing copies of Microsoft software constitutes a violation of § 1125(a) of the Lanham Act by falsely designating the origin of the software distributed. [*14] *Microsoft Corp. v. Sellers,* 411 F.Supp.2d 913, 919 (E.D.Tenn. 2006). Thus, Plaintiff has stated a claim for false designation of origin and unfair competition.

4. *California Common Law Unfair Competition*

2007 U.S. Dist. LEXIS 77088, *14

Common law claims of unfair competition and actions pursuant to Cal. Bus. & Prof. Code § 17200 (defining unfair competition as including unlawful, unfair, or fraudulent business acts or practices) are "substantially congruent" to claims made under the Lanham Act. *Cleary v. News Corp.,* 30 F.3d 1255, 1262-63 (9th Cir. 1994). The Court further notes that it is established in California that if goods or services are known to the public by a name, design, or physical appearance, any imitation which has the effect of deceiving buyers regarding the origin of the goods or services may be actionable as unfair competition. *See* 13 Witkin, Summary of California Law (10th Ed. 2005) at § 98.

Accordingly, Plaintiff has stated a pendant state claim for common law unfair competition.

In summary, Plaintiff has alleged sufficient facts to establish Defendant's liability to Plaintiff on the four claims addressed above.

D. *Damages*

Plaintiff seeks for copyright and trademark infringement only statutory damages, [*15] arguing that they are appropriate because Defendant's default has in effect precluded discovery by Plaintiff as to the full extent of Defendant's infringement and the amount of actual damages Plaintiff suffered based on Defendant's profits.

The general allegations with respect to damage include allegations on information and belief that the Defendant's conduct was not isolated, but rather was the result of Defendant's continuing involvement in advertising, marketing, installing, and/or distributing the materials, including reproductions, copies, or colorable imitations of the Microsoft copyrighted software and/or the Microsoft trademarks, logos, and service mark. (*Id.* p. 4.) Further, it was alleged that Defendant continued to commit acts of copyright and trademark infringement and was wilfully blind and acted in reckless disregard of Microsoft's registered copyrights and marks. (*Id.* pp. 4, 7.) Defendant's conduct resulted in damage to Plaintiff. (*Id.* p. 5.)

1. *Copyright*

Title 17 U.S.C. § 504 provides in pertinent part:

(a) **In General.** Except as otherwise provided by this title, an infringer of copyright is liable for either--

(1) the copyright owner's actual damages and any additional profits [*16] of the infringer, as provided by subsection (b); or

(2) statutory damages, as provided by subsection (c).

....

(c) Statutory Damages.--
*(1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $ 750 or more than $ 30,000 as the court considers just.* For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.

*(2) In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of*

*statutory damages to a sum of not more than $ 150,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court [\*17] in its discretion may reduce the award of statutory damages to a sum of not less than $ 200. The court shall remit statutory damages in any case where an infringer believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use under section 107, if the infringer was: (i) an employee or agent of a nonprofit educational institution, library, or archives acting within the scope of his or her employment who, or such institution, library, or archives itself, which infringed by reproducing the work in copies or phonorecords; or (ii) a public broadcasting entity which or a person who, as a regular part of the nonprofit activities of a public broadcasting entity (as defined in subsection (g) of section 118) infringed by performing a published nondramatic literary work or by reproducing a transmission program embodying a performance of such a work. (Emphasis added.)*

A district court has wide discretion in determining the amount of statutory damages to be awarded and should consider what is just in the particular case in light of the nature of the copyright, the circumstances of the infringement, and other relevant circumstances. *Los Angeles News Service v. Reuters Television International, Ltd.,* 149 F.3d 987, 996 (9th Cir. 1998). [\*18] The statutory damages serve both compensatory and punitive purposes, so in order to effectuate the statutory policy of discouraging infringement, recovery of them is permitted even absent evidence of the actual damages suffered by the plaintiff or of the profits reaped by the defendant. *Id.*

Plaintiff asserts that Defendant's conduct was wilful, but Plaintiff does not seek enhanced damages for wilful infringement; rather, because Defendant's conduct was wilful, Plaintiff seeks the maximum amount of statutory damages for non-wilful infringement of the copyright, which is $ 30,000.00.

The copyright concerned a software program, which is a type of work that is exponentially more expensive to produce than a single song, for example. *See, Peer International Corp. v. Pausa Records, Inc.,* 909 F.2d 1332, 1337 (9th Cir. 1990) (considering the compulsory nature of the licenses in question). The actual number of infringements is not known; only two specific distributions (February 2006 and once after October 2006) are noted in the complaint, although it was alleged that Defendant was in the business of selling copyrighted works and continued to infringe the copyright. (Cmplt. pp. 2, 4.)

Considering [\*19] all the circumstances, the Court exercises its discretion to determine the appropriate amount of statutory damages and concludes that an award of statutory damages in the amount of $ 10,000.00 is just under all the circumstances.

2. *Trademark Infringement*

Plaintiff seeks statutory damages under the Lanham Act in the amount of $ 100,000.00 for each of the three trademarks in issue (see Cmplt. p. 3).

Title 15 U.S.C. § 1117(c)(1) provides:

> *In a case involving the use of a counterfeit mark* (as defined in section 1116(d) of this title) in connection with

the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, *instead of actual damages and profits under subsection (a) of this section, an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of--*

*(1) not less than $ 500 or more than $ 100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or*

*(2) if the court finds that the use of the counterfeit mark was willful, not more than* [*20] *$ 1,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.* (Emphasis added.)

