Exhibit 29

Please mark corrections, if any, alongside respective item and submit this document along with supporting documentary evidence for updation.
In case we do not receive supporting documents, correction required will not be considered. The documents are to be sent at following address :

Registrar of Companies

**RoC-Mumbai**
Everest , 100, Marine Drive
Mumbai
Maharashtra-400002
INDIA

The envelope containing physical documents should be superscribed as "Application for Company Master Data Correction Request"

| Company Master Details | | |
|---|---|---|
| **Subject** | **Company Details/Particulars** | **Verification/Corrections,if any** |
| CIN | : U72900MH2008PTC187021 | |
| Company Name | : PLUTO DOMAINS SERVICES PRIVATE LIMITED | |
| ROC Code | : RoC-Mumbai | |
| Registration Number | : 187021 | |
| Company Category | : Company limited by shares | |
| Company Subcategory | : Indian Non-Government Company | |
| Class of Company | : Private | |
| Authorised Capital(in Rs.) | :100,000.00 | |
| Paid up capital(in Rs.) | :.00 | |
| Number of Members(Applicable only in case of company without Share Capital) | : 0 | |
| Date of Incorporation | : 24-09-2008 | |
| Address of registered office | : 5/2, STARSWAY SOCIETY, JUHU ROAD,, JUHU, MUMBAI Maharashtra-400049 INDIA | |
| Email Id | : contact@plutodomainservices.com | |
| Whether listed or not | : Unlisted | |
| Date of Last AGM | : | |
| Date of Balance sheet | : | |
| Company Status(for efiling) | : Active | |

Exhibit 29
Page 712

Company Master Details   http://www.mca.gov.in/DCAPortalWeb/dca/CompanyMaster.do?method=...

Case 2:09-cv-00613-ABC-CW  Document 122-6  Filed 12/03/10  Page 3 of 34  Page ID #:3243

I _____ son/daughter of
_____ on behalf of the company
_____ confirm that I have gone through the above details and
correction suggested is true and correct to the best of my knowledge and belief.
I also confirm that the required documents for the correction suggested was filed earlier and evidence for the same is
attached to the document.
I have been authorized by the board of directors' resolution dated _____ to sign and submit this application.


**Date:**


**Place**                   **(Signature)**


Exhibit 29
Page 713

Exhibit 30

Please mark corrections, if any, alongside respective item and submit this document along with supporting documentary evidence for updation.
In case we do not receive supporting documents, correction required will not be considered. The documents are to be sent at following address :

**Registrar of Companies**

**RoC-Mumbai**
Everest , 100, Marine Drive
Mumbai
Maharashtra-400002
INDIA

The envelope containing physical documents should be superscribed as "Application for Company Master Data Correction Request"

**C o m p a n y   M a s t e r   D e t a i l s**

| Subject | Company Details/Particulars | Verification/Corrections,if any |
|---|---|---|
| CIN | : U74999MH2007PTC175086 | |
| Company Name | : LAKSH INTERNET SOLUTIONS PRIVATE LIMITED | |
| ROC Code | : RoC-Mumbai | |
| Registration Number | : 175086 | |
| Company Category | : Company limited by shares | |
| Company Subcategory | : Indian Non-Government Company | |
| Class of Company | : Private | |
| Authorised Capital(in Rs.) | :100,000.00 | |
| Paid up capital(in Rs.) | :.00 | |
| Number of Members(Applicable only in case of company without Share Capital) | : 0 | |
| Date of Incorporation | : 16-10-2007 | |
| Address of registered office | : 5/2, STARSWAY SOCIETY, JUHU ROAD,, JUHU, MUMBAI Maharashtra-400049 INDIA | |
| Email Id | : vanita@lincwise.com | |
| Whether listed or not | : Unlisted | |
| Date of Last AGM | : | |
| Date of Balance sheet | : | |
| Company Status(for efiling) | : Active | |

Exhibit 30
Page 714

Case 2:09-cv-00613-ABC-CW   Document 122-6   Filed 12/03/10   Page 6 of 34   Page ID #:3246

I _____ son/daughter of
_____ on behalf of the company
_____ confirm that I have gone through the above details and correction suggested is true and correct to the best of my knowledge and belief.

I also confirm that the required documents for the correction suggested was filed earlier and evidence for the same is attached to the document.

I have been authorized by the board of directors' resolution dated _____ to sign and submit this application.


**Date:**


**Place**                                                          **(Signature)**

Exhibit 30
Page 715

2 of 2                                                        1/25/2009 7:07 PM

Exhibit 31



Exhibit 31
Page 716



Exhibit 31
Page 717



Exhibit 31
Page 718



Exhibit 31
Page 719

Exhibit 32

Please mark corrections, if any, alongside respective item and submit this document along with supporting documentary evidence for updation.
In case we do not receive supporting documents, correction required will not be considered. The documents are to be sent at following address :

**Registrar of Companies**

**RoC-Mumbai**
Everest , 100, Marine Drive
Mumbai
Maharashtra-400002
INDIA

The envelope containing physical documents should be superscribed as "Application for Company Master Data Correction Request"

## Company Master Details

| Subject | Company Details/Particulars | Verification/Corrections,if any |
|---|---|---|
| CIN | : U74999MH2007PTC175085 | |
| Company Name | : COMPSYS DOMAIN SOLUTIONS PRIVATE LIMITED | |
| ROC Code | : RoC-Mumbai | |
| Registration Number | : 175085 | |
| Company Category | : Company limited by shares | |
| Company Subcategory | : Indian Non-Government Company | |
| Class of Company | : Private | |
| Authorised Capital(in Rs.) | :100,000.00 | |
| Paid up capital(in Rs.) | :.00 | |
| Number of Members(Applicable only in case of company without Share Capital) | : 0 | |
| Date of Incorporation | : 16-10-2007 | |
| Address of registered office | : 5/2, STARSWAY SOCIETY, JUHU ROAD,, JUHU, MUMBAI Maharashtra-400049 INDIA | |
| Email Id | : vanita@lincwise.com | |
| Whether listed or not | : Unlisted | |
| Date of Last AGM | : | |
| Date of Balance sheet | : | |
| Company Status(for efiling) | : Active | |

Exhibit 32
Page 720

Case 2:09-cv-00613-ABC-CW   Document 122-6   Filed 12/03/10   Page 14 of 34   Page ID #:3254

I _____ son/daughter of
_____ on behalf of the company
_____ confirm that I have gone through the above details and
correction suggested is true and correct to the best of my knowledge and belief.

I also confirm that the required documents for the correction suggested was filed earlier and evidence for the same is
attached to the document.

I have been authorized by the board of directors' resolution dated _____ to sign and submit this application.

**Date:**

**Place**                                                                                    **(Signature)**

Exhibit 32
Page 721

Exhibit 33

**From:**       Nickolas Smith [propwash@mechjock.com]
**Sent:**       Tuesday, August 26, 2008 6:57 AM
**To:**         mahesh
**Subject:**    Re: Domain Transfer Expected on March 15th]

Mahesh,

Interestingly, the record for Comdot Internet Services at the India
Registrar of Companies included an Email Id of "mahesh.m@dotnamemail.com".

It appears to me that you are indeed the same entity.

The www.dotnamemail.com domain seems to be registered to you as well.

