BRET A. FAUSETT, CA Bar No. 139420
Email: bfausett@alvaradosmith.com
ALVARADOSMITH, APC
633 W. 5th Street, Suite 1100
Los Angeles, CA 90071
Telephone: (213) 229-2400
Facsimile: (213) 229-2499

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| VERIZON CALIFORNIA INC.; VERIZON TRADEMARK SERVICES LLC; and VERIZON LICENSING COMPANY,<br><br>Plaintiffs,<br><br>vs.<br><br>LEAD NETWORKS DOMAINS PRIVATE LIMITED; NARESH MALIK a/k/a NICK M.; MAHESH MALIK; KEVIN DASTE; and DOES 1-100,<br><br>Defendants. | Case No. CV 09-00613 ABC (CWx)<br><br>**RECEIVER'S RESPONSE TO OBJECTION OF NARESH MALIK TO APPOINTMENT OF PERMANENT RECEIVER**<br><br>Hon. Audrey B. Collins |

## I. INTRODUCTION

On April 13, 2011, Judgment-Debtor Naresh Malik ("Malik") filed the Objection Of Naresh Malik To The Appointment Of Permanent Receiver ("Objection"). Docket Entry 138. On April 18, 2011, the Court granted the Receiver leave to file a response no later than Monday, April 25, 2011, which responds to the objections directed specifically to the appointment of the receiver. Docket Entry 140. The Receiver now files this Response in accordance with the Court's April 18th Order.

## II. MALIK'S OBJECTION TO THE TERMINATION OF THE ARBITRATION PROCEEDING IS UNFOUNDED BECAUSE THE COURT ORDERED LEAD NETWORK'S ICANN ACCREDITATION BE DISSOLVED AND TENDERED BACK TO ICANN

Malik takes issue with the Receivership's terminating the arbitration between Lead Networks and ICANN because Lead Networks' accreditation "[was] [o]ne of the most valuable assets of Lead Networks." Objection, Pgs. 9. More specifically, Malik states that, "[w]hen the receiver was appointed as temporary Receiver and given complete control and authority over Lead Networks, he proceeded to use his authority to terminate the arbitration proceeding." Objection, Pgs. 10. Malik is correct in stating that the Receivership terminated the arbitration; however, given the financial circumstances surrounding the Lead Networks registrar business, and the Court's order the Receiver to terminate Lead Networks ICANN accreditation Malik's objection is unfounded.

By way of background, upon my appointment as receiver, I inventoried the domain names under management at the registrar to determine assets, liabilities and the prospect of running of Lead Networks as an ongoing business. At the outset of my appointment, my strong desire was to put the registrar in sufficient shape that it could be sold for value to another registrar. I also learned that ICANN had refused to renew Lead Networks accreditation, and that Lead Networks had initiated an arbitration proceeding against ICANN in an effort to retain its accreditation.

I shared details of the Lead Networks business with five leading North American registrars to look for the best price. Given the preponderance of names inside Lead Networks that were either (a) cybersquatted registrations of major U.S. brands or (b) registrations to customers based in India, all but one registrar declined to bid for the business. The prospective purchaser's concern was that

1  most of the domain names inside Lead Networks would not stay at the successor
2  registrar for more than a year; they would either be transferred to a U.S. brand
3  owner's registrar of choice or they would be transferred to an Indian-based
4  registrar. On that analysis, the prospective purchasers did not believe that they
5  could hold the names long enough to recoup the costs of transferring the domain
6  names, processing the new customers, and dealing with the legal issues certain to
7  arise from acquiring a portfolio of cybersquatted domain names. The one U.S.-
8  based registrar who submitted a proposal asked that *I pay it* to take over the
9  business; no value would have gone from the registrar to the receivership. I also
10 talked to a leading Indian-based registrar about acquiring the business, and again,
11 I was told that the company did not wish to make a bid.

12     Shortly after taking over as receiver, I also learned that Lead Networks had
13 substantial unpaid debts to Verisign Registry, the company responsible for the
14 .COM and .NET registries, of $66,000, plus unpaid ICANN accreditation fees of
15 over $5,000. Lead Networks had no money on account with Verisign, in violation
16 of its registry accreditation contract, or with ICANN to pay these incurred fees,
17 and revenue from the business was not sufficient to pay them and continue to
18 operate.

19     Rather than incur additional legal and expert witness fees on Lead
20 Networks' behalf in the arbitration with ICANN, I met several times with
21 ICANN's representatives and counsel and negotiated a stay of the ICANN
22 termination proceedings.