Plaintiff thus seeks the maximum amount of damages, $ 100,000.00, per mark of the three marks alleged to have been infringed upon; Plaintiff explains that of the four trademark registrations in issue (two for Microsoft, one for Windows, and one for Colored Flag Design), the Microsoft mark is listed in two different classifications of goods, but Plaintiff only seeks damages per counterfeit mark, or for three registrations. (Mot. p. 7 n. 1.)

Reference to § 1116(d)(1)(B) shows that a counterfeit mark is defined in pertinent part as follows:

As used in this subsection the term "counterfeit mark" means--

(i) a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered....

Thus, it appears that statutory damages are appropriate with respect to the three marks, which are alleged to have

been infringed by Defendant's conduct.

The [*21] statute provides little guidance for determining the amount of statutory damages. However, courts have analogized to the body of case law interpreting a similar provision in the Copyright Act. *Philip Morris U.S.A. Inc. v. Castworld Prods.,* 219 F.R.D. 494, 501 (C.D.Cal. 2003) (citing *Sara Lee Corp. v. Bags of New York, Inc.,* 36 F.Supp.2d 161, 166 (S.D.N.Y. 1999)). This involves consideration not only of compensation for the injured plaintiff, but also deterrence of future infringement. *Id.* This is consistent with established understanding in the Ninth Circuit of the policies underlying trademark protection, namely, to protect consumers from being misled as to the enterprise from which the goods or services emanate or with which they are associated, to prevent impairment of the value of the enterprise that owns the trademark, and to achieve these ends in a manner consistent with the objectives of free competition. *See Intel Corp. v. Terabyte International, Inc.,* 6 F.3d 614, 618 (9th Cir. 1993.) Copyright factors include the defendant's profits and saved expenses, the plaintiff's lost revenues, and the defendant's state of mind. *Louis Vuitton Malletier & Oakley, Inc. v. Veit,* 211 F. Supp. 2d 567, 584 (E.D.Pa 2002).

Here, [*22] profits, expenses, and lost revenues are matters only of speculation. Plaintiff has not given the Court even the most basic information regarding its loss, such as the price or value of the goods or services subject to the violations. The precise scope of Defendant's business is not clear. All that the allegations of the complaint indicate is that the Defendant used multiple counterfeit marks in once instance in February 2006 and in another after October 2006; further, he continued to infringe upon the marks at the time of the filing of the complaint (December 2006). It appears that Defendant did so wilfully, intentionally, and with a purpose unjustly to benefit from the efforts of Plaintiff in promoting and selling goods and/or services. Specific evidence of wilfulness includes the failure to respond to requests to cease and desist contained in a letter dated July 31, 2006, which was alleged to be notification to Defendant of the wrongfulness of his conduct, and a failure to respond to the complaint and the motion for default judgment, of which it is established that Defendant had notice. The Court notes that § 1111 provides that no damages shall be recovered against an infringer [*23] of a registered mark unless the defendant had actual notice of the registration.

Under the circumstances, the Court concludes that because there is some evidence that the use of the confusing mark was wilful and repeated, even in the absence of evidence of the extent of Plaintiff's loss or the Defendant's profits, it is appropriate to award damages for the purpose of deterrence. It is alleged that Defendant was in the business of advertising, marketing, and distributing computer software and components, and continued to do so at the time of the filing of the complaint. (Cmplt. pp. 2, 4.) Because it was alleged that the incidents were not isolated and were continuing, a significant interest in deterrence is presented. There is no detailed evidence regarding the nature or quality of the respective services offered by Plaintiff and Defendant; nevertheless, because of the likelihood of confusion established by Defendant's default, the circumstances necessarily demonstrate an interest in the protection of the public.

Plaintiff seeks $ 100,000.00 for each of the three trademarks at issue under § 1117(c)(1). This is not a case in which the defendant has been shown to have engaged in the promotion [*24] and sale of multiple counterfeit goods over the internet for an extended period of time, imported millions of infringing products, or unjustly gained huge amounts of profits. It may thus be distinguished from some of the reported cases in which extremely large awards have been made, such as *Louis Vuitton* ($ 1,500,000 for eight marks, use of multiple domain names on the internet, and egregious conduct of extensive sales of many types of goods for a long period of time); *Petmed Express, Inc. v. Medpets.Com, Inc.,* 336 F.Supp.2d 1213, 1221 (S.D.Fla 2004) ($ 400,000 for each infringing mark used on the internet plus $ 50,000 for each infringing domain name, based on wilfulness and the presumptively high scope of internet sales); and *Playboy Enters. v. Asiafocus Int'l,* 1998 U.S. Dist. LEXIS 10359, 1998 WL 724000 (E.D.Va 1998) ($ 1,000,000 for wilful infringement of two counterfeit domain names, and $ 500,000 for each category of merchandise, where there was extensive use of multiple sites for sale of Playboy merchandise as well as viewing of photographic images, use of registered trademarks within the named sites and in e-mail addresses, and active encouragement of other web sites to distribute the infringing [*25] material); *see also Philip Morris USA Inc. v. Castworld Products, Inc.,* 219 F.R.D. 494, 501-02 (C.D. 2003) (award of $ 2,000,000 for wilful infringement of two famous Marlboro trademarks by sale of 8,000,000 imported counterfeit cigarettes of inferior quality with a street

value of millions of dollars). Given that the only probative evidence available to the Court in the present case demonstrates wilful conduct of relatively short duration and of uncertain extent or effect, the Court exercises its discretion and concludes that pursuant to 15 U.S.C. § 1117(c)(1), an award of $ 100,000.00 in damages is appropriate.