I have no intention of using an external service, expecially is its
'Cyber Veillance', yet another entity affiliated with you.

Id rather my domain be given to me as per the UDRP process rules as we
both know the lawsuit is simply a delay tactic to extort more money from me.

Give my my domain and I'll just go away.

Nick



mahesh wrote:
> Hi Nickolas
> I would first like to clear your doubts that Lead Networks is working
> together with comdot or any other domain registrant to prevent
> transfer of the domain. Some clients prefer to go to Court, some
> don't, if a matter goes to Court our hands are tied and we cannot
> transfer the domain.
> We try and see to it that the UDRP Decision is implemented and do not
> give even the slightest leverage possible other than what is allowed
> in the UDRP.
> With regard to battletech.com the suit has been filed and the UDRP
> decision cannot be implemented at this stage. We can help you here by
> suggesting a company which can help you get the suit dismissed. We
> have used them in matters before and they have been successful.
> I am available on my mobile phone in case you want to discuss the
> matter till 12 noon pacific time. I shall be glad to help in any way
> as required by. In case you give me your tel number I can also call you.
> Regards
> Mahesh K Maalik
> Director
> Lead Networks Domains Private Limited
> (An ICANN Accredited Registrar)
> 707/C Neptune Apartments, 4th Cross Lane,
> Lokhandwala Complex, Andheri (west),
> Mumbai - 400 053
> INDIA
> Mobile: +91 98200 28209
> Tel: +91 22 26313093
> Fax: +91 22 26313094
> email: Mahesh@LeadNetworks.in <mailto:Mahesh@LeadNetworks.in>
> URL: www.LeadNetworks.com <http://www.LeadNetworks.com>
>
>       ----- Original Message -----
>       *From:* domain.disputes <mailto:domain.disputes@leadnetworks.in>
>       *To:* mahesh@leadnetworks.in <mailto:mahesh@leadnetworks.in>

1

Exhibit 33
Page 722

```
>    *Sent:* Monday, August 25, 2008 5:43 PM
>    *Subject:* Fw: Domain Transfer Expected on March 15th]
>
>    ----- Original Message -----
>    *From:* Nickolas Smith <mailto:propwash@mechjock.com>
>    *To:* domain.disputes <mailto:domain.disputes@leadnetworks.in>
>    *Sent:* Thursday, August 21, 2008 6:26 PM
>    *Subject:* Re: Domain Transfer Expected on March 15th]
>
>    battletech.com
>
>    domain.disputes wrote:
>    > Hi
>    >
>    > Girish is no longer working with us. Can you please tell me which
>    > domain are you referring to.
>    >
>    > Regards
>    >
>    > Omkar Pradhan
>    > +91 9920028209
>    >
>    > ----- Original Message -----
>    > *From:* Nickolas Smith <mailto:propwash@mechjock.com>
>    > *To:* Domain Disputes <mailto:DomainDisputes@LeadNetworks.in>
>    > *Sent:* Thursday, August 21, 2008 8:48 AM
>    > *Subject:* Re: Domain Transfer Expected on March 15th]
>    >
>    > Girish,
>    >
>    > It has become clear that COMDOT and LEAD NETWORKS are deliberately
>    > working together to prevent me from my legitimate claim on this
>    > domain.
>    >
>    > I and several other parties are fully aware of what COMDOT and LEAD
>    > NETWORKS is trying to do with several domains that are supposed
to be
>    > transferred after several UDRP decisions. I want to know what its
>    > going
>    > to take to resolve this issue once and for all.
>    >
>    > Nickolas Smith
>    >
>    >
>    >
>    > Domain Disputes wrote:
>    > > Hi Nikolas
>    > >
>    > > The domain transfer is due after 10 working days which is 26th
>    > March
>    > > 2008. The decision was served on us on 7th March 2008 (6th March
>    > being
>    > > a National Holiday). There are a few holidays in the next week
>    > also so
>    > > 10 working days end on 26th March 2008.
>    > >
>    > > The process is that you have to logon to www.LeadNetworks.com
>    <http://www.LeadNetworks.com>
>    > <http://www.LeadNetworks.com>
>    > > <http://www.LeadNetworks.com> create an account for yourself
>    and we
>    > > shall push the domain to the said account after the expiry of
>    > the wait
>    > > period. Transfer of the domain out of Lead networks will be
>    > permitted
>    > > after 60 days of the domain being pushed into your account.
```

```
>       > >
>       > > Regards
>       > >
>       > > Girish
>       > >
>       > > ----- Original Message -----
>       > > *From:* Nickolas Smith <mailto:propwash@mechjock.com>
>       > > *To:* DomainDisputes@LeadNetworks.in
>       <mailto:DomainDisputes@LeadNetworks.in>
>       > <mailto:DomainDisputes@LeadNetworks.in>
>       > > <mailto:DomainDisputes@LeadNetworks.in>
>       > > *Sent:* Friday, March 07, 2008 1:21 AM
>       > > *Subject:* [Fwd: Domain Transfer Expected on March 15th]
>       > >
>       > > As I have won a UDRP decision regarding a Domain you are a
>       > registrar
>       > > for, I expect to have this domain transferred to my
>       > godaddy.com on
>       > > March
>       > > 15th
>       > >
>       > > I have included the a copy UDRP ruling.
>       > >
>       > > If this Domain is no transferred on the 15th due to a local
>       > court
>       > > order,
>       > > I expect to have a copy of the order preventing the transfer
>       > before the
>       > > 15th.
>       > >
>       > > If Comdot fails to provide the documentation by the 15th of
>       > March,
>       > the
>       > > domain transfer is expected to be completed on that date and
>       > no later.
>       > >
>       > > Nickolas Smith
>       > >
>       >
>       >
>
```

Exhibit 34

Please mark corrections, if any, alongside respective item and submit this document along with supporting documentary evidence for updation.
In case we do not receive supporting documents, correction required will not be considered. The documents are to be sent at following address :

**Registrar of Companies**

**RoC-Mumbai**
Everest , 100, Marine Drive
Mumbai
Maharashtra-400002
INDIA

The envelope containing physical documents should be superscribed as "Application for Company Master Data Correction Request"

## Company Master Details

| Subject | Company Details/Particulars | Verification/Corrections,if any |
|---|---|---|
| **CIN** | : U72900MH2007PTC173973 | |
| **Company Name** | : Cyber Veillance Private Limited | |
| **ROC Code** | : RoC-Mumbai | |
| **Registration Number** | : 173973 | |
| **Company Category** | : Company limited by shares | |
| **Company Subcategory** | : Indian Non-Government Company | |
| **Class of Company** | :  Private | |
| **Authorised Capital(in Rs.)** | :100,000.00 | |
| **Paid up capital(in Rs.)** | :.00 | |
| **Number of Members(Applicable only in case of company without Share Capital)** | : 0 | |
| **Date of Incorporation** | : 10-09-2007 | |
| **Address of registered office** | : C/205 MAITRI, 24 BIMBISAR NAGAR,, OFF WESTERN EXPRESS HIGHWAY, GOREGAON (EAST) MUMBAI Maharashtra-400065 INDIA | |
| **Email Id** | :  mahesh.m@dotnamemail.com | |
| **Whether listed or not** | :  Unlisted | |
| **Date of Last AGM** | : | |
| **Date of Balance sheet** | : | |
| **Company Status(for efiling)** | :  Active | |

Exhibit 34
Page 725

Case 2:09-cv-00613-ABC-CW   Document 122-6   Filed 12/03/10   Page 21 of 34   Page ID #:3261

I _____ son/daughter of
_____ on behalf of the company
_____ confirm that I have gone through the above details and
correction suggested is true and correct to the best of my knowledge and belief.