23     During the stay, and with assistance from Verizon's counsel, I identified a
24 number of client accounts which I believed were actually the assets of the
25 Defendants. Each of these accounts consisted almost entirely of cybersquatted
26 domain names. By Court Orders (Docket No.102 and 112) these domain names
27 were transferred to an account held by the Receivership at a U.S.-based registrar.
28

1   With no market for the registrar, no money on account, and significant debts, I believed that the best course was to wind down the business. On July 13, 2010 I filed a Status Report with the Court in which I stated, "I have concluded that the best option is to formally dissolve the accreditation of Lead Networks, tender the Lead Networks registrar accreditation back to ICANN…" Receiver's Status Report, Docket Entry 111.

On July 14, 2010 the Court entered its Order, which states in pertinent part, "… that the Receiver is authorized to formally dissolve the Lead Networks registrar accreditation by tendering it back to the Internet Corporation for Assigned Names and Numbers ('ICANN') and to work with ICAN as necessary to wind up any registrar accreditation issues," terminating the arbitration was both necessary and appropriate. *See,* July 14, 2010 Order, at para. 15, Docket Entry 112.

A substantial number of the remaining domain names were registered to customers based in India. As a consequence, I worked with ICANN to find candidates for an appropriate Indian based company to take over customer service of the remaining customers. Again, I first attempted to sell the Indian customer base for value to an Indian successor registrar, but I was not able to find a buyer. Accordingly, on August 29, 2010, I tendered the Lead Networks' accreditation back to ICANN and asked that Answerable.com PVC, a Mumbai, India-based registrar, be appointed by ICANN as the successor registrar. ICANN accepted both the accreditation and my recommendation for a successor registrar, and an announcement was posted on the ICANN website on August 24, 2010. *See*, http://www.icann.org/en/announcements/announcement-2-24aug10-en.htm.

In view of the following information, and the Court's July 14, 2010 Order, the termination of the arbitration and winding down of Lead Networks' registrar business was both necessary and appropriate, and Malik's objection is unfounded.

### III. MALIK'S OBJECTION TO THE LOSS OF REVENUE FROM HIS DOMAIN NAMES IS COUNTER TO THE COURT'S ORDER TRANSFERRING HIS DOMAIN NAMES TO THE RECEIVERSHIP ESTATE

Malik now objects to the Receivership because revenue earned from the seized domain names is being paid to the Receivership estate rather than to the Judgment-Debtors, including Malik. Malik also contends that, now that the Receivership estate is being paid the revenue, that monetizing these domain is improper. *See*, Objection at pg. 10.

As a result of the Court's Order establishing the Receivership estate and authorizing the transfer of Judgment-Debtors' domain name assets to Receiver estate, approximately ten thousand domain names have been transferred. *See*, Orders of this Court (Docket Nos. 102 and 112).  Many of the domain names seized were being monetized through the use of parked pages and advertising accounts, and notwithstanding the Receivership's seizing of these domain names, that revenue was continuing to be paid to Judgment-Debtors by the monetizing company, Domain Sponsor.

In order to seize this revenue for the estate, rather than having it paid to the Judgment-Debtors, I directed Domain Sponsor to pay any revenues earned from these domain names to the Receivership estate.  The estate has used these revenues to partially defray the substantial costs of renewal the seized domain names.  Absent these revenues, the estate would be unable to pay the renewal costs and many of the domain names would expire—and the domain names would subsequently be reregistered by other cybersquatters. Additionally, the substantial cost required to change the *status quo* for each of the approximately ten thousand domain names would jeopardize the financial viability of the estate.

The Receivership recently began the process of identifying and contacting trademark owners regarding the seized domain names and the trademark claim

program authorized by the Court. As this effort proceeds, and those domain names which infringe trademark owner's rights are transferred to the owners, each trademark owner will be able to choose how to use the respective domain names.

## IV. CONTRARY TO THE ALLEGATIONS IN THE OBJECTION, NO DOMAIN NAMES HAVE BEEN SOLD

In his Objection, Malik claims that, "Upon information and belief, the receiver has sold domain names containing trademarks to entities who are not the trademark owners in contravention of the order of the Court." Objection, pg. 11.

Although I have received offers to buy domain names held in the receivership, I have not sold any domain names. Moreover, Malik claims that the domain names myxter.com; myxerstune.com; olayhousedisney.com; and sketchersboots.com were sold by the Receiver. Objection, Pg. 11. Malik is mistaken as no domain names have been sold. Similarly, I have not solicited any buyers to purchase any domain names, nor have I placed "for sale advertisements" on any domain names.