The Court notes that a successful plaintiff is entitled to recover both actual damages under the Lanham Act and statutory damages under the Copyright Act. *Nintendo of America, Inc. v. Dragon Pacific Intern.,* 40 F.3d 1007, 1010-11 (9th Cir. 1994), *cert. denied,* 515 U.S. 1107, 115 S. Ct. 2256, 132 L. Ed. 2d 263 (1995). The court in *Nintendo* reasoned that a separate award of statutory damages under both the Copyright Act and the Lanham Act was appropriate when a single act has violated both statutes because two separate wrongs have been committed. However, the court distinguished a case in which recovery of actual [*26] damages under both statutes was held to be an impermissible double recovery. *Id.* at 1011 n. 1.

The Court has not found any definitive authority in the Ninth Circuit, although the Court takes judicial notice of orders [2] submitted in cases before district courts in the Central and Eastern Districts of California, in which awards of statutory damages under both statutes were made, and which Plaintiff submitted after hearing.

2   The two orders are in *Microsoft v. Image & Business Solutions, Inc., et al.,* 2007 U.S. Dist. LEXIS 76519, 2007 WL 2874440 (C.D.Cal. 2007) and *Microsoft v. Hargadon Computer, Inc. et al.,* Eastern District of California Case No. CIV S-03-1486 LKK/GGH.

It is established in this circuit that an award of actual damages under the Lanham Act and statutory damages under the Copyright Act is permissible because multiple wrongs have been committed. *Nintendo of America, Inc.,* 40 F.3d at 1011. Further, the Court finds that there is no double recovery in awards of statutory damages under both statutes because distinct injuries to different interests have been suffered by the Plaintiff. *See, Microsoft Corp. v. Tierra Computer, Inc.,* 184 F.Supp.2d 1329, 1331 (N.D.GA 2001) (noting cases in which awards of statutory [*27] damages were made under both acts). Further, statutory damages serve not only as a substitute for compensation, but also as a penalty and a deterrent to future violations. *Id.* It is clear that in this case actual

damages are difficult or impossible to calculate, and this is largely due to Defendant's own conduct and inaction. Considering all these factors, and exercising its considerable discretion, the Court concludes that an award of statutory damages for trademark and copyright infringement does not violate the rule against double recoveries.

E. *Injunctive Relief*

Plaintiff seeks injunctive relief against future copyright and trademark infringement.

1. *Injunction against Trademark Infringement*

Title 15 § 1116(a) provides:

> The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title. Any such injunction may include a provision directing [*28] the defendant to file with the court and serve on the plaintiff within thirty days after the service on the defendant of such injunction, or such extended period as the court may direct, a report in writing under oath setting forth in detail the manner and form in which the defendant has complied with the injunction. Any such injunction granted upon hearing, after notice to the defendant, by any district court of the United States, may be served on the parties against whom such injunction is granted anywhere in the United States where they may be found, and shall be operative and may be enforced by proceedings to punish for contempt, or otherwise, by the court by which such injunction was granted, or by any other United States district court in whose jurisdiction the defendant may be found.

It is appropriate to award injunctive relief in connection with a default judgment pursuant to the Lanham Act. *Philip Morris USA Inc. v. Castworld Products, Inc.,* 219 F.R.D. 494, 502 (C.D.Cal. 2003) (finding permanent injunctive relief appropriate because the claims otherwise warranted an injunction, the defendant had chosen to ignore the lawsuit, and failure to grant the injunction would needlessly [*29] expose the plaintiff to the risk of continuing irreparable harm); *Pepsico, Inc. v. California Security Cans,* 238 F.Supp.2d 1172, 1177-78 (C.D. 2002) (granting an injunction barring use of a trademark on counterfeit products where it was consistent with the relief requested in the complaint, and it was not absolutely clear that the wrongful behavior had ceased and would not begin again).

An injunction is an equitable remedy appropriate where there is irreparable injury and inadequacy of legal remedies; the Court will balance the competing claims and consider the potential injury and convenience to each party of granting or withholding the injunctive relief, as well as consider the public interest. *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312-13, 102 S. Ct. 1798, 72 L. Ed. 2d 91 (1982).

The Lanham Act gives courts the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation" of a registrant's rights. 15 U.S.C. § 1116(a). A plaintiff is not automatically entitled to an injunction simply because it proved its affirmative claims; the grant of injunctive relief is not a ministerial act flowing as a matter of course. *Pyrodyne Corp. v. Pyrotronics Corp.,* 847 F.2d 1398, 1402 (9th Cir. 1988). [*30] However, the owner of a registered mark is generally entitled to injunctive relief because there is no adequate remedy at law for the injury caused by a defendant's continuing infringement. *See Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1180-81 (9th Cir. 1988); *Lone Star Steakhouse & Saloon v. Alpha of Va., Inc.,* 43 F.3d 922, 939 (4th Cir. 1995). Demonstrating a likelihood of confusion is generally sufficient in trademark infringement or unfair competition cases to permit a presumption that the plaintiff will suffer irreparable harm. *Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 612 n. 3 (9th Cir. 1989). Denying injunctive relief would force Plaintiff to endure continuing infringement and to bring successive suits for money damages. Further, there is a strong interest in

protecting consumers. In cases where the infringing use is for a similar service, broad injunctions are especially appropriate. *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d at 1180-81.