I also confirm that the required documents for the correction suggested was filed earlier and evidence for the same is attached to the document.

I have been authorized by the board of directors' resolution dated _____ to sign and submit this application.

**Date:**

**Place**                                                                    **(Signature)**

Exhibit 34
Page 726

Exhibit 35

Case 2:09-cv-00613-ABC-CW    Document 122-6    Filed 12/03/10    Page 23 of 34    Page ID #:3263

## ICANN Meetings in Lisbon Portugal

**Transcript - Tutorial - How the Marketplace for Expiring Names Has Changed: Why names aren't released and what is the impact on consumers and other interests? Are registrars becoming domain name portfolio owners?**

*25 March 2007*

---

Note: Although transcript output is largely accurate, in some cases it is incomplete or inaccurate due to inaudible passages or transcription errors. It is posted as an aid to understanding the proceedings at the session, but should not be treated as an authoritative record.

---

>>TIM COLE: Ladies and gentlemen, I'd like to welcome you to this first of two tutorials we are having this afternoon on various aspects of the domain name marketplace. The first one is going to take place over the next hour, and it's being facilitated by Rob Hall, who is a very large player in the domain marketplace. And Rob Hall is going to give you more background on himself and his company, so I'm not going to go into too many details at the moment. But I would like you to welcome Rob. He is going to speak on changes in the period following the expiration for domain names.

And then for the next two hours, when Rob finishes, we are going to have another group of people who are going to speak on evaluation of domain names and what causes domain names to have high value and so forth. So we've got a couple back-to-back really interesting sessions here.

We have people who are watching on the Web. We are being webcast. And they will have an opportunity to participate through our public participation site. And if they want to ask questions during the question-and-answer period, I would encourage them to submit them at that time. We'll make every effort to accommodate those questions, in addition to the questions that come from the audience.

So, without any further ado, I'd like to introduce Rob Hall.

[ Applause ]

>>ROB HALL: Thank you. And I've lost my screen here.

Sorry. I'll need to restart.

You can see it, but I can't. Okay, my apologies. My name is Rob Hall.

The agenda for today, I'll talk a bit about who I am and why I'm here.

I want to run through a history of what happened in the expiry market. And I'll define what that is. We'll go through current-day practices that we're seeing happen in the expiry market. And then I'll talk again specifically about how it affects things like the RGP, UDRP, transfers, registrar silos, privacy practices, renewal practices, registrar portfolios. And what's next.

Please, a little bit of background. If I talk too fast, someone stand up and yell "slow down" or speak louder.

I'm the CEO of momentous.CA corp. I'll explain in a second what our structure is and I think you'll understand why we are in the domain name space. I'm also the former vice chair of the Canadian association of Internet Service Providers, and I had the privilege of serving as the chair of CIRA, so I have extensive experience both in the ISP world and the country code world. And, in fact, of the members of the ISP and ccTLD constituencies in the past, although currently I am only a member of the registrar constituency.

A disclaimer. I am here to educate. I am going to show you examples by certain registrars and companies. And I in no way am trying to say what what they're doing is wrong or outside their contracts. I believe that everybody in this space is entirely within their ICANN contract and their behavior is proper. So the examples I show are in no way meant to say that registrar is doing something wrong. In fact, just the opposite. I'm here simply to say this is what I see occurring in the real world. And my examples will lend itself to that.

Momentous.CA is made up of three main groups. We have the registrar group, which includes four brands, namescout.com and rebel.com, and interNIC.CA and domains at cost.CA. We have a company called pool.com, the drop-catching market, along with companies like SnapNames and eNOM. Also with companies such as CITO. Pool has been operating in that space. It operates primarily in the secondary space. Affiliated with pool.com, we own 104 registrars that are acquisition registrars that we use to catch the dropping names. Then we have a company called zip.CA, which is a DVD rental company that ships via mail, so you rent online. The first time we had to ship something physical.

Today, most of the talk will be contained to the knowledge of the registrar groups and certainly of pool.com.

Exhibit 35
Page 727

This is a standard life cycle graph that ICANN uses to talk about how the life cycle of a domain occurs. It goes from availability into being registered as it goes through a five-day add/grace period. It goes to being registered anywhere from one to ten years. As long as it continues to be registered, it continues to be alive. It then expires at some point. All domain names have an expiry date.

Typically, in the past, five to seven years ago, this was put into place. It's behaved that way right up until a couple years ago. The auto renew grace period, what happened, where a registrar has 45 days, so from zero to 45 days, this is where often a lot of confusion comes in, a registrar could say, "I don't need that domain name anymore." So on expiry, the domain renewed, and it was up to the registry to go in and say, "Delete this from the registry."

What happened seven years ago was, five days later, that domain would become available for registration, and a lot of people lost their domains because the five-day window was so short.

So what happened was the intellectual property group here at ICANN suggested the redemption grace period, which, for lack of a better term, is a 30-day holding period where a domain is held by the registry, the term they use is put on hold, where it doesn't resolve, it does not work. It's often the first alert that someone has to their domain has expired and is not working. And the registrant can get it back during that 30-day redemption grace period.

After that, it goes into a pending delete period, which nothing can come out of. So once it's in pending delete, there's no reversing it. That's a five-day period. The registries publish everything in the pending delete period. They're released for availability. That point of time is where the drop-catching occurs on the domains. The interesting thing, in most cases pending delete means it's going to delete absolutely. RegisterFly has a bunch of domains in the pending delete phase right now that are being held by the registry. We're not sure what's going to happen with them. They're not deleting, they're in pending delete, and they're extending past that five-day period.

So I can't comment on what ICANN or the registries are going to do with those. But every other domain I have ever seen, except for this most recent incident, goes through the pending delete with no way to get it out.

Most of what I'm talking about today are the changes during the auto renew grace period. So if you look at what happens during this period, it's very different than what happened five to seven years ago. You'll see how it doesn't actually, most domains don't actually come out and end up going through redemption grace period. Most domains are not deleted or go through a pending delete.

So most of my talk today is about this what I call the expiry period, or the point after the expiration of the domain, but before the deletion of the domain, where the domain name can be transferred or sold.

This is what actually is happening during that period. So a couple years ago, registrars realized that they were deleting domains, the drop catchers, such as pool and SnapNames, were very efficient at picking up, SnapNames pioneered the market years ago, back I think as early as 2000, 2001. And we were very efficient at getting these names for our customers. And the registrars realized they were deleting vast values of domain names that they actually had control over for a period of time before they deleted them. So what's happened and what you see happening today and I'll show a couple of examples in a second, is when the domain expires, the registrant is changed from the current registrant to the registrar, or a holding account for the registrar.