As discussed above, approximately ten thousand domain names have been transferred into the Receivership estate as a result of the Court's Orders. *See*, Orders of this Court (Docket Nos. 102 and 112). The transfer of these domain names was achieved over several months (as domain names were traced to the Judgment-Debtors), and in multiple batches, via direct registry transfer. Due to the multitude of transferring domain names, a very small number of domain names (it appears that less than .01 of the domain names) were inadvertently allowed to expire. Once this error was identified, the process used to renew domain names was corrected. Similarly, Malik objects because the domain name ExxonMobilCard.com was inadvertently allowed to expire. *See* Objection, at pg. 11 ("the Receiver has negligently let the domain names expire without renewal"). While Malik is correct that this domain name, and several others, did expire, this

was due to inadvertence and not negligence. To date, the Receivership has spent over $59,000 on domain name renewal fees.

Additionally, approximately 15 domain names have been transferred to companies that prevailed in UDRP proceedings in accord with Lead Networks' contractual obligations as an ICANN registrar. In these circumstances, the transfers were made to a party who had valid trademark rights, and who had prevailed in a UDRP proceeding against the domain name. Further, these transfers were made only after a legal review of the published UDRP decision.

## V. MALIK'S CLAIM THAT THE RECEIVER HAS TRANSFERRED MANAGEMENT OF DOMAIN NAMES WITHOUT COMPENSATION TO LEAD NETWORKS IS FACTUALLY INACCURATE

Malik claims that "the Receiver has given the management of the domain names of Lead Networks to anther registrar without any compensation payable to Lead Networks. Objection, pg. 11.

As discussed above in greater detail, this plainly misstates the value of the Lead Networks' and ignores the actual state of affairs of the registrar business. It also is inconsistent with my findings when I attempted to sell the registrar business (to no less than 6 other ICANN registrars). As I stated above, based on my diligent inquiries and the nature of the domain names under management, I do not believe any reputable registrar would have bought Lead Networks.

## VI. CONCLUSION

In sum, none of the basis for Malik's Objection has merit. The Receivership has secured approximately ten thousand domain names—almost all of which infringe the rights of famous trademark owners—which belonged to the Judgment-Debtors. The process of researching and locating these assets, as well moving them under the Receivership estate's control, has been challenging and time-consuming.

The Receivership recently began the process of identifying and contacting trademark owners regarding the seized domain names and the trademark claim program authorized by the Court. This effort will return those infringing domain names to the trademark owners over the next several months. The Receivership will also auction the non-infringing domain names owned by Judgment-Debtors.

DATED: April 25, 2011

Respectfully submitted,

ALVARADOSMITH
A Professional Corporation

By: /s/ Bret A. Fausett
BRET A. FAUSETT
Court Appointed Receiver

# PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is ALVARADOSMITH, 633 W. Fifth Street, Suite 1100, Los Angeles, CA 90071.

On **April 25, 2011**, I served the foregoing document described as **RECEIVER'S RESPONSE TO OBJECTION OF NARESH MALIK TO APPOINTMENT OF PERMANENT RECEIVER** on the interested parties in this action.

☒   by placing the original and/or a true copy thereof enclosed in (a) sealed envelope(s), addressed as follows:

>   Naresh Malik
>   B-505 Florida, Y11, Shastri Nagar
>   Lokhandwala Complex
>   Andheri (West) Mumbai, 400 053
>   India

☒   **BY REGULAR MAIL:** I deposited such envelope in the mail at 633 W. Fifth Street, Los Angeles, California 90071. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with this firm's practice of collecting and processing correspondence for mailing. It is deposited with U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

☐   **BY FACSIMILE MACHINE:** I Tele-Faxed a copy of the original document to the above facsimile numbers.

☐   **BY OVERNIGHT MAIL:** By placing the document listed above in a sealed envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a Federal Express and/or Overnite Express agent for delivery.

☐   **BY ELECTRONIC MAIL:** I served the foregoing document by electronic mail to the email address(es) listed on the service list.

☐   **BY PERSONAL SERVICE:** I caused such envelope(s) to be delivered by hand to the above addressee(s).

☒   (Federal) I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.

Executed on **April 25, 2011**, at Los Angeles, California.

*/s/ Liliana Hernandez*
Liliana R. Hernandez