The Court finds that, as alleged in the complaint, Defendant's wrongful conduct included the advertising, marketing, installing, and/or distribution of "infringing materials," specifically, reproductions, copies, [*31] or colorable imitations of the Microsoft copyrighted software and/or the Microsoft trademarks, logos, and service mark described in the complaint. (Cmpt. p. 4.) The Court further finds that, as Plaintiff alleged in the complaint, Plaintiff's trademarks and service mark are unique and valuable property which have no readily determinable market value; Defendant's infringement caused harm to Plaintiff that could not be remedied by a monetary award; Defendant's wrongful conduct and damage resulting therefrom are continuing; and if Defendant's wrongful conduct is allowed to continue, the public is likely to become further confused, mistaken, or deceived as to the source, origin, or authenticity of the infringing materials. (Cmplt p. 7.)

The Court finds that Plaintiff has established that it is the owner of four registered trademarks, one including a service mark: "MICROSOFT," Trademark and Service Mark Registration No. 1,200,236, for computer programs and computer programming services; MICROSOFT," Trademark Registration No. 1,256,083, for computer hardware and software manuals, newsletters, and computer documentation; "WINDOWS," Trademark Registration No. 1,872,264 for computer programs [*32] and manuals sold as a unit; and COLORED FLAG DESIGN, Trademark Registration No. 2,744,843, for computer software. Defendant engaged in trademark infringement of these brands and continues to do so. Defendant's infringement was wilful.

The Court finds that Plaintiff is entitled to permanent injunctive relief against future infringement of its marks by Defendant because Plaintiff has established a likelihood of confusion if Defendant continues to use Plaintiff's mark, has shown that irreparable harm will result absent such relief, and finally has shown that a permanent injunction will serve the public interest. Further, the Court finds that with respect to the relative hardships imposed by an injunction, the balance tips in favor of issuance. Plaintiff is only seeking to enjoin illegal activity. The injunction will not adversely affect

any of Defendant's legitimate business operations, nor will it suffer any cognizable hardship as a result of its issuance. Conversely, Plaintiff will suffer harm in the form of disfavor from customers if Defendant's activities continue. The Court further finds that injunctive relief would serve the public interest because the pertinent law protects not [*33] only the private interests of the trademark owner, but also the public's interest in not being confused by the infringing products. The Court finds that an injunction would deter future infringement.

2. *Injunction against Copyright Infringement*

Plaintiff also seeks injunctive relief against further copyright infringement by Defendant.

Title 17 U.S.C. § 502 states:

(a) *Any court having jurisdiction of a civil action arising under this title may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.*

(b) Any such injunction may be served anywhere in the United States on the person enjoined; it shall be operative throughout the United States and shall be enforceable, by proceedings in contempt or otherwise, by any United States court having jurisdiction of that person. The clerk of the court granting the injunction shall, when requested by any other court in which enforcement of the injunction is sought, transmit promptly to the other court a certified copy of all the papers in the case on file in such clerk's office (emphasis added).

As a general rule, absent a [*34] great public injury, a permanent injunction will be granted when liability has been established and there is a threat of a continuing violations. *Cadence Design Systems, Inc. v. Avant! Corp.,* 125 F.3d 824, 829 (9th Cir. 1997); *MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 520 (9th Cir. 1993) (issuing an injunction against further infringement of protected software rights where the plaintiff demonstrated that the defendant had computers in its loaner inventory with the protected software on it).

2007 U.S. Dist. LEXIS 77088, *34

Generally a party seeking a preliminary injunction must show either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor; however, because in a copyright infringement claim a showing of a reasonable likelihood of success on the merits raises a presumption of irreparable harm, a plaintiff need only show a likelihood of success on the merits to obtain a preliminary injunction. *Micro Star v. Formgen, Inc.,* 154 F.3d 1107, 1109 (9th Cir. 1998).

Here, Plaintiff seeks a permanent injunction. Plaintiff has already shown actual success on the merits because [*35] the complaint states a claim for infringement, and Defendant has defaulted; further, Plaintiffs have alleged that unless restrained, Defendant will continue to cause irreparable injury for which there is no full monetary compensation. This is sufficient for a permanent injunction. *Sony Music Entertainment, Inc. v. Global Arts Productions,* 45 F.Supp.2d 1345, 1347 (S.D.Fla. 1999). An injunction against further infringement and even infringement of future works is permitted, and it is appropriate to grant an injunction on an application for default judgment. *Princeton University Press v. Michigan Document Services, Inc.,* 99 F.3d 1381, 1392-93 (6th Cir. 1996) (noting that an injunction of works copyrighted in the future is supported by the weight of authority); *Elektra Entertainment Group Inc. v. Crawford,* 226 F.RD. 388, 393-94 (C.D.Cal. 2005) (granting a final injunction on default judgment to enjoin defendant from directly or indirectly infringing plaintiffs' rights under federal or state law in copyrighted recordings, whether then in existence or later created, where requested terms of injunction were the same as those prayed for in complaint, proposed injunctive relief was appropriate, [*36] the plaintiffs sent two letters to defendant before plaintiffs sought entry of default which warned of default judgment, defendant failed to respond to serious claims brought against him despite receiving adequate notice, and failure to grant injunction would have resulted in plaintiffs' continued exposure to harm with no method of recourse).

Here, the Court finds that, as Plaintiffs alleged in the complaint, Defendant infringed Plaintiff's valid copyright held in Windows XP Pro (including user's reference manuals, user's guides, and screen displays), duly and properly registered with the United States Copyright Office, Registration Certificate TX 5-407-055. (Cmplt. p.