The registrars have typically implemented something that's very confusingly similar to the redemption grace period but is actually called the registrar grace period. It has RGP again. It lasts 30 days again, where the domain forwards to a pay per click page and a renewal. It also offers pay per click listings on. It there's typically a five to ten-day sale period where that registrar attempts to sell the domain name and then the domain is transferred to a new other than. So no longer are domains of any value deleting. What happens is the registrar takes control of them on the expiry date, the registrar watches the monetization of them for the 30 days. The registrar tries to sell the domain, and then the registrar transfers the domain to the new owner.

So this is a very different behavior than the domain being returned to the registry and it coming up again or the drop-catching.

What actually happens is a little more detailed. And I've drawn this other chart. When the domain is put up for auction -- and I should be clear that I know of only one large registrar that's not following this. So this is kind of de facto process for all registrars. Some have banded together and use a central service to sell them. Some are selling them on their own sites to their own clients. But by large, most registrars are monetizing the domains in these ways, certainly the vast majority of the 22,000 that delete every day have gone through process.

The first is did the domain sell at auction, if the answer is, yes, I was able to sell it and auction it, the domain transfers right away to the new owner. If the answer is, no, I had no bid on it, and bid typically starts around $60 for one of these deleting domains, then the registrar typically goes back and examines during the 30 days that I had it on this pay-per-click page for the last 30 days, do I project it'll make more than $6, the $6 cost. If the answer to that is yes, the registrar typically keeps the domain. And when I say that, I mean they may put it in a third company and they may have a deal with a third party to sell it. But, essentially, it does not delete. It's transferred by the registrar into an entity they own or have a participation in.

Exhibit 35
Page 728

If the registrar says, no, it's -- I don't think it's going to make $6, in other words, over the last 30 days, it's made less than 50 cents, for example, so it's not even going to cover the registry cost, then it deletes. So what we are seeing out of the deletion market are domains that are deleting that have value in terms of their pay-per-click value. So it's very radically changed the life cycle of a domain as domains with any value that had any Web site on them previously will not delete, and the only place you can get them is at the registrar that has them.

So let's take a quick look at this. I've used Network Solutions as an example here. I in no way mean to say there's anything untoward going on at Network Solutions. I believe everything they're doing is within their contracts and done properly.

So this is domain name called necktie.com. And necktie.com was owned by Huntington clothiers. I have to thank domain tools for the history here. They have given me all the past history, they keep the WHOIS history of all domain names. Right back to 2005, you can see hunting clothiers owned this domain name. Interestingly enough, I notice they have improper WHOIS phone numbers, but I don't think that really affected this at all. You'll notice the DNS is also stored at yahoo.com. What they did if you go to archives.org is they ran a store for neckties online.

Sometime in 2006, they switched over to Network Solutions privacy service. This is really neither here nor there in terms of the discussion today for what happens to the domain. You can see they still, as of September 2006, had a store running.

What's happened is Huntington went bankrupt and didn't renew their name. If you went to it prior to the organization, it says, we've shut down. We can't keep going. And we're basically closing the company. Here's our lawyers' name and number if you want to contact them.

The second the domain name expired, this was last month, you'll notice that the registrant has changed. So the registrant is now an entity called pending renewal or deletion. And the e-mail address is pending renewalordeletion@networksolutions.com. This is very important step. So, effectively, what happened is the registrar has taken ownership of the name. You'll notice the DNS server has changed to pendingrenewal -- it's forwarded to a pay per click site and a renewal site.

Network Solutions grants them the right, they still may renew that domain. They actually are no longer the registrant of that domain. That starts to affect a lot of things like UDRP and transfers. We'll talk about them in a second.

This is what happens to a domain that is after the expiry date, effectively, the former registrant is no longer the registrant, and although the registrar may keep in their database some right or some right of renewal for that, they're in no obligation to. Theoretically, they could transfer it to themselves and not give it back to the registrant and monetize it themselves. We haven't seen that. Typically, they're waiting the 30 days to see if the registrant wants to renew it. But contractually, they could if they wanted to.

Here's the WHOIS today, someone named Morgan Dunn, so from February to now, it's gone through the process of where it's been sold and transferred. A person by the name of Morgan Dunn now owns necktie.com. You can see a couple of important things in this record. Certainly the original record created, so the date the domain was created, was February 12th, 1997. That hasn't changed. This domain has been in existence since '97, it didn't go any process where it was deleted and started again. That date is critical because it's used in the UDRP process.

And, of course, there's the (inaudible) dot com. Here's the example of the site that we're talking about, the pay-per-click site this goes to. It's just a Network Solutions coming soon page. The only difference between this site and the one that says renew it is they put a box under the Network Solutions saying, click here if you're the former owner and you want to renew during the 30-day period.

I want to take a look at what I believe the effects on the redemption grace period are. I think there's a lot of confusion happening between the redemption grace period and what the registrars call the registrar grace period.

So the redemption grace period is an ICANN-mandated period that the registries have that when a domain is deleted and turned back to the registry, it has to be put on hold for 30 days before it is actually made available to someone else.

The registrar grace period is a period of time, typically now 30 days, but it could be shorter there's no contractual requirement for the registrars to offer it, that is a registrar-implemented period where the owner of the domain, the former registrant of the domain, rather, may choose to go and renew it back.

The interesting thing is, domains of value, if the domain has any value over $6, they're no longer entering the redemption grace period. It's very rare that we see any. In fact, recently in the market, about a month and a half ago, we saw about 150 domains delete that had significant value. We noticed our customers at pool were screaming. And all of a sudden back orders went way up for them. Those 150 domains were deleted because of a court order forcing the actual deletion where the registrar couldn't take advantage of them. The 150 domains were picked up by companies such as SnapNames and pool.com and sold for over $500,000, that one day's deletion. So the market that day for those 150 names was worth $500,000. But the former registrar could have just taken had it not been for the court order.

The domain in theory could be transferred to the owner the day it expires contractually. But they're saying, no, give it 0 days after

Exhibit 35
Page 729

the expiry dates.

The effects of UDRP, which is a more challenging one. I start with the premise is the UDRP becoming useless. There's two schools of thought on how UDRP works, and the powers that be, WIPO and the dispute forum, implement them differently.

The first school of thought was the original date of registration's very important, because the trademark holder must have that before the date of registration. This was all very good in 1999 and 2000, when most trademark holders were saying, we need something if we already have a trademark to go and get the domain name away from a person who is squatting. Most registration dates for domain names were back in the '90s, because they're not deleting and starting again. In the necktie example, the original was '97. It could change, and the registration date will always be 1997. Anyone with a trademark after 1997 will be unable to use any UDRP to get the domain name away from anyone who is abusing it. That isn't to say the new owner of neckties is abusing it. But the original registration date is very important.

If you look at the converse school of thought of, well, why don't we just simply say it's not the registration date, it's the contract with the registrar and any new contract with the registrar is important. You can't really do that, either.

So the challenge there would be, if you say that every new service contract with a registrar is effectively a new domain registration -- which technically it might be as you're entering into a new contract for that domain name for that period of time -- that would mean anytime someone transfers a domain name between registrars, it's a new contract and someone could argue it's UDRPable.

I'll give you an example that no one has done but will make you think a little bit, hopefully, of a little bit of camera.com, cameras.com, I believe there's an S, was sold for a million and a half dollars at the traffic conference, two conferences ago.

If someone was enterprising and knew how the system worked, what they might be able to do is go out and take a trademark very quickly, knowing that it was coming up for auction. Cameras.com sold for a million and a half dollars.