3.) Further, Defendant engaged in wrongful conduct, including advertising, marketing, installing, and/or distribution of infringing materials, specifically reproductions, copies, or colorable imitations of the Microsoft copyrighted software and/or the Microsoft trademarks, logos, and service mark described in the Complaint, and that Defendant wilfully continued to commit acts of copyright and trademark infringement against Plaintiff. (Cmplt. pp. 3-4.) Further, as previously noted, it is alleged that Plaintiffs have no [*37] adequate remedy at law. (Cmplt. pp. 5-6.)

The Court finds that Defendant's lack of intent to comply with the copyright restrictions is demonstrated by the Defendant's failure to reply to the letter that Plaintiffs sent to the Defendant which notified Defendant that his conduct infringed Plaintiff's intellectual property rights and demanded cessation of the conduct, and by Defendant's further failure to respond to serious claims brought against him despite receiving adequate notice. It appears that the failure to grant the requested injunction would result in Plaintiff's continued exposure to harm with no method of recourse. There does not appear to be any public injury that would result from issuance of the injunction. Accordingly, the Court concludes that injunctive relief is appropriate.

However, the injunctive relief sought is too broad. Generally an injunction must be narrowly tailored to remedy only the specific harms shown by the plaintiffs rather than to enjoin all possible breaches of the law; injunctive relief concerning a copyright will be limited to works that infringe on the Plaintiffs' copyright. *Iconix, Inc. v. Tokuda,* 457 F.Supp.2d 969, 998-1002 (N.D.Cal.2006) (preliminary [*38] injunction in copyright case). Further, it is established that every order granting an injunction shall set forth the reasons for its issuance; shall be specific in its terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise. Fed. R. Civ. P. 65(d). Even without objections by a party, a court has an independent duty to assure that an injunction is specific in its terms and describes in reasonable detail the acts sought to be restrained. *See, EFS Marketing, Inc. v Russ Berrie & Co.,* 76 F.3d 487, 493-94 (2nd Cir. 1996); 4 *Nimmer on*

*Copyright*, § 14.06(C) (2006).

Here, the permanent injunction proposed by Plaintiff (Doc. 15) would enjoin infringement with respect to not only the computer software programs that are the subject of the copyright and trademark protection, but also things that are packaged and distributed with the protected programs, such as unspecified [*39] proprietary components, end user license agreements (EULA's), and certificates of authenticity (COA's) (Prop. Inj. pp. 1-2), which pursuant to the complaint are additional to the copyrighted Windows XP Pro operating system, user's reference manuals, user's guides, and screen displays (Cmplt. pp. 1-2), and further appear not to be included in the matters described as the things for which there are registered trademarks, namely, computer programs and programming services; computer hardware and software manuals, newsletters, and computer documentation; computer programs and manuals sold as a unit; and computer software (Cmplt. p. 3).

Likewise, the proposed injunction would cover infringement of any other works now or hereafter protected by any of Plaintiff's trademarks or copyrights (Prop. Inj. p. 2). It would also cover the use of names, logos, or "other variations thereof," terminology which is not sufficiently specific. These aspects of the injunction would be unclear and also would exceed the scope of the infringement.

Accordingly, these aspects should be eliminated from the injunctive relief sought.

The Court should order Defendant Matthew Evans, and his agents, servants, employees, [*40] representatives, successors and assigns, and all those persons or entities acting in concert or participation with him, to be permanently enjoined and restrained from

1) imitating, copying, or making any other infringing use or infringing distribution of the Microsoft Windows XP Professional (Windows XP Pro) software package and operating system, including reference manuals, user's guides, and screen displays, protected by Microsoft's copyright number TX 5-407-055; and

2) imitating, copying, or making any other infringing use or infringing distribution of the matters covered by registered trademarks and service mark, including the following: "MICROSOFT," Trademark and Service Mark Registration No. 1,200,236, for computer programs and

computer programming services; "MICROSOFT," Trademark Registration No. 1,256,083, for computer hardware and software manuals, newsletters, and computer documentation, including reference, user, instructional, and general utilities manuals and data sheets for computer hardware and software users; "WINDOWS," Trademark Registration No. 1,872,264, for computer programs and manuals sold as a unit; and COLORED FLAG DESIGN, Trademark Registration No. 2,744,843, [*41] for computer software; user manuals therefor sold as a unit therewith; computers; computer hardware; computer application programs; computer peripherals; computer mice and pointing devices; DVD players; digital cellular phones; blank smart cards; communication servers and computer application and operating system programs for use therewith; video game machines and operating system software for use therewith and in playing electronic games; computer keyboards; computer and video game joysticks; and video game interactive control floor pads; and

3) manufacturing, assembling, producing, distributing, offering for distribution, circulating, selling, offering for sale, advertising, importing, promoting, or displaying any item or thing included in the matters listed in paragraph (2) above and bearing any simulation, reproduction, counterfeit, copy, or colorable imitation of any of Microsoft's registered trademarks or service mark listed in paragraph (2) above; and

4) using any simulation, reproduction, counterfeit, copy, or colorable imitation of any thing covered by Microsoft's registered trademarks or service mark listed in paragraph (2) above, in connection with the manufacture, distribution, [*42] offering for distribution, sale, offering for sale, advertisement, promotion, or display of any software, component, end user license agreement, certificate of authenticity, or other item or thing not authorized or licensed by Microsoft; and

5) using any false designation of origin or false description which can or is likely to lead the trade or public or individuals erroneously to believe that any software, component, end user license agreement, certificate of authenticity, or other item or thing has been manufactured, produced, distributed, offered for distribution, advertised, promoted, displayed, licensed, sponsored, approved, or authorized by or for Microsoft, when such is not true in fact; and

6) using the names or logos of any of Microsoft's copyright and/or trademark-protected software programs in any of Defendant's trade or corporate names; and

7) engaging in any other activity constituting an infringement of any of Microsoft's trademarks, service mark and/or copyrights, or of Microsoft's rights in, or right to use or to exploit these trademarks, service mark, and/or copyrights, or constituting any dilution of Microsoft's name, reputation, or goodwill; and

8) assisting, aiding, [*43] or abetting any other person or business entity in engaging in or performing any of the activities referred to in paragraphs numbered one through eight above.