The registrant on it is actually the domain financing company that financed it for the owner.

So the registrant is not now the owner. It's the financing company, the mortgage company that holds it because they want to hold the asset until it's paid for by the person who bought it. But if you had a trademark before it and you were able to argue successfully that it wasn't the creation date that mattered, it was the new transfer date, so the date the new registrant took it over, you can UDRP against the financing company who had no rights in it when you have a trademark and you might be successful.

So clearly there are things happening in this marketplace, and I don't have the answer for them but it's not very simple to figure out what should we be doing to change this or should we be doing anything to change it.

But certainly that's what we see occurring in the marketplace.

But in either case there is a significant impact on the functionality of the UDRP given the domains I understand no longer delete that have any value and go through this process.

What is the effect on transfers? As a registrar we see transfers are no longer really possible after the expiry date. Theoretically they are but as a registrar, what we're required to do is get the permission of the current registrant that the domain is going to be transferred to us. As you can imagine, that's very tough when the current registrant is a holding company for a registrar and the e-mail address doesn't work. It works, but they won't ever say yes to the transfer.

They own that domain right now. They are the registrant for the domain. I say "own." They have the service contract with themselves for that domain right now, but the registrant is now the registrar.

So practically speaking, the only place that domain can be renewed is at the existing registrar and no permissions are possible to get or initiate the transfer away from that registrar.

So it absolutely effect RGP, UDRP and transfers.

We also have -- this is graphic that our graphic artist came up with. I said I wanted silos and they actually gave me a barn with silos if you can believe it.

We are also seeing the effect of registrar silos on the market. And what that means is we have one registry for com, for example, which is VeriSign. Typically what used to happen is domains went back to VeriSign and every registrar had an equal opportunity at it. Verisign was very good at making sure every registrar had the same access to the registry and that's what caused people to go out and buy large groups of registrants to get more access to the registry for their groups, if you will.

But what's happening now is the individual registrars are in fact becoming the de facto registry for that domain name. The only place you can get it is at that registrar.

Exhibit 35
Page 730

I've thrown some examples up here. I used Go Daddy, NetSol and eNOM, the three largest.

But if you wanted gradient.com, the only place you can get that domain name is at Go Daddy. If it's at Go Daddy now and it expires and doesn't renew, the only place you can get it is at Go Daddy. You cannot go to any other -- oh, jeez.

You cannot go to any other registrar and get that domain name.

It's only available there.

So what in effect we have created is silo registries where the users, the registrants who want to buy a domain, will have to be not only aware of what domain they want and what registrant it's at and whether it might be for sale at that registrant. There's a lot of work going on in that secondary market saying it is for sale and it's at Go Daddy. So I know a lot of people are working to make that smoother for the consumer but we are seeing a siloing of the actual domain names.

Let's talk a little bit about privacy services.

Privacy services are when a registrar puts their privacy name, their name, basically, on a registration. I think the first pioneer in this area really was Go Daddy with their domains by proxy service. Almost every registrar now has one.

The interesting thing is it makes transferring in this expiry period even easier because they are already the registrant of the domain name.

The curious thing I am concerned about privacy services, and I am not trying to pass judgment on good or bad, we certainly operate one, we operate privacy.ca which is our privacy service. But in order to make you aware, a bankruptcy or decision against a privacy service means that privacy service now owns a portfolio of domains that are an asset to the creditor of that privacy service.

So I can give you an example.

We currently have a lawsuit against a bunch of people that were committing fraud in our domain marketplace. We started a lawsuit, we sued all the registrants of the domain names and one of them happened to be a domain privacy service run by a registrar.

If we're successful in the suit, we would have a judgment against potentially against that privacy service, and if they were not able to pay the judgment, we could go in and say I want the 400,000 domains that are under that privacy service that they are the registrant of, even though they may be leased or committed to other people, that's an asset of that privacy service. So people need to understand what privacy service are and how they could be attacked or sold separately from a registrar.

It's also much easier to sue a UDRP in privacy service because the privacy service may have no rights to use the domain under a UDRP.

And we're seeing that, certainly, as well.

We're also seeing UDRPs happen very quickly. So for the first time ever our registrar saw one that came within five days of the domain being registered. So in that five-day grace period when the domain could still be deleted someone was able to get a UDRP off and get a process started and lock the domain down. That was the first time we saw that happen. The UDRP, intellectual property people are getting much faster at what they're doing and understanding the space much more.

Let's talk a bit about renewal practices. Typically about 30% of domains do not renew. There may now be incentive for registrars not to renew domains. And in fact, I believe over 50% of the domains in existence right now are for sale in one way or another, either through a portfolio holder, a domainer or a registrar's holdings but over half are for sale. And I have said for years now what we have called the secondary market is now becoming the primary market. So we keep referring to this orphan as the secondary market and if I can compare it to the housing market, and I know the next panel will talk in depth about this, but if I compare it to the housing market we would never think of the used housing market as the secondary market in homes. Only 10% of the houses sold in the world are new every year. 90% are used, and we are going to see that same trend in domain names, I believe.

So what we keep talking about as the secondary market is the primary market today.

To give you some example of the economics, a discount registrar might sell a domain and make a $2 profit on renewing a domain. He makes a much higher profit on selling that domain out of the secondary market.

Registrars owning portfolios -- let me talk a bit about domain portfolios and what the marketplace for that is happening right now.

A domain portfolio, a typical pay-per-click portfolio, that's a domain portfolio without marquee names, but you will have many marquee names like business.com and rebel.com that sold for millions of dollars in the past, those are names for a brand and I'll separate them from the pay-per-click portfolios, but a typical pay-per-click portfolio is worth eight to ten times the annual revenue of the pay-per-click portfolio. We have one worth about $3 million. That means that portfolio is worth on the market today 24 to

Exhibit 35
Page 731

$30 million.

So you can understand why the marketplace is moving that way.

The interesting thing is registrars are now being valued more for their portfolio than they are for their registrar business. So we have seen a couple of acquisitions with the Demand Media buying eNOM, where a media company is saying there's value in this registrar for other reasons other than just its registrar business.

A registrar makes very small margins on renewals. Typically they make 2 to 3$ for the discount registrars. Domain names in the secondary market go from between $60 as a starting point to $500,000, very typically. That may shock a lot of people, but we are regularly seeing at pool.com, once a week we'll have a domain for over $50,000 sell. I'm sure the other services such as SnapNames and SEDO are seeing the exact same pattern of more and more domains are selling for higher and higher values weekly. This isn't a once-in-a-lifetime occurrence, or business.com sold for $7 million.

There was a recent auction at the traffic conference in Las Vegas where, I believe it was well over $10 million in domain names changed hands in a two-hour live auction period. People are buying domain names in what I call the primary market now. And as domain names become more and more scarce for a brandable, good domain name, people will start buying it.

What the registrars are working towards very smartly is saying, hey, if someone comes to my site and says I want rob.com, right now all I do is I go to the registry and say is it available. Well, the answer is of course no, so I tell the customer no. But in fact rob.com might be available. It just might have a price tag of $10,000 on it.

So you will see a lot of companies over the next year to work together to see how we can figure out what this market is, this primary market that most refer to it as the secondary market and how can we get the consumers the domains they want. It just may have different price points on it.