F. *Attorney's Fees*

Plaintiff seeks an award of attorney's fees pursuant to both 17 U.S.C. § 505 and 15 U.S.C. § 1117(a).

With respect to the copyright claim, 17 U.S.C. § 505 states:

> In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

Under this provision, attorney's fees are to be awarded to prevailing parties in the court's discretion after consideration various factors, including but not limited to frivolousness, motivation, objective unreasonableness (both as to legal and factual components of the case), culpability, the degree of success obtained, the strength of the case relative to the costs of the litigation, the pecuniary circumstances of the parties, and the need in the particular circumstances of the case to advance considerations of compensation and deterrence; [*44] the award should further the underlying purposes of the Copyright Act. *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 535 n. 19, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994); *Fantasy, Inc. v. Fogerty,* 94 F.3d 553, 557-60 (9th Cir. 1996). The objectives of the Copyright Act include discouraging infringement and increasing public exposure to a creative work. *Fantasy, Inc. v. Fogerty,* 94 F.3d at p. 559. A court has the discretion to award interest

on the fees. *See, Fantasy, Inc. v. Fogerty,* 94 F.3d at p. 561.

Here, an award of attorney's fees would further the deterrent and compensatory purposes of the act and would reward successful handling of the litigation.

With respect to the trademark claim, 15 U.S.C. § 1117(a) concerns violations of any right of a registrant of a mark or a violation under § 1125(a) that have been established in a civil action. It states in pertinent part, "The court in exceptional cases may award reasonable attorney fees to the prevailing party." Exceptional cases includes cases in which trademark infringement is malicious, fraudulent, deliberate, or wilful. *Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400, 1409 (9th Cir. 1993); *Philip Morris USA Inc. v. Castworld Products, Inc.,* 219 F.R.D. 494, 502 (C.D.Cal.2003).

To [*45] determine a reasonable attorney fee award under § 1117(a), courts employ the lodestar method. *See, Earthquake Sound Corp. v. Bumper Industries,* 352 F.3d 1210, 1219 (9th Cir. 2003).

Case law construing what a reasonable fee is applies uniformly to all federal fee-shifting statutes. *City of Burlington v. Dague,* 505 U.S. 557, 561, 112 S. Ct. 2638, 120 L. Ed. 2d 449 (1992). "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983). This figure, the "lodestar," is presumed to be the reasonable fee contemplated by the statute. *Riverside v. Rivera,* 477 U.S. 561, 568, 106 S. Ct. 2686, 91 L. Ed. 2d 466 (1986). Factors to consider in the initial lodestar calculation are the novelty and complexity of the issues, the special skill and experience of counsel, the quality of the representation, the results obtained, and the superior performance of counsel. *Blum v. Stenson,* 465 U.S. 886, 898-900, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984). As to the reasonable hourly rate, a district court should be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience and reputation. [*46] *Blum v. Stenson,* 465 U.S. 886, 895 n. 11, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984). Either current or historical rates prevailing rates may be used; use of current rates or an appropriate adjustment for delay in payment may be reasonable. *Missouri v. Jenkins,* 491 U.S. 274, 283-84, 109 S. Ct. 2463, 105 L. Ed. 2d 229 (1989). Local Rule 54-293 also

sets forth the procedure to be followed, the matters to be shown by an applicant, and the criteria to be followed in making awards.

Here, the violations were deliberate and wilful. Thus, the Court determines that the case is exceptional, and an award of attorney's fees would be appropriate.

The declaration of Katherine M. Dugdale establishes that she is a partner in her Santa Monica firm and an attorney with primary responsibility for this case; she has handled matters of this type for nine years and has been an attorney for fourteen years; she and Jennifer N. Chiarelli, a 2000 law school graduate, have worked on the case; Dugdale's time was billed at a rate of $ 387 per hour, and Chiarelli's at $ 301.50 per hour; based on Dugdale's experience and familiarity with rates charged by Los Angeles attorneys with similar experience and expertise, the fees incurred are reasonable and appropriate.

For preparation and review [*47] of the complaint and accompanying documents and service, 7.4 hours were expended, for a sum of $ 2,769.75; for preparation and review of request for entry of default, 2.1 hours were expended, for a sum of $ 633.15.

Considering the reasonable hourly rate and number of hours expended, and further considering the skill of the attorneys, the issues, and the quality of the representation and results obtained, the Court concludes that the amount sought, $ 3,402.90, is reasonable.

With respect to costs, Plaintiff withdrew its request for costs at the hearing on this motion.

F. *Status of Defendant*

The declaration of Dugdale establishes that Defendant is not an infant, incompetent, or a person protected by the Servicemembers Civil Relief Act of 1940, 50 App. U.S.C. §§ 501, 521.