But that is what a lot of registrars are going to morph into, I believe, is providing the names that people want. It just won't be at the $6 registry price with a small mark-up on it. It will be at whatever the current holder of the domain names wants, much like real estate is.

I will give you an example that may shock a lot of people. Marchex with a 300,000 name portfolio two years ago sold for $164 million. So a media company called Marchex bought a company called Altsearch for $164 million for 300,000 domain names. The same year, Network Solutions sold for 100 million, so less, and had over 7 million names in its portfolio. The 7 million names is really the registrant's and not the portfolio. Sure, true, but if 30% a year delete, that deletion out of the 7 million names is worth more than the $164 million Marchex paid. And it may explain why Network Solutions recently sold for between 8 and $900 million.

So the valuations now are not on just what a registrar is, but what portfolio of names it has under management that it may be able to monetize. And you need to keep that in mind when you are thinking about why is this occurring or why is the marketing changing. Because it is a free and open market, as it should be, with and the market will set the rules and dictate the values of domain names. And I know the next panel is going to talk quite a bit about the value of domain names and how you value domain names and whether it's pay-per-click or a marquee name.

So what's next? I think you are going to continue to see massive changes am this expiry market.

The market will continue to evolve. The market will get smarter. Registrars will start to work together, companies like pool and SnapNames and eNOM will start to work together to make the market more efficient because a more efficient market drives better revenue for everybody and a better consumer experience.

You are going to see more and more advertisers coming in to the pay-per-click market. So I know Google and Yahoo! have been predicting an increasing in advertising. We have been seeing it. The naysayers are saying it's going to die out, that's not what we are seeing. We are seeing more and more money flow into advertising on these domains.

We are seeing domains being bought from the $6 mark to the $4 mark thinking they have future value.

So the cutoff used to be domainers would say do I buy a domain that's less worth than what it cost me a year, and the answer was typically no. Now we're seeing that. So for the first time we are seeing domainers buy domain names down to the $4 mark.

And the domainer numbers are growing. This is becoming a very serious industry. To give you a comparison, the most recent traffic conference had well more than 500 people at it, which is more than will attend this ICANN meeting, and they all paid $2,000 a head for the privilege of attending a two-day session. This is becoming a very mature market with very serious players in it.

Companies such as Marchex are starting to play in it. This is no longer a couple guys sitting offshore doing this. This has become a standard for a public company to get into it and start to market grab domains and have a portfolio of domain names.

The other thing you will see is the new primary market will evolve. So we have to move towards something, and we will. The market will drive us there, and it already is, that says if a domain name is available for sale, I want to know what it is I can buy it at, and I'll trade at it and buy it.

Exhibit 35
Page 732

Recently we went out looking for another brand of a new service we are buying and we didn't go to the registry and see what domain was available. We went to the after market and went to SEDO and SnapNames and said what names are out there reasonably priced, say $50,000 or less, that we can grab to build the name of a company on and we in fact bought it and are building a company on that brand.

So that's what's going to happen in the future is companies are realizing it's not a $6 domain name anymore. These domains have value to them in acquiring them, and they are happy to pay the price to acquire them.

And I know those prices are going up and up as the market gets faster and faster and stronger and stronger.

And you will see the market and the commerce people and the registrars and the registries -- not so much the registries. More the registrars and the after markets, the domain marketplaces like SEDO and pool.com and SnapNames will rush to embrace what the consumers are demanding from them, which is give us a way to buy these names, tell us how they are for sale, tell us where we can buy them securely, because there is still a lot of unknown when buying a domain name. Where do I ask or how do I buy it.

But when that matures we will see a flourishing market that's very different from the last five or six years when you went to the registry and said can I get it for six bucks and you can get it.

I have my names and e-mail address there. I left a fair bit of time for questions, and I encourage it. I can also speak to the deletion market if you want, although I haven't touched much on that in my talk.

I will be happy to take 20 minutes for questions and answers and I see some people coming to the mike.

>>NIGEL ROBERTS: Nigel Roberts. Fascinating presentation. I made a couple of notes as you were going along.

You mentioned, and this is a passing comment, really, you mentioned at one point the registrant has a contract with itself.

I would hesitate to rely on the fact that you can have a contract with yourself. You must either have a contract with somebody or you've got hold of it some other way.

I'll put a list together in a minute.

Second thing is, it's a bit anti-competitive. The position whereby a domain never goes back to VeriSign, never goes back to the pool and you can only ever register that domain through one registrar, that kind of restricts competition, doesn't it, between the registrars.

Do you agree?

>>ROB HALL: Sorry, I thought you were going to -- I can answer your first one first, if I can.

>>NIGEL ROBERTS: Sure. Okay.

Okay. Let's hear your reaction to that.

>>ROB HALL: The registrar having a contract with themselves is an interesting conundrum, and what most have done is created a third party where they have a contract with them. So I wouldn't take that as a big a deal as it is. So most of the privacy services incorporate domains by proxy and that sort of thing.

I am not here to speak as to whether it's anti-competitive. I believe free and open markets create competition. I don't believe that the siloing, and I won't comment on whether it is or is not. I'm hear to educate and give a tutorial on what I see happening in the marketplace, Nigel. It's up to others to determine whether that's behavior is proper or not. I know it's contractually right, there's no rule being broken, and under the existing structure it's perfectly acceptable.

>>NIGEL ROBERTS: Those are two points that I wanted to bring up what from what you said, I flagged as you went along.

The really interesting one, the domain arrangement, let's not call it contract, the domain arrangement with the original registrant comes to an end, and the registrar hangs onto it; right? Then tries to auction it, puts it on pay-per-click for this 30 days and so on; right?

And maybe they will sell it to somebody else, maybe they will hang onto it. It depends on the maim.

>>ROB HALL: Or maybe the original registrant will renew it during that period. That's probably what most often happens.

>>NIGEL ROBERTS: That's probably the most common of those possibilities. But let's take the widgets scenario. You have widgets, incorporated. You own widgets.com.

>>ROB HALL: I don't own widgets.com. Nice try.

Exhibit 35
Page 733

>>NIGEL ROBERTS: You for whatever reason, similar to the necktie situation, you don't renew, you aren't interested, you have had enough. There's a company somewhere else, maybe a different country, maybe a different part of the country, widgets, limited or widgets something else, but they have a -- they have been trading for years, they use the name widgets. They, I would suggest, have some kind of rights in the name widgets. I'm not saying in the domain name: Rights in the name widgets.

During that period, during that 30 days, the registrar is trading off the rights of that other company, making money by pay-per-click, selling the domain name for greater than out-of-pocket expenses, is the expression I would use. Therefore, making itself, I would suggest, liable to UDRP or some kind of other dispute, legal action or something.

I would suggest that the registrant -- sorry, the registrar during that period might be seen to be acting unlawfully.

How would you react to that suggestion?

>>ROB HALL: I would react by saying ICANN's position is the registrant, by the WHOIS, is the registrant of record. UDRPs and lawsuits are brought against the registrant of record, so it is very possible, I would suggest, that somebody could UDRP a gain.

>>NIGEL ROBERTS: Pending renewal of deletion.com, for example.

>>ROB HALL: Whatever the entity is, sure. Could you UDRP against that? Yes, I think you probably could. Could you lawsuit against that? I learned from my friends the Americans, I am Canadian, by the way, the Americans have proved you can litigate anything you want.