G. *Discretionary Factors*

Here, it does not clearly appear that there is any risk of mistake or excusable neglect on the part of anyone with a potential interest in the subject matter of the instant action. Further, given the state of the pleadings, there is no apparent likelihood of a dispute as to a material fact essential to the Plaintiffs' case. Defendant's delay has been long-standing, and there is no cognizable

showing [*48] of excuse on the part of Defendant. There does not appear to be any reason why the general policy in favor of a decision on the merits would warrant refusing to enter the requested default judgment.

Accordingly, the Court finds that Plaintiff has shown entitlement to a default judgment.

G. *Defendant's Address for Service of this Order*

At the hearing, Defendant Matthew Evans represented to the Court that his address is 5900 Chancellor Way, Riverbank, California 95367. His telephone numbers are (209) 481-9230 (cell) and (209) 863-8201 (land line).

II. *Recommendation*

Accordingly, it IS RECOMMENDED that

1) Plaintiff's motion for default judgment BE GRANTED; and

2) The Clerk BE DIRECTED to enter judgment in favor of Plaintiff Microsoft Corporation and against Defendant Matthew Evans in the amount of $ 110,000.00 in statutory damages and $ 3,402.90 in attorney's fees; and

3) The Clerk BE DIRECTED to enter a judgment in favor of Plaintiff Microsoft Corporation and against Defendant Matthew Evans that enjoins Defendant Matthew Evans his agents, servants, employees, representatives, successors and assigns, and all those persons or entities acting in concert or participation with him, to be permanently [*49] enjoined and restrained from

a) imitating, copying, or making any other infringing use or infringing distribution of the Microsoft Windows XP Professional (Windows XP Pro) software package and operating system, including reference manuals, user's guides, and screen displays, protected by Microsoft's copyright number TX 5-407-055; and

b) imitating, copying, or making any other infringing use or infringing distribution of the matters covered by registered trademarks and service mark, including the following: "MICROSOFT," Trademark and Service Mark Registration No. 1,200,236, for computer programs and computer programming services; "MICROSOFT," Trademark Registration No. 1,256,083, for computer

hardware and software manuals, newsletters, and computer documentation, including reference, user, instructional, and general utilities manuals and data sheets for computer hardware and software users; "WINDOWS," Trademark Registration No. 1,872,264, for computer programs and manuals sold as a unit; and "COLORED FLAG DESIGN,"Trademark Registration No. 2,744,843, for computer software; user manuals therefor sold as a unit therewith; computers; computer hardware; computer application programs; computer [*50] peripherals; computer mice and pointing devices; DVD players; digital cellular phones; blank smart cards; communication servers and computer application and operating system programs for use therewith; video game machines and operating system software for use therewith and in playing electronic games; computer keyboards; computer and video game joysticks; and video game interactive control floor pads; and

c) manufacturing, assembling, producing, distributing, offering for distribution, circulating, selling, offering for sale, advertising, importing, promoting, or displaying any item or thing included in the matters listed in paragraph (b) above and bearing any simulation, reproduction, counterfeit, copy, or colorable imitation of any of Microsoft's registered trademarks or service mark listed in paragraph (b) above; and

d) using any simulation, reproduction, counterfeit, copy, or colorable imitation of any thing covered by Microsoft's registered trademarks or service mark listed in paragraph (b) above, in connection with the manufacture, distribution, offering for distribution, sale, offering for sale, advertisement, promotion, or display of any software, component, end user license [*51] agreement, certificate of authenticity, or other item or thing not authorized or licensed by Microsoft; and

e) using any false designation of origin or false description which can or is likely to lead the trade or public or individuals erroneously to believe that any software, component, end user license agreement, certificate of authenticity, or other item or thing has been manufactured, produced, distributed, offered for distribution, advertised, promoted, displayed, licensed, sponsored, approved, or authorized by or for Microsoft, when such is not true in fact; and

f) using the names or logos of any of Microsoft's copyright and/or trademark-protected software programs in any of Defendant's trade or corporate names; and

g) engaging in any other activity constituting an infringement of any of Microsoft's trademarks, service mark and/or copyrights, or of Microsoft's rights in, or right to use or to exploit these trademarks, service mark, and/or copyrights, or constituting any dilution of Microsoft's name, reputation, or goodwill; and

h) assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in paragraphs numbered [*52] one through eight above; and

4) The Clerk of the Court IS DIRECTED to serve a copy of this order by mail on Defendant Matthew Evans at 5900 Chancellor Way, Riverbank, California 95367.

This report and recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) *court* days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst,* 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated: October 16, 2007**

**/s/ Sandra M. Snyder**

UNITED [*53] STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-60594-CIV-DIMITROULEAS

NEIMAN MARCUS GROUP, INC., and
NM NEVADA TRUST,

       Plaintiffs,

vs.

JACOB RIVARD, a/k/a SHAUN WALLER,
a/k/a G.H. WAGENAARS, a/k/a H.W.
BARNES, and NET41 MEDIA CORP., and
DOES 1-10,

       Defendants.

_____/

## FINAL DEFAULT JUDGMENT AND PERMANENT INJUNCTION

THIS CAUSE came before the Court on the Motion for Entry of Final Default Judgment

and Permanent Injunction in favor of Plaintiffs The Neiman Marcus Group, Inc. and NM Nevada

Trust (collectively "Plaintiffs") and against Defendants Jacob Rivard a/k/a Shaun Waller a/k/a

G.H. Wagenaars a/k/a H.W. Barnes and NET41 Media Corp. (collectively "Defendants") [D.E.