Is it unlawful? No, I don't believe it's unlawful. Just like many people who own rights, and this is something we confuse. There are many people in many countries of the world that own rights. Yahoo is trademarked by six different companies in Canada have a trademark on yahoo. That doesn't mean yahoo has the sole rights of yahoo.com or yahoo.ca. That's why we offer a first come, first served business. Nor does the registrar have any obligation to go out to every person in the world who may have a right to that, whether to register it or not, and say this is for sale, although I'm sure they'd love to find a way to do that because, in theory, the people who want that domain would be exactly those people who might have a business or desire to run a business under it.

But certainly while the registrant of record changes, you can UDRP against that registrant, I'm not sure if that has ever been tried. It would be interesting to see what happened if they did. But certainly, yes, the registrant of record has changed on those domains. So factually it, would be possible, I believe.

>>NIGEL ROBERTS: Okay. I won't stop the others from coming to the microphone. I'll just say one final thing, though.

Everything you said so far leads me to think that domain names are becoming property.

>>ROB HALL: Well, I'll -- I know you stood away from the contract thing. But, technically, right now, they're a contract for service with a registrar and the registrar has a contract with the registry and a contract through ICANN. Currently, they're a timed contract for service. The other thing that you kind of alluded to is, what did happen that I didn't say is, registrars changed their conduct years ago to facilitate this. So registrars not doing something that the registrant wasn't informed of and isn't actually contractually bound to. So the registrant in their contract, should they go back and read them, for most registrars, are giving the registrar to resell that name.

And what you are seeing is different models from registrars as well, where some registrars are saying, "I'll give most of the money back to the original registrant that I get from auction. Why should I just let this go and no one get anything from it? Let me find a way." I think you're finding registrars are differentiating themselves in the marketplace saying, "I'll give back."

I'm sure Elliot is about to tell just how much money he will give back. I know he was one of the innovators saying, "We have this model and we have these resellers and there is value in this and how can we share it with our network?"

So I know this will be a market and it will evolve. And registrars will use it to differentiate themselves. And some may take the stance, we don't do this, and some may take the stance, we do, and some may give money back. But that will be the open marketplace working, and the consumer wins.

>>ELLIOT NOSS: Rob, again, very interesting. Thanks very much for this.

They were a few places where I think I factually disagree with you, and I wanted to poke at them.

RGP, UDRP transfers, the last comment on silo, you stated categorically, or it sounded fairly categorical to me --

>>ROB HALL: I should have preferenced my entire talk by "This is my opinion." I apologize.

>>ELLIOT NOSS: No, no, not that it was -- You stated what sounded to me as facts that registrars are now effecting a 30-day grace period as opposed to where it was previously a 75 or a 45 plus 30. I think that's factually incorrect. I think registrars are all over the place.

Exhibit 35
Page 734

Case 2:09-cv-00613-ABC-CW   Document 122-6   Filed 12/03/10   Page 31 of 34   Page ID
#:3271

I think with the secondary market, we have seen some shorten their windows inside of the 30 days. We've seen some stay around that point.

For us, who are certainly active in the secondary market and have been for a little over a year now, we are not only respecting the 75-day period -- I don't know if we're the only ones that are -- but we actually are finding the ability to step past it.

You know, prior to this evolution in the market, you know, the one thing we were guaranteed of is after 75 days, a valuable name, which as you know is just about anything with any traffic associated with it, would go through you, through SnapNames, through, you know, the one or two others, to somebody. And we had no recourse anymore to get it back.

We've given names back outside of the 75-day period, in appropriate circumstances.

And, you know, have found that this market evolution is, in fact, helping us protect registrants' interests with a greater degree than before.

And I think that --

>>ROB HALL: I would agree. Registrars are going to differentiate themselves.

>>ELLIOT NOSS: There was -- that 30-days that sounded pretty categorical to me. UDRP, you're fixed on a registration creation date. It's my experience, I've been in all three sides of UDRP, kind of trying to get names back, being taken on as a name owner and, obviously, as registrar. I think you don't give the intellectual property lawyers and the folks who handle the arbitrations, the UDRPers, nearly enough credit. It will take no time if it hasn't happened already for them to do exactly what you did with the domain tools and others to back-create that data.

You know, we've had a couple recently where, you know, creation date was -- the only relevance to creation date was how it related to the UDRP claimants' ability to say, hey, this is something horrible.

And that would be true in the neckties.com example, no matter who the owner was.

So I -- really, personal experience -- let me just conclude on that.

Personal experience -- and I'll let you respond to it -- is that that is not at all a significant factor in UDRPs.

>>ROB HALL: Let me respond to your first and then the second.

I will state -- I'll make it categorically -- I think you are the only registrar offering the 75 days, to be quite honest. You're far beyond anyone else.

>>ELLIOT NOSS: Thrilled to hear that.

>>ROB HALL: The average is 30, we are seeing some less than 30. Registrars are trying to duplicate a 30-day period where they hold onto the domain in some form before they sell it. Some are going less, some may get down to the zero day, which is what I fear, quite frankly. Which is the second it expires, they're gone, and that's their contractual right. And registrants may pick other registrars. You are one of the few, if not the only that I know of, that extends it past the 45 days where you've got an offer for a domain but still give the other person some rights back to it.

So I congratulate you for that. That certainly is right.

My point that I was trying to make is, I believe the UDRP was written -- I'm not an intellectual property lawyer, and I thank God sometimes -- that it was written with the creation date in mind. Yes, I agree we're moving more and more away from that. But where do you start arguing that. Do you argue that the transfer date or the new registrant date is the one most important. If we go down that road, you're going to see different games being played through the UDRP where someone starts attacking with the UDRP to take a domain name away from a new registrant that may not have as many rights as they do.

>>ELLIOT NOSS: Creation date only really relates to the sort of bad faith on both sides of the issue.

You made it sound -- If I was an intellectual lawyer listening to that, I would have heard, "Oh, my God, UDRP has become toothless." And I think that this issue is bordering on insignificant as it relates to UDRPs.

The third issue was transfers, where you seem to suggest that it's evolution in the market that has affected a registrant's right to transfer after expiry in that first 30-day window. That's what you categorically said.

>>ROB HALL: Let me stop you. The registrant is no longer the original registrant. So when I say the registrant's right to transfer, the registrant now is the registrar at that point.

>>ELLIOT NOSS: In the first 30-day grace period?

Exhibit 35
Page 735

>>ROB HALL: In the first 30-day grace period. That's the example I showed with Network Solutions.

>>ELLIOT NOSS: The point is still germane, which is that as far as I think, again, we may be the only ones, if we still do, who has, for any amount of time, allowed transfers in that first 30-day grace period.

As you know, that was one of the first things with the new transfer policy that registrars said was, hey, I'm owed money, that's one of my means to deny it. And registrants are locked into their previous supplier, and unable to transfer in the 30-day grace -- in the 30-day grace period in any event. So I think that's independent of what we're seeing here.

>>ROB HALL: The transfer policy I think clearly says that's not a permitted reason to deny is during that 30-day period. But the problem is now the registrant changes.

>>ELLIOT NOSS: You have one of two --

>>ROB HALL: Second the registrant changes, you're beat. The registrant is no longer the original, it's the registrar.