16]. Having considered the Motion, supporting Memorandum of Law, Declarations [D.E. 17-

20], the record and being duly advised in the premises, it is hereby ORDERED, ADJUDGED

AND DECREED as follows:

      1. The Court has jurisdiction of the subject matter and of the parties;

      2. Venue is proper in this jurisdiction;

      3. Defendant Net41 Media Corp. was properly served with the Summons and

Complaint on April 27, 2009 [D.E. 5];

1

4. Defendant Jacob Rivard a/k/a Shaun Waller, a/k/a G.H. Wagenaars, a/k/a H.W. Barnes was properly served with the Summons and Complaint on May 9, 2009 [D.E. 6];

5. Default was entered against Defendants by the Clerk of Court on June 3, 2009 [D.E. 12 and 13];

6. Plaintiffs possesses valid trademarks for the trademarks NEIMAN MARCUS (U.S. Trademark Reg. Nos. 0934177, 1593195, 1733202, 2209260, 2959652) and NEIMAN-MARCUS (U.S. Trademark Reg. Nos. 0601375, 0601723, 0601864, 1154006) (collectively, "Neiman Marcus Marks") and that those trademarks are enforceable;

7. Defendants registered, trafficked in, or used at least three domain names, neimanmadcus.com, neinanmarcus.com, and enimanmarcus.com, which are identical or confusingly similar to the Neiman Marcus Marks in violation 15 U.S.C. §1125(d), the Anticybersquatting Consumer Protection Act (the "ACPA");

8. Defendants' violation of 15 U.S.C. §1125(d), the ACPA, was willful;

9. As a consequence of this willful conduct, under 15 U.S.C. §1117(d), Plaintiffs are entitled to recover from Defendants damages for infringing Plaintiffs' rights in the amount of $100,000 for each of the three domain names registered in violation of the ACPA for a total monetary judgment of $300,000, jointly and severally, against Defendants, with interest accruing at the legal rate of 0.47% per annum for which JUDGMENT shall issue forthwith;

10. This is an exceptional case, and as a result, Plaintiffs are entitled to recover their reasonable attorneys' fees and costs in accordance with 15 U.S.C. § 1117(a). Within 30 days from the date of this Final Default Judgment and Permanent Injunction, Plaintiffs shall submit to the Court their motion for determination of the amount of attorneys' fees;

Exhibit A
Page 70

11.  Pursuant to 15 U.S.C. § 1125(d)(1)(C), Defendants and Defendants' officers, directors, employees, representatives, agents, successors-in-interest, parent corporations, subsidiary corporations, affiliated companies, and all other persons, firms or entities acting in concert or participating with them, directly or indirectly, shall relinquish all rights, title, and interest, in all domain names which are confusingly similar to Plaintiffs' NEIMAN MARCUS, NEIMAN-MARCUS, NEIMANS, LAST CALL, BERGDORF GOODMAN, and HORCHOW trademarks ("Plaintiffs' Marks") which are under their control, and to transfer all domain names to Plaintiffs. To facilitate this transfer, it is further ORDERED that the registry of those domain names shall change the registrar of record to a registrar of Plaintiffs' choosing. It is further ORDERED that the new registrar of record change the registrant to Plaintiffs or their authorized representative;

12.  Defendants and Defendants' officers, directors, employees, representatives, agents, successors-in-interest, parent corporations, subsidiary corporations, affiliated companies, and all other persons, firms or entities acting in concert or participating with them, directly or indirectly, who receive actual notice by personal service or otherwise, are PERMANENTLY ENJOINED from:

a.  Registering, trafficking in or using any domain name that is identical or confusingly similar to the trade names and trademarks NEIMAN MARCUS, NEIMANS, LAST CALL, BERGDORF GOODMAN, and HORCHOW; and

b.  Assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to in paragraph 12.a., above; and

13.  This Court shall retain jurisdiction over the parties and the subject matter for the

3

Exhibit A
Page 71

purpose of enforcing the provisions of this Final Default Judgment and Permanent Injunction and to enter such other Orders as may be necessary to enforce the provisions of this Final Judgment and Permanent Injunction. In the event that legal action is necessary to enforce this Final Judgment and Permanent Injunction, the prevailing party shall be entitled to its reasonable attorneys' fees.

      14.  The Clerk shall close this case.

      15.  All pending motions are hereby denied as moot.

      DONE AND ORDERED in Chambers at Fort Lauderdale, Broward County, Florida, this 28th day of July, 2009.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished to:

Counsel of record

Jacob Rivard
a/k/a Shaun Waller a/k/a G.H. Wagenaars a/k/a H.W. Barnes
483 E. 9th Street, Apt. A
Reno, NV 89512

Net41 Media Corp.
c/o its Registered Agent
Business Filings, Inc.
6100 Neil Road, Suite 500
Reno, NV  89511

4

Exhibit A
Page 72

**CERTIFICATE OF SERVICE**

I certify that on December 3, 2010, pursuant to Federal Rules of Civil Procedure, a true and correct copy of the foregoing document described as **APPENDIX OF AUTHORITIES NOT AVAILABLE IN THE FEDERAL REPORTER CITED IN MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR FINAL DEFAULT JUDGMENT AGAINST MAHESH MALIK** was served on the party(ies) in this action as follows:

MAHESH MALIK

**By First Class International Air Mail to:**
707/C Neptune Apts, 4th Cross Lane,
Lokhandwala Complex, Andheri (West)
Mumbai Maharashtra 400053
India

**By Email to:**
Mahesh@LeadNetworks.in

I declare that I am employed by a member of the bar of this Court, at whose direction this service was made.

Executed on December 3, 2010 at Newport Beach, California.

Linda L. Bolter

CHRISTIE, PARKER & HALE, LLP