>>ELLIOT NOSS: I don't think that has changed registrants' rights at all as it relates to the evolution of the market. And you may have highlighted a significant enforcement problem that we have at an industry level, which is something that we'll be discussing a lot later in the week.

>>ROB HALL: I'm sure we will. But the fact remains that -- I get what you're saying. The original registrant rights may not be affected.

(Multiple people speaking simultaneously.) Talk

>>ELLIOT NOSS: If you're the registrant today, the previous registrant today, you still couldn't transfer in that period, with overwhelmingly every registrar in the industry. I'm just saying it hasn't changed. And to attribute that change to the secondary market is inaccurate.

>>ROB HALL: We disagree. I believe the second the registrant has changed, that the expiry phase, as the example I showed with Network Solutions, you can send all the e-mails you want trying to get an authorization to transfer that domain to that address. You'll never get a yes.

>>ELLIOT NOSS: I'm saying that was the case before.

>>ROB HALL: I see, you're saying it hasn't changed.

>>ELLIOT NOSS: Yes.

The last bit with silos, I think that that was creative. However, it's certainly my view -- I feel those three were factual -- this is my view -- that what we've moved to now is simply different silos, that they were large silos before -- yourself, SnapNames, eNOM, may be one or two others -- but, really, you three overwhelmingly dominant in terms of the ability to acquire names outside of primary registration. Same silos, just different silo owners.

>>ROB HALL: Different competitive market, though, Elliot. There was nothing to stop eNOM to get into it or pool.com from creating itself. It's really different with an incumbent registrar.

>>ELLIOT NOSS: Significant barriers to entry if someone looked at competing with you, there's significant barriers to doing it.

>>ROB HALL: Let me look at something that may change your mind. If you had seen something that we're doing in the marketplace now two months after Network Solutions was created, would you have the same opinion? If there was a dominant registrar that owned 98 Paul Stahura of the domains out there and they were doing this, we'd all be screaming about the silo.

>>ELLIOT NOSS: You're 100% right. It's a question of context. Rob, you know, as I've said to you privately any number of times, my hat's off to you for being incredibly creative and opportunistic and a great businessman in creating this evolution. So all credit to you.

But, again, to the folks out here who are thinking about this often with registrant hats on, it's same day, different silos.

>>ROB HALL: I'm not sure I agree, but okay.

Yes, sir.

>>WOLFGANG KLEINWAECHTER: We had a similar debate just a couple of months ago in a meeting organized in Switzerland in Baden, organized by Switch, about this.

And a lot of legal issues have been raised. And I'm interested in your comments, what you think about this.

Exhibit 35
Page 736

A little bit about this, whether this is property or not. You compared it with real estate. The question was, if it's like real estate and you invest in this, can this be taken to your tax record? Is this -- are -- is this investment taxable that you have to pay taxes like you have to pay taxes, you know, for real estate?

And then what if you die, do your children have a right to continue with the name? They have to give it back? And what all the legal implications? And there was no answer in the meeting in Switzerland. It was only the issues were raised.

I'm interested in what you think about this new market, the high investment, the question of ownership of property, of taxation, and all of these issues.

>>ROB HALL: It's a thorny issue. So here's my opinion. I'll clarify it with that. Because I am not a lawyer and I do not want to give legal advice here.

But my opinion is a domain name is a service contract. It is not property. And the word "property" has a very specific meaning in law. And you gain all kinds of property rights in most countries as soon as you have that.

It is a contract for service that is not property.

And my example of the marketplace of new and old houses was not to imply that domain names are property but rather to illustrate a market where something is -- you've got incumbents that are old that are sold in more volume than the new.

I do believe that a domain name is a service contract. And I do believe it's an asset. And that's where a lot of confusion comes in, because then the intellectual property group comes in and says, well, it's intellectual property. It might be intellectual property, but that doesn't make it real property. And that'll upset a lot of intellectual property lawyers, and there's law firms that have debated this for years.

So I believe it's an asset, absolutely. And as an asset, I believe a company or an individual can own it and it can be transferred, transferred by will, transferred when you die. So, yes, it is absolutely an asset that you have, but it is not true property in the terms of property rights and property taxes and -- you might argue the ICANN 25-cent tax is a property tax and try and write it off on your tax bill. But I'm not sure you'd get away with that, to be quite honest. I'm not sure the governments would see it as a proper tax.

So, no, I don't believe a domain name is property. I believe it's an asset. It is intellectual property. It can be made to be intellectual property through the use of trademarking a domain name.

But it is not -- it is not -- it is not real property like a house would be.

Any other questions or --

Yes, sir.

You might want to go up to the mike. I think we're webcasting.

And the stenographers need you to identify yourself.

I'm sorry.

>>BERNIE TURCOTTE: Bernie Turcotte, hi, Rob.

Just for fun, though, if some court somewhere does declare domain names as property, what do you think the impact would be?

>>ROB HALL: It'll certainly change -- it'll certainly change this marketplace.

It'll bring up the jurisdictional question immediately of what jurisdiction is the domain name in, ==we have a very inventive registrar out of India that's offering a service to domainers at the last traffic conference that says, look, I'm a registrar in India, I will incorporate you a registrant in India, and I will put all your domains in that registrant with our registrar, so that if anyone ever UDRPs, even if they're successful, the only court you can turn to or go to is the Indian court. And, by the way, I'll even start that action for you, they claim, and I guarantee you it'll take at least ten years to get through any Indian court. So you can continue to own and operate that domain for ten years, even if you lose a UDRP.==

So jurisdiction is starting to become a huge thing in domain names. I think if a domain name was seen to be property, you'd have governments, all different governments have different property rights, some are more liberal than others. In China, I would imagine there's almost none compared to the U.S. or compared to Canada.

But certainly that would change the ability of a domain name to be awarded via a service contract with registrars. We may have to change the way we think about domain names, whether they can ever expire or not. Maybe they cannot expire, maybe registries aren't allowed to charge every year, maybe it's yours until you decide to sell it. It certainly would change the entire industry as we

Exhibit 35
Page 737

know it if a domain name was property. And I think it would probably take more than one court.

What would happen is if the U.S. courts all said domain names are property, immediately, registrants would flood to jurisdictions that weren't in the U.S. where they weren't property, or perhaps the reverse would be true, perhaps you might get a small country like Barbados, saying domain names are property and everyone floods there.

It would certainly bring the jurisdictional card into play, which I think is important, but registrants don't seem to be as cognizant of. And it would certainly give them rights that they do not enjoy today. I would have to let the lawyers speak to what those rights are. A couple of lower courts, I believe in Canada, have found them to be property, and it's working itself through the appeal process. And I'm hopeful that it will not found that, because it would certainly affect our business in Canada, and I think yours as a registrar.

I think Tim has asked me to wrap it up. I thank you for your time.

They're going to be talking more about what I started, which is how do you value domain names and what is the market for domain names and why I think it will become the primary and no longer be referred to as the secondary market in a couple of years. Thank you.

[ Applause ]

>>TIM COLE: Thanks, Rob.

We'll take about a ten-minute break and then the other group will be up here to start over again. So we'll give the scribes a chance to take a break and give the other folks here, everybody out here. Thanks.

%%%l2end.

Exhibit 35
Page 738